FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ FEB 14 2011 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------ X

Point 4 Data Corporation, and Dynamic
Concepts, Inc.,

               Plaintiff,

    vs.

Tri-State Surgical Supply & Equipment, Ltd.,
SJ Computers, Inc., and Shmuel Judkovitz

              Defendants.

------------------------------------ X

INDEX No.

# CV 11 - 0726

**COMPLAINT FOR DAMAGES AND
PRELIMINARY AND INJUNCTIVE
RELIEF**

DEARIE, CH. J.

MANN. M.J.

Plaintiffs Point 4 Data Corporation, f/k/a D.S. Burden, Inc., and Dynamic Concepts, Inc., a

California corporation, allege as follows:

## NATURE OF THE ACTION

1.     This action arises out of the unlawful efforts of Defendants to "crack" the security

protections of the plaintiff's proprietary software programs, in order to circumvent licensing

restrictions on the use of those programs, avoid paying additional licensing fees and, and to

illegally copy protected and copyrighted content.

2.     Defendant Tri-State Surgical Supply & Equipment Ltd. ("Tri-State") licensed the

plaintiff's software programs for many years.   Recently, Tri-State sought to upgrade their

versions of these software programs and transfer them to a new server.   Under the terms of the

license agreements between Tri-State and Plaintiffs, Tri-State was required to seek the consent of

Plaintiffs and pay additional licensing fees as appropriate.   Indeed, plaintiff Point 4 Data

Corporation explained these facts to Tri-State in response to Tri-State's specific inquiry last year.

3.      Rather than abide by its contractual agreements, however, Tri-State decided to try to save itself some money by breaking the law.  It retained the services of defendant Shmuel Judkovitz ("Judkovitz") and directed him to find an unauthorized "do-it-yourself" solution to Tri-State's software problem that would not involve Tri-State paying licensing fees to Plaintiffs. Judkovitz's fix, conducted with the knowledge and assistance of Tri-State, involved disabling and circumventing the security measures used by Plaintiffs to protect the copyrighted content of their proprietary software.  After "cracking" the plaintiff's security protections, Judkovitz, on direction from Tri-State, unlawfully copied over the plaintiff's software code to a new Tri-State computer server.

4.      Plaintiffs now bring this action to protect the integrity of their copyrighted, proprietary software, and to enforce their existing licensing agreements.

## JURISDICTION AND VENUE

5.      This action arises under the Digital Millenium Copyright Act, 17 U.S.C. § 1201 *et seq.*, the Lanham Act, 15 U.S.C. § 1125, and New York state law.

6.      Jurisdiction is conferred on this Court pursuant to 28 U.S.C. § 1338 and with respect to claims under state law, by the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

7.      Venue is properly laid in this District under 28 U.S.C. §§ 1391 and 1400, as a substantial part of the events giving rise to this claim occurred in this judicial district and, on information and belief, the principal places of business of defendants Tri-State Surgical Supply & Equipment, Ltd. and SJ Computer Inc. are both in this district, and individual defendant Shmuel Judkovitz resides in this district.

## THE PARTIES

2.

8.     Plaintiff Point 4 Data Corporation, ("Point 4"), f/k/a D.S. Burden, Inc. is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of California.

9.     Plaintiff Dynamic Concepts, Inc. ("Dynamic") is, and at all times herein mentioned was, a corporation organized and existing under the laws of the State of California. Point 4 and Dynamic shall collectively be referred to as "Plaintiffs."

10.     Defendant Tri-State is, and at all relevant times hereinafter mentioned was, a corporation organized and existing under the laws of the state of New York, with its principle place of business in Brooklyn, New York.

11.     Defendant SJ Computers, Inc. ("SJ Computers") is, on information and belief, a corporation organized and existing under the laws of the State of New York, with its principal place of business in Brooklyn, New York.  On information and belief, defendant Judkovitz is the Chief Executive Officer of SJ Computers.

12.     Defendant Judkovitz is an individual who, on information and belief resides, and all relevant times hereinafter mentioned resided, in Brooklyn, New York.

## FACTUAL ALLEGATIONS

13.     Point 4 owns the exclusive rights to the GENESYS Distribution Accounting System ("Genesys"), an automated accounting and management information system.  Point 4 distributes Genesys software to customers through software licenses, with licensing prices based in significant part on the number of users who will have access to the program.

14.     The Genesys software is designed to operate with UniBasic, an interactive computer development language that operates on a wide range of Unix-based computer systems. Dynamic is the creator, developer, publisher and licensor of the UniBasic software.  Dynamic

3.

distributes the UniBasic program to customers through software licenses, with licensing prices based in significant part on the number of users who will have access to the program.

15. Both UniBasic and Genesys software employ security measures to prevent unauthorized access to the programs by unlicensed users. UniBasic is protected by a proprietary software algorithm that matches a unique license number for a given server with a unique activation code in the software. The unique server license number may be either contained within a physical "dongle" or derived from the server's configuration. In order to execute properly, the program requires a proper match and decryption of the unique server license number and the activation code at each point of start up. Upon start up, UniBasic displays a start-up screen that contains the unique license number. The proper match and decryption will not occur if, among other things, the server is unauthorized or if the number of users accessing the software exceeds the number permitted under the license.

16. The security measures of Genesys are interconnected with UniBasic's licensing security scheme. Each Genesys installation on UniBasic generates a unique "key," which controls access to the Genesys code and is also tied to the security algorithm of UniBasic (which is necessary for Genesys to run properly). The key controls security for Genesys by regulating access to UniBasic, verifying the number of users authorized to access UniBasic, and defining the proper operating system on the hardware. Therefore, the key effectively controls the number of valid Genesys users on a particular system and prevents the unauthorized transfer of the software to other systems. Due to the design of UniBasic's security scheme, with which Genesys is interconnected, transferring Genesys to another server or computer system requires either obtaining authorization or circumventing the security measures of Genesys and/or UniBasic.

4.

17.     Tri-State has supplied a variety of hospital and surgical products to nursing homes around the country for over 20 years.  Sometime during the 1980s, Tri-State acquired software licenses for the Genesys software.  Tri-State uses the Genesys program to assist in its business, and has modified and added functions to the program as its business has grown and its computer functions have increased in scope.

18.     In the Spring of 1999, Tri-State approached Point 4 in order to, among other things, upgrade the Genesys program and prepare for and remedy the anticipated Y2K problem before January 1, 2000.  Point 4 had a particular appeal to Tri-State because Point 4 had greatly improved the Genesys software with many added features and functions, and it was thought that by retaining Point 4 to perform all the required services, the transition from an earlier version of the Genesys software to a new upgraded Genesys program would be easier for Tri-State.

19.     On or about August 31, 1999, Point 4 and Tri-State entered into the Equipment Purchase, Software License, Programming and Installation Services Agreement (hereafter "Agreement") to permit Tri-State to use the Genesys software.  Annexed to and incorporated into the Agreement was a license agreement between Dynamic and Tri-State to use the UniBasic program, which was necessary for Tri-State's proposed upgrade.  A copy of the written Agreement, dated August 31, 1999, is attached hereto as Exhibit A and incorporated herein by reference.  Among other things, the Agreement provided as follows:

(a)     In Paragraph 1, incorporation of the terms and conditions contained in the annexed Purchase Agreement and in any attachments attached to the Agreement, including but not limited to, the Dynamic Concepts, Inc. Software Selection Number and License Agreement issued on September 21, 1999, IRIS 6.01.01[48]

5.

aka UniBasic version 6.X (48 user license) (hereafter "Dynamic License") and the Genesys 4.0 license dated August 31, 1999 (hereafter "Genesys License");

(b)     The Dynamic License (attached to the Agreement) provides, among other things, that the UniBasic program is to be used on a single computer system, is transferable to an identical hardware platform only with preauthorization from Dynamic, that Tri-State may not reverse compile or disassemble the software or make any attempt to bypass the security provisions of the software selection number or the single computer system license, and that Tri-State has no other right to export or re-export the software;

(c)     The Genesys License (attached to the Agreement) provides, among other things, that in order to gain access to the source code, file structure and related materials, any outside (i.e., non-Point 4) programmer must have on file a Contractor Confidentiality Agreement ("Confidentiality Agreement") with Point 4, which provides that consent to use by such contractor of the Genesys software is conditional on use by the contractor solely for maintenance of the Genesys product or enhancements or new modules while under contract or agreement with Point 4;

(d)     In Paragraph 2, Point 4 agreed to sell, furnish, and install the equipment and software listed in the Agreement, including the licenses and sublicenses required to use any of the software programs, so as to enable the operation of the computer system of Tri-State at its headquarters and all designated branches;

(e)     In Paragraph 3 and 4 (and in the attachments), Tri-State agreed to pay the sums specified in the Agreement according to a payment schedule (with last payment to

6.

occur no later than January 30, 2000) to buy and accept delivery of the equipment and software listed in the Agreement;

(f)    In Paragraph 9, Tri-State agreed to provide full and free access to the computer equipment to enable Point 4 to provide the equipment, maintenance, and warranty service and for purposes of analysis, program correction, software delivery, and installation of updated systems;

(g)    In Paragraph 10, Tri-State agreed to provide Point 4 telephone access to its system through a suitable modem, and Point 4 agreed to use the modem and telephone line in connection with error diagnosis and correction;

(h)    In Paragraph 16, Tri-State agreed to request, by written change order, any modification within the general scope of this Agreement, in the specifications or progress data not agreed to at the point of execution of this Agreement, and Point 4 agreed to make any such changes, thereby entitling Point 4 to payment for the performance of such changes at the hourly rates specific in this Agreement;

(i)    In Paragraph 17, the parties agreed that, in the event Tri-State purchased any additional CPU's for Tri-State's subsidiaries or affiliates, then the subsequent Genesys license fees shall be discounted by 33% of the then current license fees for CPU's 2 through 4, by 50% on CPU's 5 through 10, and 70% on CPU's ordered in excess of 10;

(j)    In Paragraph 19, the parties agreed that Point 4 would service all warranties for Tri-State's computer system hardware;

(k)    In Paragraph 23, the parties agreed that if certain independent contractors designated by Point 4 to service the software could not, were unable to, or refuse

7.

to service Tri-State's computer, only then would Tri-State have the right to hire another individual to perform such services, but only after such individual is required to sign the Confidentiality Agreement attached to the Agreement, which is required to be on file with Point 4; and

(l)     In Paragraph 41, the parties agreed that a breach or threatened or attempted breach by either party of any provision of the Agreement could not be remedied solely by arbitration or by damages; that because of the unique nature of the software, and unique aspects of Tri-State's business, irreparable harm would be caused by a breach by either party of their obligations under the Agreement; that monetary damages alone would be inadequate to compensate for such harm; that injunctive relief would be an appropriate remedy to enforce the provisions of the Agreement; and that, therefore, in the event of a breach or threatened or attempted breach by either party of any of the provisions of the Agreement, the non-breaching party would be entitled to injunctive relief restraining the other party, its agents or business, firm, partnership, individual, corporation, or other entity participating in such breach or threatened or attempted breach.

20.     After the parties entered the Agreement, Point 4 spent considerable time installing the hardware and customizing the software. Point 4 also attempted to coordinate efforts with Tri-State, but Tri-State failed and refused to cooperate.

21.     On or about January 13, 2000, Point 4 submitted invoices for work performed thus far under the Agreement, but Tri-State refused to pay any invoices until all the work was completed, contrary the payment schedule under the Agreement. Tri-State then turned off the

8.

modem connection that provided Point 4 with access to Tri-State's system as required by Paragraph 10 of the Agreement and hired another programmer to complete the work.

22. In January of 2001, Tri-State commenced an arbitration proceeding with the American Arbitration Association, claiming that Point 4 did not perform in accordance with the Agreement and that Point 4 misrepresented its capacity to do so, and seeking $120,000 in damages. Point 4 countersued Tri-State for $140,000, based upon Tri-State's failure to cooperate and to pay Point 4 any progress payments under the Agreement.

23. After 7 days of arbitration hearings in February and March of 2002, on or about June 14, 2002, the Arbitrator issued his Award of Arbitrator finding no breach of contract by Point 4. Instead, the Arbitrator ruled that Tri-State had breached the Agreement and concluded that Point 4 was "entitled to be paid for the products and services provided to [Tri-State] under the contract which remain unpaid and which total $55,115.00," plus interest, travel costs, and attorney's fees. The total amount paid to Point 4 as a result of the Award was over $250,000.00.

24. Since the Arbitration Award in 2002, Tri-State, on information and belief, continued to use the software licensed pursuant to the Genesys License and the Dynamic License from 2002 through 2010.

25. In or about March, 2010, Tri-State contacted Point 4 to determine what it would cost to upgrade and customize its computer system with the latest versions of the UniBasic and Genesys programs and to add additional users. Point 4 answered by submitting a quote to Tri-State stating that the upgrade would cost $32,497. After an unsuccessful attempt at negotiating a lower price, Tri-State never responded further.

26. Shortly after contacting Point 4, however, Tri-State, on information and belief, retained the services of a computer hacker, defendant Judkovitz. On information and belief, Tri-

9.

State hired Judkovitz to circumvent the security measures protecting the copyrighted content of Genesys and UniBasic software, with the aim of illegally copying those software programs for use on a new computer server, while avoiding paying required licensing fees to Plaintiffs.

27.     Judkovitz operates his business through defendant SJ Computers, in Brooklyn, New York.

28.     In or about June 2010, Judkovitz, indentifying himself as "Shmuel," of SJ Computers, contacted Roger Petersen, a computer consultant and service provider for the UniBasic software. Judkovitz informed Mr. Petersen that he had been retained by Tri-State to transfer the UniBasic and Genesys programs and related data from a legacy Tri-State computer server to a new Tri-State server. When Petersen queried whether Tri-State had obtained the necessary licenses to effectuate this transfer, Judkovitz responded that Tri-State had "taken care of it." At that time, Petersen took Judkovitz's comment to mean that Tri-State had in fact procured valid licenses from the Plaintiffs in connection with its copying of UniBasic and Genesys programs.

29.     In a subsequent conversation with Judkovitz, however, Petersen learned that Tri-State, with the assistance of Judkovitz and SJ Computers, had unlawfully transferred the UniBasic and Genesys programs without obtaining the required licenses from Plaintiffs. Petersen also learned that the defendant had improperly circumvented the security measures put in place by Plaintiffs in order to prevent such illegal copying. Petersen learned about Defendants' circumvention of security protections when Judkovitz permitted Petersen to access the Tri-State servers remotely. Petersen then observed that the usual license security screens used by the UniBasic and Genesys programs to block unauthorized access had been removed. In particular, the start-up screen displaying the unique license information did not appear. When he

asked about the absence of these license security screens, Judkovitz responded that Defendants had "got somebody to get around it" in order to effectuate the transfer of UniBasic and Genesys software to the new server.

30.     Upon information and belief, in violation of the Genesys License and the Dynamic License, Tri-State is continuing to use the UniBasic and Genesys software programs, without the security features in force, without obtaining Point 4's or Dynamic's consent to the transfer of such files to a new server, and without obtaining executed confidentiality agreements from outside contractors, among other things.

31.     Plaintiffs are informed and believe, and thereupon allege, that Tri-State, SJ Computers and Judkovitz have made duplicate copies from Plaintiffs' copyrighted software for purposes outside the terms of the Genesys License and the Dynamic License. Plaintiffs are informed and believe, and thereupon allege, that Tri-State, SJ Computers and Judkovitz then improperly used these illicit copies of the UniBasic and Genesys software, and that Tri-State presently uses these illicit copies to operate its company, and to sell their products and services.

32.     Plaintiffs have never granted to Tri-State, SJ Computers, and Judkovitz the right to copy any of Plaintiffs' software other than for internal use only, consistent with the terms of the Dynamic License and the Genesys License.

33.     The aforesaid activities of Defendants materially affect interstate commerce among the several states in that Defendants service interstate customers. Also, the activities of Defendants materially affect interstate commerce in that Defendants' goods are offered in interstate commerce.

11.

## FIRST CAUSE OF ACTION

### (Violation of Digital Millennium Copyright Act, 17 U.S.C. § 1201 *et seq.*)

### (By Plaintiffs Against Defendants)

34.     Plaintiffs incorporate, as if fully set forth herein, the allegations of the preceding paragraphs.

35.     Defendants engaged in conduct that circumvents a technological measure that effectively controls access to a copyright work, including altering the security measures of Genesys and Dynamic software.

36.     Defendants Judkowitz and SJ Computers, at the direction or behest of Defendant Tri-State, provided services that are primarily designed or produced to circumvent conditional access controls to Plaintiffs' copyrighted software, or have limited commercially significant use other than for such circumvention.

37.     All of Defendants' acts were and are performed without the permission, license or consent of Plaintiffs.

38.     Plaintiffs are informed and believe, and on that basis allege, that Defendants have received substantial monies, benefits, and/or cost savings as a result of the foregoing infringing activities, including avoiding payment of legitimate software license fees.

39.     Defendants have willfully infringed and, unless enjoined, will continue to willfully infringe Plaintiffs' copyrighted content, as set forth above, by knowingly circumventing access controls to Plaintiffs' copyrighted software in violation of 17 U.S.C. Section 1201, *et seq.*

40.     The wrongful acts of Defendants have caused, and are causing, injury to Plaintiffs, which damage cannot be accurately computed, and unless this Court restrains

Defendants from the further commission of such acts, Plaintiffs will suffer irreparable injury, for all of which Plaintiffs are without an adequate remedy at law.

41.      By reason of the foregoing, Plaintiffs have no adequate remedy at law to redress the injuries that Defendants have caused and intend to cause by their conduct.  Plaintiffs have also been damaged in an amount not presently known but to be proven at trial.

## SECOND CAUSE OF ACTION

### (Unfair Competition Under 15 U.S.C. § 1125(a) of the Lanham Act)

### (By Plaintiffs Against Defendants)

42.      Plaintiffs incorporate, as if fully set forth herein, the allegations of the preceding paragraphs.

43.      Defendants removed the start-up screen of the UniBasic and/or Genesys programs containing Plaintiffs' respective name and/or trademark and license information.

44.      Defendants are continuing to use the UniBasic and/or Genesys programs with Plaintiffs' respective name and/or trademark removed.

45.      Defendants' conduct is causing injury to Plaintiffs by causing confusion as to the true origin of the UniBasic and/or Genesys programs, as well as depriving Plaintiffs of advertising value and goodwill associated with their names.

46.      Defendants' conduct constitutes unlawful, unfair and fraudulent business practices in violation of Lanham Act Section 43(a), 15 U.S.C. Section 1125(a).

47.      By reason of the foregoing, Plaintiffs have no adequate remedy at law to redress the injuries that Defendants have caused and intend to cause by their conduct.  Plaintiffs have also been damaged in an amount not presently known but to be proven at trial.

13.

## THIRD CAUSE OF ACTION

### (Breach of Written Contract)

### (By Plaintiff Point 4 Against Defendant Tri-State)

48.     Plaintiff Point 4 incorporates, as if fully set forth herein, the allegations of the preceding paragraphs.

49.     As set forth above, Point 4 entered into the Agreement with Tri-State and in connection with the Agreement further entered into the Genesys License.

50.     Point 4 performed all of the conditions, covenants and promises required on its part to be performed in accordance with the Agreement, and in accordance with the Genesys License.

51.     Point 4 is informed and believes, and thereon alleges, that Tri-State breached the Agreement by each of the following acts and omissions:

(a)     By wrongfully causing defendants Judkovitz and SJ Computers to transfer the relevant software program files, protected by the Dynamic License and the Genesys License, to a new server and to work around the security features of these licensed programs without obtaining consent to such transfers, without obtaining licensed upgrades from Point 4 or Dynamic, and without requiring such outside contractor to sign the confidentiality agreement attached to the Agreement;

(b)     In violation of the Genesys License and the Dynamic License, Tri-State is continuing to wrongfully use the UniBasic and Genesys software programs without the security features in force, without obtaining Point 4's or Dynamic's

14.

consent to the transfer of such files to a new server, and without obtaining executed confidentiality agreements from outside contractors;

(c)     By wrongfully allowing outside programmers and contractors to gain access to the source code, file structure and related materials without obtaining prior consent from Point 4 and without providing to or obtaining from such programmer(s) or contractor(s) the Confidentiality Agreement required by the Agreement or ensuring that such programmer or contractor is under contract or agreement with Point 4;

(d)     By wrongfully installing the equipment and software listed in the Agreement in a manner which violates the licenses and sublicenses required to use any of the software programs, including, but not limited to, the Genesys License;

(e)     By wrongfully failing and refusing to provide full and free access to the computer equipment to enable Point 4 to provide the equipment, maintenance, and warranty service and for purposes of analysis, program correction, software delivery, and installation of updated systems.

(f)     By wrongfully failing and refusing to provide Point 4 with telephone access to its system through a suitable modem, so that Point 4 could use the modem and telephone line in connection with error diagnosis and correction;

(g)     By wrongfully failing and refusing to request from Point 4, by written change order, any modification within the general scope of the Agreement, and thereby not allowing Point 4 to make any such changes, thereby depriving Point 4 of its contractual right to receive payment for the performance of such changes at the hourly rates listed in the Agreement.

15.

(h)     By wrongfully failing and refusing to allow Point 4 the opportunity to receive negotiated Genesys license fees for additional CPU's provided for Tri-State's subsidiaries or affiliates, in violation of Paragraph 17 of the Agreement;

(i)     By wrongfully failing and refusing to allow Point 4 to designate its independent contractors to service the software hiring another individual to perform such services and by failing to secure the execution by such contractor of the Confidentiality Agreement attached to the Agreement, which is required to be on file with Point 4;

(j)     By refusing and failing to allow Point 4 to provide reasonable consulting assistance to Tri-State in converting Tri-State's files from their pre-Agreement condition to files required by Point 4's system, and instead hiring an unauthorized consultant without the consent of Point 4.

(k)     In the alternative, by refusing and failing to give notice to Point 4 of any expiration or termination of the Agreement, thereby allowing Point 4 to cease storing and to return to Tri-State all data, records and documentation belonging to Tri-State, before making appropriate provision, after termination of the Agreement, for the handling of the functions performed by Point 4 through another entity.

(l)     By refusing and failing to use the Genesys License to use and copy the Genesys software for the internal use of Tri-State only;

(m)     By refusing and failing to maintain in strict confidentiality all proprietary information, including copyrighted software programs, and other rights of Point 4,

16.

including, but not limited to, by giving access to such information to defendants Judkovitz and SJ Computers.

52.     As a direct and proximate result of Tri-State's breaches of the Agreement, Point 4 has been damaged in an amount to be ascertained at trial, plus interest thereon at the legal rate or in accordance with the terms of the Agreement.

53.     Paragraph 41 of the parties' Agreement permits either party to seek injunctive relief in the event of a breach of the Agreement by the other party.  Tri-State's acts complained of herein have damaged and will continue to damage Point 4 irreparably.  Point 4 has no adequate remedy at law for these wrongs and injuries.  The damage to Point 4 includes harm to its good will and reputation in the marketplace that money cannot compensate.  Point 4 is therefore entitled to a preliminary and permanent injunction restraining and enjoining Defendants and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using, registering, or transferring the licensed software files, or any colorable imitation or variation thereof, or using such software in connection with the promotion, advertisement and sale of Tri-State's goods or services.  Point 4 is entitled to an order requiring Tri-State to assign any remaining rights in the Genesys License to Point 4.

## FOURTH CAUSE OF ACTION

### (Breach of Written Contract)

### (By Plaintiff Dynamic Against Defendant Tri-State)

54.     Plaintiff incorporates, as if fully set forth herein, the allegations of the preceding paragraphs.

55.     As set forth above, Dynamic was a third party beneficiary of the Agreement between Point 4 and Tri-State as a result of Tri-State's purchase and use of the Dynamic License through the Agreement.

56.     Point 4 and Dynamic have performed all of the conditions, covenants and promises required on their part to be performed in accordance with the portions of the Agreement pertaining to the Dynamic License.

57.     Dynamic is informed and believes, and thereon alleges, that Tri-State breached the Agreement and the Dynamic License by each of the following acts and omissions:

(a)     By wrongfully causing a third party contractor to transfer the relevant software program files, protected by the Dynamic License, to a new server and to work around the security features of the Dynamic License without obtaining licensed upgrades and a new activation code, in violation of the Dynamic License;

(b)     By wrongfully continuing to use the UniBasic software program files without its security features and an authorized software selection number (activation code), issued by Dynamic, for the new server;

(c)     By wrongfully using software program files protected by the Dynamic License on more than a single computer system or on a system with more than 48 users;

(d)     By wrongfully transferring software program files protected by the Dynamic License to an identical hardware platform without prior authorization from Dynamic;

(e)     By wrongfully bypassing and attempting to bypass the security provisions of the software selection number or the single computer system license protected by the Dynamic License;

18.

(f)     By wrongfully reverse engineering or disassembling portions of the software program files protected by the Dynamic License; and

(g)     By wrongfully using, copying, exporting, or re-exporting portions of the software program files protected by the Dynamic License.

58.     As a direct and proximate result of Tri-State's breaches of the Agreement and the Dynamic License, Dynamic has been damaged in an amount to be ascertained at trial, plus interest thereon at the legal rate or in accordance with the terms of the Agreement.

59.     Paragraph 41 of the parties' Agreement permits them to seek injunctive relief if there is a material breach by the other party. Tri-State's acts have damaged and will continue to damage Dynamic irreparably. Dynamic has no adequate remedy at law for these wrongs and injuries. The damage to Dynamic includes harm to its good will and reputation in the marketplace that money cannot compensate. Dynamic is therefore entitled to a preliminary and permanent injunction restraining and enjoining Defendants and their agents, servants, and employees, and all persons acting thereunder, in concert with, or on their behalf, from using, registering, or transferring the licensed software files, or any colorable imitation or variation thereof, or using such software in connection with the promotion, advertisement and sale of Tri-State's goods or services. Dynamic is entitled to an order requiring Tri-State to assign any remaining rights in the Dynamic License to Dynamic.

## FIFTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing)

### (By Plaintiffs Against Defendant Tri-State)

60.     Plaintiffs incorporate, as if fully set forth herein, the allegations of the preceding paragraphs.

19.

61.     In entering the Agreement described above, the parties herein were obligated to act in good faith and to deal fairly with one another in interpreting and complying with the terms of the Agreement.

62.     Tri-State breached the covenant of good faith and fair dealing by, among other things, (1) arbitrarily refusing to work with Point 4 or allow Point 4 to update the Dynamic licensing under the Agreement; (2) causing Tri-State employees and/or outside contractors to work around the security features of the Dynamic software program; and (3) causing Tri-State employees and/or outside contractors to upgrade the Dynamic software program without obtaining authorization or an updated UniBasic software program from Dynamic.

63.     By reason of the foregoing, Plaintiffs have no adequate remedy at law to redress the injuries that Defendants have caused and intend to cause by their conduct.  Plaintiffs have also been damaged in an amount not presently known but to be proven at trial.

### SIXTH CAUSE OF ACTION

### (Unfair Competition Under New York Common Law)

### (By Plaintiffs Point 4 and Dynamic Against Tri-State and Does 1 to 50)

64.     Plaintiffs incorporate, as if fully set forth herein, the allegations of the preceding paragraphs.

65.     Plaintiffs have invested substantial time and resources in their software.

66.     Defendants' conduct constitutes unlawful, unfair and fraudulent business practices in violation of New York state common law.

67.     By reason of the foregoing, Plaintiffs have no adequate remedy at law to redress the injuries that Defendants have caused and intend to cause by their conduct.  Plaintiffs have also been damaged in an amount not presently known but to be proven at trial.

## SEVENTH CAUSE OF ACTION

### (Unjust Enrichment Under New York Common Law)

#### (By Plaintiffs Against Defendants)

68.     Plaintiffs incorporate, as if fully set forth herein, the allegations of the preceding paragraphs.

69.     Plaintiffs have invested substantial time and resources in their software.

70.     Defendants unfairly received a benefit at Plaintiffs' expense. Defendants have not remunerated any compensation to Plaintiffs.

71.     By reason of the foregoing, Plaintiffs have no adequate remedy at law to redress the injuries that Defendants have caused and intend to cause by their conduct. Plaintiffs have also been damaged in an amount not presently known but to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment against Defendants as follows:

**ON THE FIRST CAUSE OF ACTION FOR VIOLATION OF THE DIGITAL MILLENNIUM COPYRIGHT ACT:**

1.     That pursuant to Paragraph 41 of the parties' Agreement, Defendants, their officers, agents, servants, employees, representatives, and attorneys, and all persons in active concert or participation with them, be preliminarily and permanently enjoined from destroying, altering, manufacturing, importing, copying, reproducing, preparing derivative works, photographing, distributing, selling, or conducting any other form of dealing or transaction in, the copyrighted software files, or any colorable imitation or variation thereof, or using such software in connection with Tri-State's goods or services, or from conspiring amongst themselves or with any other person or entity to further such activities;

21.

2.      A seizure order be entered, directing the seizure and impounding of all software and articles possessed, owned or under the control of Defendants, their officers, agents, servants, employees, representatives, and attorneys, and all persons in active concert or participation with them, which infringe upon Plaintiffs' copyrights, including but not limited to, all software, equipment, or other tangible materials, together with the means of reproduction thereof, which simulates, imitates or infringes upon Plaintiffs copyrights, as well as all business records related thereto, including, but not limited to, purchases, invoices, communications and the like;

3.      An accounting be made for all profits, income, receipts or other benefits derived by Defendants from the use, copying, tampering, transfer, distribution or sale of software, products, and other articles improperly or unlawfully infringing upon Plaintiffs copyrights;

4.      That Defendants pay to Plaintiffs actual, compensatory, and general damages in an amount to be proven;

5.      That Defendants pay to Plaintiffs punitive damages for their intentional and willful conduct.

**ON THE SECOND AND SIXTH CAUSES OF ACTION FOR UNFAIR COMPETITION AND SEVENTH CAUSE OF ACTION FOR UNJUST ENRICHMENT:**

6.      That pursuant to Paragraph 41 of the parties' Agreement, Defendants, their officers, agents, servants, employees, representatives, and attorneys, and all persons in active concert or participation with them, be preliminarily and permanently enjoined from destroying, altering, manufacturing, importing, copying, reproducing, preparing derivative works, photographing, distributing, selling, or any other form of dealing or transaction in, the copyrighted software files, or any colorable imitation or variation thereof, or using such software in connection with Tri-State's goods or services, or from conspiring amongst themselves or with any other person or entity to further such activities;

7.      A seizure order be entered, directing the seizure and impounding of all articles possessed, owned or under the control of Defendants, their officers, agents, servants, employees, representatives, and attorneys, and all persons in active concert or participation with them, which infringe upon Plaintiffs' copyrights, including but not limited to, all software, equipment, or other tangible materials, together with the means of reproduction thereof, which is identical to or simulates, imitates or infringes upon Plaintiffs copyrights, as well as all business records related thereto, including, but not limited to, purchases, invoices, communications and the like;

8.      An accounting be made for all profits, income, receipts or other benefits derived by Defendants from the use, copying, tampering, transfer, distribution or sale of software, products, or articles which improperly or unlawfully infringes upon Plaintiffs' copyrights;

9.      Defendants be held liable to Plaintiff in compensatory damages for all actual damages, losses or injuries, trebled, and reasonable attorneys' fees and costs, in accordance with Section 16 of the Lanham Act, 15 U.S.C. section 1117 and N.Y. Gen. Bus. L. §§ 349(h), 350-d.

10.      That Defendants pay to Plaintiffs general damages in an amount to be proven;

11.      That Defendants pay to Plaintiffs punitive damages for their intentional and willful conduct.

**ON THE THIRD AND FOURTH CAUSES OF ACTION FOR BREACH OF CONTRACT AND ON THE FIFTH CAUSE OF ACTION FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING:**

12.      For compensatory, special, consequential, and incidental damages as proved at trial, but not less than $ 6,000,000.00;

13.      That, pursuant to Paragraph 41 of the Agreement, Defendants, their officers, agents, servants, employees, representatives, and attorneys, and all persons in active concert or participation with them, be preliminarily and permanently enjoined from destroying, altering, manufacturing, importing, copying, reproducing, preparing derivative works, photographing,

23.

distributing, selling, or any other form of dealing or transaction in, the licensed software files, or any colorable imitation or variation thereof, or using such software in connection with Tri-State's goods or services, or from conspiring amongst themselves or with any other person or entity to further such activities.

**ON ALL CAUSES OF ACTION:**

A.      For costs of suit incurred herein;

B.      For interest at the legal rate as permitted by law;

C.      For Plaintiffs' reasonable attorney's fees incurred herein, as allowed by contract and/or by law;

D.      For such other and further relief as the Court deems just and proper, including equitable relief.

Dated: New York, New York                    Respectfully submitted,

February 14, 2011                            By: _____

                                             COOLEY LLP
                                             Jason Koral
                                             Karen K. Won
                                             1114 Avenue of the Americas
                                             New York, New York  10036
                                             Tel:  (212) 479-6000
                                             Fax:  (212) 479-6275
                                             (jkoral@cooley.com)
                                             (kwon@cooley.com)

                                             **GREENWALD & HOFFMAN, LLP**
                                             Paul Evan Greenwald
                                             1861 E. First Street, Suite 860
                                             Santa Ana, California, 92705
                                             Tel:  (714) 285-0025
                                             Fax:  (714) 285-0028
                                             (pegreenwald@ghlaw.us )

                                             *Attorneys for Plaintiffs*

# EXHIBIT A

## EQUIPMENT PURCHASE, SOFTWARE LICENSE, PROGRAMMING AND INSTALLATION SERVICES AGREEMENT

AGREEMENT dated August 1ˢᵗ, 1999, by and between Point 4 Data Corporation [hereinafter "Point 4"], with an office address at 3303 Harbor Boulevard, Costa Mesa, California 92626, , and Tri-State Surgical Supply & Equipment, Ltd. [hereinafter "Tri-State"], with an office address at 409 Hoyt Street, Brooklyn, New York 11231.

WHEREAS, Tri-State desires to purchase hardware and software to update its current Genesys system in order to expand its capabilities and enable it to be Y2K compliant; and

WHEREAS, Point 4 has represented that it can install hardware and software in Tri-State's computer system to meet Tri-State's goals; and

WHEREAS, Point 4 has submitted to Tri-State a purchase and implementation agreement (hereinafter "Purchase Agreement"); and

WHEREAS, the parties have agreed to supplement this Purchase Agreement with additional terms;

NOW, THEREFORE, in exchange for valuable consideration and mutual promises contained herein, the parties agree as follows:

1.    The parties agree to execute the Purchase Agreement annexed hereto.  The Purchase Agreement and the additional terms and conditions herein and any attachments are incorporated in and made a part of this Agreement.  The parties acknowledge that they have read each document and agree to the terms and conditions stated therein.

2.    Point 4 agrees to sell, furnish, and install the Equipment and Software listed in the Purchase Agreement. This includes an integrated computer system comprising computer hardware, computer software, licenses or sublicenses required to use any of the software programs, and all necessary software design, programming, and implementation services so that the updated software with additional hardware properly operates the computer system of Tri-State at its headquaters and all branches.

3.    Tri-State shall pay to Point 4 the sums stated in the Purchase Agreement annexed hereto and as modified herein.



-1-

4.   Tri-State agrees to buy and accept delivery of the
Equipment and Software listed therein when tendered at its
headquarters at 409 Hoyt Street, Brooklyn, New York 11231
and all other branches.

5.   Point 4 shall carry out and implement the hardware
installation and software programming stated in said
Agreement.

6.   Point 4 represents that all hardware and software being
purchased or licensed hereunder will perform in accordance
with their respective manufacturer's published
specifications, and that the Application Programs in
conjunction with the Operating System Software provided as
part of this Agreement will properly function on Tri-State's
upgraded equipment.  In the event that the Software does not
conform, Point 4 shall at its option, either correct the
defect, or replace the Software with a conforming copy.

7.   Point 4 represents that it has met with Tri-State
personnel, it has been advised what Tri-State is seeking
with regard to the computer system both with regard to the
software and the hardware that it is upgrading, and has
advised Tri-State what equipment and software to purchase
from it in order to provide it with the needs and
capabilities it requires.  Point 4 acknowledges being
advised that the sole purpose of Tri-State entering into the
Purchase Agreement with Point 4 is to enable Tri-State to
carry out a wide range of computer and online services
including its distribution operations, accounting network,
financial applications, and related services and
requirements in compliance with Y2K and further represents
being aware that Tri-State would not be entering into this
Agreement except for representations by Point 4 that the
hardware and software being sold by Point 4 to Tri-State
shall satisfy the needs of Tri-State.  Point 4 represents
and warrants that the equipment and software being sold to
Tri-State is able to perform various aspects of
distribution, accounting, and finance, including but not
limited to generating data regarding inventory, shipping,
routing, employees, taxes, payroll, billing, invoice
printing, invoice updating, invoice creation, accounts
receivables, reconciliation statements, and balance
information.

8.   Point 4 will deliver and install the application
software, and related documentation materials to Tri-State's
designated locations.  At the time of installation, Point 4
will train a reasonable number of Tri-State's personnel in
the operation of the Software.  Such services will be billed
to Tri-State on a time and materials basis in accordance

with Point 4's rate.

9.  Tri-State agrees to provide full and free access to the Computer Equipment to enable Point 4 to provide the equipment Maintenance and Warranty service and for the purposes of analysis, program correction, software delivery and installation of the updated systems.

10.  Tri-State shall provide Point 4 telephone access to its system through a suitable modem.  Point 4 shall use this modem and telephone line in connection with error diagnosis and correction.

11.  The payment schedule listed in the Purchase Agreement is modified as follows:

| Genesys License | Services |
|---|---|
| 20% deposit | 20% deposit |
| 50% upon installation | 30% after Phase IV |
| 15% after 30 days of usage | 30% after Phase VI |
| 15% on January 30, 2000 | 20% on January 30, 2000 |

 If all the modifications are not done by January 30, 2000, then the final payments shall be due thirty days after such modifications are completed.

 12.  Point 4 agrees that the eighty dollar rate it will be billing per hour shall remain fixed for the first twelve months from the date herein.

13.  Whenever a Point 4 representative needs to travel to Tri-State, Tri-State shall make all travel arrangements for air and ground transportation and for lodging for the duration of the visit.

14.  Point 4 agrees that if its cost for the purchase of the equipment goes down after the date herein, then the price to Tri-State will go down accordingly.

15.  Point 4 assumes responsibility for its personnel providing service and will make all deductions required of employers by state, federal and local laws, including deductions for Social Security and withholding taxes, contributions for unemployment compensation funds.  Point 4 shall maintain Worker's Compensation and liability insurance for each of them.

16.  Tri-State may, by written change order, request a modification within the general scope of this agreement, in the specifications or program data not agreed to at the date herein.  Point 4 agrees to make such changes, and Point 4 shall be entitled to payment for the performance of such changes at the hourly rates charged herein.  However, if Tri-State requests a change in lieu of an agreed upon

component or modification included in the charges herein, then the Tri-State shall be given a credit for the component not installed or the modification not carried out.

17. In the event Tri-State purchases any additional CPUs for Tri-State's subsidiaries or affiliates, then the subsequent license fees shall be discounted by 33% of the then current license fee for CPUs 2-4, by 50% on CPUs 5-10, and 70% on CPUs in excess of 10.

*see change*

18. Tri-State agrees to designate two employees to be fully authorized to discuss and coordinate all services to be rendered and performed pursuant to this Agreement.

19. Point 4 agrees to service all warranties for the hardware including making available replacement computers on a temporary basis of computers upgraded by Point 4 until repairs can be performed by authorized service repair representatives. Point 4 shall diligently obtain replacement parts or repair of any defective hardware.

20. Point 4 agrees that time is of the essence with regard to the installation and implementation of the system and that prompt performance of all work under this agreement is required by Tri-State in order to meet its schedule and commitments. Point 4 agrees that in the event the time table stated in the Purchase Agreement is not adhered to, that Point 4 will incur penalties of one hundred dollars per day for the first week of the delay and then two hundred fifty dollars per day for each day thereafter. In the event Point 4 does not complete installation on or before December 10, 1999, then Tri-State shall have the right to retain the services of another person to complete the installation and implementation process and Point 4 shall be responsible to pay any additional costs incurred by Tri-State. *all change*

21. In the event Point 4 defaults in installing and implementing the system, and terminates the contract without cause, then Tri-State shall have the right to retain services of any other party or entity and Point 4 shall be liable for all damages incurred by Tri-State in having another party or entity complete the contractual work. In the event Tri-State defaults and fails to make payment within thirty days of the date due as stated in Purchase Agreement, then Point 4 may terminate the contract for cause and Tri-State shall be liable for damages for breach of contract. In all instances, the losing party shall be liable to the winning party for legal fees.

-4-

22.   Point 4 shall not be responsible or liable for delays
or failure of performance under this Agreement resulting
directly or indirectly from causes beyond the reasonable
control of Point 4 such as, act of God, war, strikes,
natural disasters, floods, storms, transportation problems,
and power failures.  Any such delays or failures will extend
Point 4's time hereunder and not be deemed a breach hereof.

23.   Point 4 agrees to provide Tri-State at the time of the
execution of these agreements with the names of three
independent programmers capable of servicing all the
software being purchased by Tri-State from Point 4.  In the
event these three individuals cannot, are unable to, or
refuse to service the computers, then Tri-State shall have
the right to retain the services of Compudata to perform
such services.  In the event he is unable to or refuses to,
then Tri-State may hire any other individual to perform such
services.  The said individual shall be only required to
sign the nondisclosure agreement annexed hereto as Exhibit
"A."

24.   This Agreement is assignable without written permission
from Point 4 to any person controlling, controlled by, or
under common control with Tri-State, or to any entity or
person which purchases all or substantially all of
Tri-State's assets or with which Tri-State is merged.

25.   Point 4 represents that it owns the copyrights for the
Genesys 4.0 license and shall indemnify Tri-State from all
third parties in the event any claims made by such other
party for copyright infringement and for license fees.

26.   In the event Tri-State becomes aware of any claims by
any third parties of an infringement of any copyright,
patent, trademark, trade secret or other proprietary rights
by the Software licensed hereunder, Tri-State agrees to
notify Point 4 of such claims of infringement within five
(5) days of its becoming aware of same.  If such claims is
pursued by such third parties, Tri-State hereby renders full
control of the defense of such claim to Point 4, and Point 4
hereby agrees to defend same as it best sees fit and hold
Tri-State harmless from any liability therefore.  In the
event that the Software, or any part thereof, is held to
constitute such an infringement and its use is enjoined,
Point 4 shall, at its own expense and at its option, either:
(1) procure for Tri-State the right to continue to use
copies related to the system; (2) replace same with a
non-infringing item of equal quality; or (3) modify it so it
becomes non-infringing.  Point 4 shall not be liable to
Tri-State under any provision of this clause if any patent,
copyright, trademark or other proprietary right infringement

-5-

or claim thereof is based upon the use of the Software with
other software not licensed hereunder.

27.  Point 4 agrees to commence operations to correct any
software problem within four hours after being given notice
via telephone or telecopier of a problem with the computer's
software.  In the event Point 4 fails to initiate remedial
measures within forty eight hours of notification, then
customer may retain the services of an independent
consultant and Point 4 shall be liable for the consultant's
charges.  Point 4 will be responsible for correcting all
errors caused by machine or software malfunction or by Point
4's operational errors of any kind, including restoration of
programs and/or data files.

28.  Point 4 represents that the Genyses 4.0 software system
is Y2K compliant and shall properly work in Tri-State's
upgraded computers.

29.  Point 4 agrees to assist Tri-State in developing any
pre-printed forms required by the system.  Tri-State will be
responsible for ordering any such pre-printed forms, and all
other supply items such as disc packs, magnetic tapes,
cards, stock paper, etc., as may be required by the system.

30.  Point 4 agrees to provide reasonable consulting
assistance to Tri-State in converting Tri-State's files from
their present condition to files required by Point 4's
system.

31.  Point 4 will adhere to professional standards, will use
due care in the handling and processing of Tri-State's
materials, and will perform all services required under this
agreement in a manner consistent with generally accepted
procedures for computer services and data processing.

32.  All personnel assigned by Point 4 to perform the
services herein will be qualified to perform the assigned
duties.

33.  Point 4 will provide Tri-State with a tape media copy
of the licensed software source code in the event that Point
4 becomes insolvent or ceases operations.  Point 4 shall
notify Tri-State of all access codes and any modifications.
Point 4 shall provide Tri-State with all application program
source code including the source for the driver programs.
If Tri-State shall suffer damages as a result of Point 4's
failure to disclose, then Point 4 shall be liable for all
damages including consequential, incurred by Tri-State as a
result.

-6-

34. All cards, tapes, disks, other media, processes,
reports, and information of any nature from Tri-State that
are made available to Point 4 by virtue of this agreement or
the relationship created by this agreement shall be held in
strict confidence by Point 4. Any disclosure or provision
of confidential information to Point 4 shall be made in
reliance on this promise.

35. On expiration or termination of this agreement for any
reason, Point 4 shall, without additional cost to Tri-State,
return to Tri-State all data, records and documentation
belonging to Tri-State. Tri-State may, by written notice to
Point 4, defer the actual termination date of this agreement
for one month to enable Tri-State to make appropriate
provision for the handling of the functions performed by
Point 4 through another entity. Any such extension shall be
on the terms and conditions of this agreement.

36. Unless otherwise instructed in writing by Tri-State,
Point 4 shall maintain and store software version of — *See change*
Tri-State in a secure manner in a proper environment.

37. All written information submitted by Tri-State to Point
4 in connection with this agreement, which is identified as
proprietary information, will be safeguarded by supplier to
at least the same extent as supplier safeguards like
information relating to its own business.

38. Point 4 for good and valuable consideration hereby
grants Tri-State a non-exclusive, personal, non-transferable
license to use and to copy in machine readable form its
Software Product, for the internal use of Tri-State, subject
to the terms and conditions hereof, Point 4 represents that
it has the authority to enter into this License Agreement.
"Software" as used herein means system software, utility
programs, routines, related documentation and media.
The term of this License with respect to the Software shall
commence upon the delivery and installation of the software
and payment in full of the license fee.

39. Point 4 agrees not to compete with Tri-State, not to
disclose Tri-State's confidential information, and/or not to
solicit or attempt to solicit business away from Tri-State.

40. The parties agree that all disputes between them
relative to this Agreement shall be submitted to the
American Arbitration Association. The parties agree to
fully comply with the Award which may be issued by the
Arbitration and hereby authorize the Award to be confirmed
as a judgment in any State or City Court of competent
jurisdiction. If one of the parties opposes the

-7-

confirmation, and the Award is confirmed nevertheless, the opposing party waives his right to appeal therefrom. If any party improperly commences a civil suit in court, the other party may move to have the suit dismissed and be decided by Arbitration as stated herein unless immediate injunctive relief is required. The opposing party also agrees to reimburse the prevailing party for all legal costs and expenses in obtaining confirmation of the Award and enforcement of it's provisions including any appeals.

41. Notwithstanding the above, Point 4 and Tri-State agree and understand that breach or threatened or attempted breach by Point 4 or Tri-State of any provision of this Agreement cannot be remedied solely by arbitration or by damages. Furthermore, Point 4 and Tri-State agree that because of the unique nature of the Software, and unique aspects of Tri-State's business, irreparable harm will be caused by a breach by Tri-State or Point 4 of their obligations under this Agreement, that monetary damages alone will be inadequate to compensate for such harm, and that in addition to monetary damages, injunctive relief will be an appropriate remedy to enforce the provisions of this Agreement. Accordingly, in the event of a breach or threatened or attempted breach by Point 4 or Tri-State of any of the provisions of this Agreement, Point 4 or Tri-State shall be entitled, inter alia, to injunctive relief restraining the other party, its Agents and any business firm, partnership, individual, corporation, or other entity participating in such breach or threatened or attempted breach. Each party waives the requirement, if any, to post a bond.

42. Any notice to be delivered pursuant to this License Agreement shall be deemed delivered upon service, if served personally, or one day via overnight mail, or three (3) days after deposit in the United States mail if mailed by first-class mail, postage prepaid registered or certified, and addressed to a party at the address set forth on the front page of this Agreement or at such other address as shall be specified pursuant to notice duly given. Notice by fax if confirmed shall be deemed notice on the same day.

43. This agreement is severable. The parties agrees that the restrictions contained in this agreement are reasonable. However, if a court of proper jurisdiction finds any restriction in whole or in part to be unreasonable or unenforceable because of the scope, duration, or geographic coverage thereof, such court shall reduce such scope, duration, or geographic coverage in order to make the same reasonable. The remainder of this agreement shall still be effective, enforceable, and binding on the parties to the

-8-

SEP-02-1999  13:34        PRIVATE                                    P.12

extent the court deems it reasonable.

44.  If any provision of this Agreement shall be held to be
invalid, illegal or unenforceable, the validity, legality
and enforce ability of the remaining provisions shall not in
any way be affected or impaired thereby.

45.  This Agreement may only be changed or amended by a
writing, executed by Officers of Point 4 and Tri-State.

     IN WITNESS WHEREOF, the parties hereby have hereunto
set their hands and seals this   3/ 15   day of August, 1999.

POINT 4 DATA CORPORATION          TRI-STATE SURGICAL SUPPLY
                                  & EQUIPMENT, LTD.

By: Michelle Nira, VP operations  By: George Hoffman, President


Trisagr1


-9-

SEP-01-1999  12:03        PRIVATE                                    P.02/05

August 31, 1999

Contract changes:

Section    Change

7.      (line 17)... ..shall satisfy the needs of Tri-State *as represented by Tri-State to Point 4.*

11.     (paragraph two- delete  and add in the following) *Analysis and Programming on additional modifications will begin no later that mid-February by Point 4. Since additional modifications are estimated between 80-128 hours, Point 4 anticipates the requested modifications to be ready for testing by late March at the latest, and ready for implementation by early April.    Additional modifications will be billed upon completion at terms of Net 10 and require a 20% deposit.*

17.     (line 3) ..subsequent *Genesys* license

20.     (add-on) *Point 4 will not be responsible for delays caused by outside sources or lack of testing on the part of Tri-State.*

38.     (line 2)   ..Point 4 shall maintain and store *the installed* software version...

35.     (add-on) *It is the responsibility of Tri-State to back up their system on a regular (preferably daily) basis and maintain in a secure manner in a proper environment, backup of the Tri-State system.*



August 31, 1999

Contract changes:

Section          Change

7.      (line 17)….. shall satisfy the needs of Tri-State <u>as represented by Tri-State to Point 4.</u>

11.     (paragraph two-delete and add in the following) Analysis and Programming on additional modifications will begin no later that mid-February by Point 4. Since additional modifications are estimated between 80-120 hours, Point 4 anticipates the requested modifications to be ready for testing by late March at the latest and ready for implementation by early April. Additional modifications will be billed upon completion at Terms of Net 10 and require a 20% deposit.

17.     (line 3)….. subsequent <u>Genesys</u> license

20.     (add-on) Point 4 will not be responsible  for delays caused by outside sources or lack of testing on the part of Tri-State.

36. (line 2)….. Point 4 shall maintain and store <u>the installed</u> software version……

36.     (add-on) It is the responsibility of Tri-State to back up their system on a regular (preferably daily) basis and maintain in a secure manner in a proper environment, backup of the Tri-State system.

Point 4 Data Corporation
CONTRACTOR CONFIDENTIALITY DECLARATION

This Confidentiality declaration is made by
_____, and, an independent contractor
("Contractor") working for Tri-State Surgical Supply and
Equipment, Ltd., effective as of the date signed.

Point 4 Data has agree to allow the Contractor access
to the source code, file structures, and related materials
("Materials") of the Genesys Distribution Accounting System
("Genesys") on the Tri-State's system for : 1) The purposes
of demonstration, custom modifications, and support of
Tri-State or: 2) Enhancements under contract or agreement
with Point 4 Data.  The consent is conditional on the
Contractor using the Materials solely for:

1) The maintenance of the Genesys product

or:

2) Enhancements or new modules while under
contract or agreement with Point 4 Data.

The Contractor herewith acknowledges that the Materials
contain confidential and valuable information and that its
use and distribution by any competitor could cause serious
damage to Point 4.  The Contractor agrees to use his best
efforts in good faith to take all necessary or appropriate
steps to maintain the confidentiality of the information
contained in the Materials, and to prevent disclosure of the
Materials or any information therein to anyone without the
express written consent of Point 4 Data.  The Contractor
disclaims obtaining any ownership rights to the Genesy
System by reason of his working on Tri-State's computer
system.

The participants accept and agree to the above terms by
affixing their respective signatures below:

"CONTRACTOR"

_____

By:_____

Date:_____

EXHIBIT "A"

AMF:tk
trisagr2

-1-



# *Genesys Implementation*

## Phase I:   1-30 days from receipt of Signed order and Deposit

1. Receive backup tape from customer
   a. Check readability
   b. Convert programs and files from IMS to Unibasic
   c. Set up conversion programs for conversion to Genesys 4.0

## Phase II:  Day 30-45

1. Install new hardware on site already loaded with Unix, Unibasic & Tri-State's current version of Genesys
   a. Get all terminals, printers, etc. working on system
   b. Convert data files from old system to new system
   c. Tri-State running old software on new system

## Phase III:   Day 45-60

1. Conversion of Genesys 3.x to Genesys 4.0 at our site
2. System analysis for setting up the G/L and new options- (see checklist)

## Phase IV:  Day 45-60

1. Install new version of Genesys 4.0 on system and run a trial conversion

## Phase V:  Day 60 - 75

1. Tri-State to test new version on system
   a. Check converted data
   b. Check for old modifications
   c. Check for bugs or problems

## Phase VI:   Day 75

1. Go LIVE- Final Conversion of data
2. Implementation and testing  (see checklist)

## Phase VII:  February 2000

1. Additional reports and programs (ie. Rebate, Barcoding, EDI etc.)



### Point 4 Data Corporatio
### TriState Medical revised
### August 31, 1999

***Point 4 Status Custom Pentium System*** including the following:

**HARDWARE**
450 MHZ Pentium II Processor
10 Bay Tower, Dual Cooling Fans, 300 W. Power Supply w/ Fan
512k cache memory, 2 ISA/ 4PCI
256 MB memory
3.5" Floppy drive
Ultra/Wide SCSI Controller (w/7 head cable)
9.1 GB SCSI disk drive
4/8 GB SCSI tape drive ¼" (backup)
Color Monitor w/ 1MB Video Card
104 Keyboard
Specialix SIO host w/ 48 port adapter
CD Rom 40X
Multi-tech modem 33.6
10/100 Fast Ethernet Card
8 - 4/8 GB Tape Cartridges, Cleaning Kit
Installation of hardware at customer headquarters

|  |  |
|---|---|
| Hardware System: | $7,395.00 |

**Software & Services**

|  |  |
|---|---|
| Unibasic version 6.X (48 user license) | $7,550.00 |
| SCO Open Server 5 v5.5- Enterprise (55 user license) | 3,415.00 |
| Backup Edge for Open Server 5 | 350.00 |
| Conversion of data and files to Open Server 5 | 750.00 |
|  | $12,065.00 |
|  |  |
| Subtotal: | $19,460.00 |
| Discount per db | (1,760.00) |
|  | $17,700.00 |

**Additional Software:**

|  |  |
|---|---|
| Fax Answer – Faxing software | $4,275.00 |
| Message Manager 50 users– E-mail interface & appt. scheduling software | |
|  | $ 1,540.00 |
| Total: | $23,515.00 |

Initials

**POINT 4 DATA CORPORATION** • 3303 Harbor Blvd., Suite G-2, Costa Mesa, CA 92626 • Tel: (714) 755-6550 • Fax: (714) 755-6561

FROM : POINT 4 DATA CORP.          PHONE NO. : 714 755 6561          Sep. 02 1999 11:43AM P2



# TriState Medical Quotation(revised)
## August 31, 1999

### *Genesys Distribution Accounting Software*

**Software**

| | |
|---|---|
| Genesys 4.0 license  (48 user license) | $30,000 |
| Less discount for version 3.X. (25%) | (7,500) |
| *Additional discount* | (4,000) |
| Genesys Payroll Module    (no charge) | 0 |
| | $18,500 |

**Services**

| | |
|---|---|
| Conversion of Programs and files | $4,000 |
| System Analysis for Set up & Configuration | |
| **Approx. 40 hours @ $80.00/hr | $3,200 |
| Program Modifications | |
| **60-80 hours (based on need) @$80/hour | $4,800-6,400 |
| Implementation: | |
| **40 hours (based on need)  @ $80.00/hr | $3,200 |
| | $15,200-16,800 |

| | |
|---|---|
| Estimated Total: | $33,700- $35,300 |

| | |
|---|---|
| 1st year support (option 1)  - effective 45 days after "Live Date", billed in monthly increments of $250/month | $3,000 |

**The hours listed are estimated to the best of our knowledge.

**Note:** Genesys 4.0 is software protected.  In order to gain access to source code, file structures and related materials, outside programmer must have on file an *End User Contractor Confidentiality Agreement* with Point 4 Data Corp.

Additional Costs are as follows:
① Freight: FOB Source
② Sales Tax (where applicable)
③ Travel charges not paid for by customer will be billed at cost

Terms:

| Genesys License | Services |
|---|---|
| 20% deposit | 20% deposit |
| 50% due upon *installation* | 30% due upon *installation* for *Phase IV* |
| 15% due after 30 days of usage | 30% due upon going "live" (phase VI) |
| 15% due on January 30, 2000 | 20% due on January 30th, 2000 |

**NOTE:** Travel, freight and Misc. charges due upon receipt of invoice

The customer will be billed *modem connect* time at $15.00 per hour in addition to the quoted amount.  This quotation is also based upon the customer having a 9600 Baud or faster modem.  If slower modems are used, additional charges will be incurred.  By signing below, the customer is authorizing the work to be done.  Payment for the subject work is due as per terms of the contract.  This Programming/ Services Quotation is good for ten days.

Accepted and Agreed to:

_____          Date  8/31/99

Please FAX a signed copy of this agreement to (714) 755-6561 to authorize the work.
**POINT 4 DATA CORPORATION** • 3303 Harbor Blvd., Suite G-2, Costa Mesa, CA 92626 • Tel: (714) 755-6550 • Fax: (714) 755-6561

# GENESYS Distribution Accounting Software
## License Agreement

| | | | |
|---|---|---|---|
| License : | G40480096 | Issued: | 10-20-99 |
| Platform: | SCO Unix O/S 5 | | |
| Sold To: | Tri-State | | |
| Installer *: | Point 4 Data Corp | # Users: | 48 |
| User Name: | Tri-State Surgical | | |

**Important, Read Carefully:** By authorizing the installation of the Genesys Distribution Accounting Software as represented on this license, Customer agrees to be bound by all the terms and conditions of the License Agreement.

**License Agreement:** In return for payment of the applicable fee, Point 4 grants the customer a license to use the Genesys software, subject to the following.

**Use:** Customer may use the software on any one computer solely for customer's own business purposes. However, unless the customer has paid the applicable fee to Point 4, this license is void. Customer further agrees not to reverse, compile or disassemble the software.

**Version 4.0:** - Copies of programs and/or files from later versions of Genesys may not be implemented on this version without written approval and/or a license fee paid to Point 4 Data Corporation.

**Copies and Adaptations:** Customer may make copies or adaptations of the software for archival and back-up purposes. Customer has no other right to copy. All copies and adaptations of the software must bear the copyright notice(s) contained in or on the original. This includes (unless a Source Code License has been purchased) using any routine or existing program to create another or part of another program.

**Ownership:** Customer agrees that it does not have any title or ownership of the software, other than the ownership of the physical media. Customer acknowledges and agrees that the software is copyrighted and protected by copyright laws.

**Transfer of Rights in Software:** Customer may transfer rights in the software to a third party only as part of the transfer of all rights and only if Customer obtains prior agreement of the third party to be bound by the terms of this License Agreement. Upon such transfer, Customer agrees that their rights in the software are terminated and that it will either destroy its copies and adaptations or deliver them to a third party. Point 4 is to be notified in writing of such transfers.

**Sublicense And Distribution:** Customer may not sublicense the software or distribute copies or adaptations of the software to the public in any form without prior written agreement of Point 4.

**Termination:** Point 4 may terminate this Software License for failure to comply with any of these terms, provided Point 4 has requested Customer to cure the failure and Customer has failed to do so within thirty (30) days of such notice.

**Limited Warranty:** Point 4 makes no representations or warranties, either expressed or implied, including but not limited to, any implied warranty of merchantability or fitness for a particular purpose. In no event shall Point 4 be liable for any incidental, indirect, special or consequential damages whatsoever (including, but not limited to, lost profits or interruption of business). You assume the entire risk as to the quality and performance of the software. Point 4 liability under this agreement at no time shall exceed any amount paid for the product license involved.

*If installed by other than Point 4, the installer must have a signed confidentiality agreement signed and in good standing with Point 4. Failure to accept this condition is a violation of this license agreement and is cause for termination.

Agreed;

Company_____ By_____ Title_____

Signature_____ Date_____

04:30 Pm PST    03/17/10    +19494485234                                    Page    2  a2

**Dynamic Concepts Inc.**

One Columbia. Aliso Viejo. California. 92656
Telephone: 949 448.8600  Fax: 949.448.5234
e-mail: sales@dynamic.com

**Software Selection Number (SSN)
and License Agreement**

```
License:    991D0DB1  Issued: 09/21/99
Platform:   99 SCO UNIX              [x]=#Users for each product
Sold to:    DTR Business Systems
Installer:  Point 4 Data Corporation   Phone: 714-755-6550
Products:   IRIS 6.01.01[48]
User SSN:   7Vd9 CHRH 6MK6 QJNM odHL 88ss 0E3o 8sb
User Name:  TRISTATE
```

**NOTE:** Enter SSN in either case with, or without spaces and press [RETURN]. When required. enter the User Name exactly as shown above. The SSN is represented by the following character set, for readability:
*Numerics:* 0123456789  *Alpha characters:* AbCdEFGHiJKLMNoPQRsTUVWXYZ  *(note: b, d, i, o, s)*

**IMPORTANT, Read Carefully:** By installing, copying, or otherwise using the software product(s) (hereinafter referred to as Software) represented on this license, Customer agrees to be bound by all the terms and conditions of the License Agreement. If you do not agree to all of the terms and conditions of the License Agreement, do not install this SSN. Promptly return the unused Software and all associated materials to DCI.

**LICENSE AGREEMENT:** In return for payment of the applicable fee, Dynamic Concepts grants the Customer a license to use the specific revisions of the Software printed above, subject to the following:

**Use:** Customer may use the Software on any one computer solely for Customer's own internal business purposes. However, unless the applicable fee has been paid to Dynamic Concepts, this license is void. Customer further agrees not to reverse compile or disassemble the Software or make any attempt to bypass the security provisions of the SSN and single computer license. This license is intended for use on a single computer system and only with preauthorization from DCI is transferable to an identical hardware platform, solely determined by DCI to be binary compatible.

**Copies and Adaptations:** Customer may make copies or adaptations of the Software for archival and backup purposes; or when copying or adaptation is an essential step in the use of the Software with the computer, so long as the copies and adaptations are used in no other manner. Customer has no other right to copy. All copies and adaptations of the Software must bear the copyright notice(s) contained in or on the original. Customer agrees that no training or support is provided by DCI unless otherwise agreed by DCI.

**Ownership:** Customer agrees that it does not have any title or ownership of the Software, other than ownership of the physical media. Customer acknowledges and agrees that the Software is copyrighted and protected by copyright laws. Customer further acknowledges and agrees that the Software may have been developed by a third-party named in the copyright notice(s) included with the Software, who shall be authorized to hold Customer responsible for any copyright infringement or violation of this License Agreement.

**Transfer of Rights in Software:** Customer may transfer rights in the Software to a third-party only as part of the transfer of all rights and only if Customer obtains the prior agreement of the third-party to be bound by the terms of this License Agreement. Upon such transfer, Customer agrees that their rights in the Software are terminated and that it will either destroy its copies and adaptations or deliver them to the third-party along with a copy of this License Agreement. Transfer to a U.S. Government department or agency or to a prime or lower tier contractor in connection with a U.S. Government contract shall be made only upon their prior written agreement to terms required by DCI.

**Sublicense and Distribution:** Customer may not sublicense the Software or distribute copies or adaptations of the Software to the public in physical media or by telecommunications without the prior written consent of DCI.

**Termination:** DCI may terminate this Software License, without incurring any liability to Customer, for Customer's failure to comply with any of these terms, provided DCI has requested Customer to cure the failure and Customer has failed to do so within thirty (30) days of such notice. Upon termination, any and all rights granted to Customer herein are revoked.

**Updates and Upgrades:** Customer agrees that the Software does not include updates and upgrades which may be available, subject to these same terms, from DCI under a separate transaction or through the Software Assurance program. Unauthorized installation of any updates or upgrades shall be grounds for termination of this license.

**Export:** Customer agrees not to export or re-export the Software, or any adaptation, in violation of the U.S. Laws or regulations or any other law or regulation.

**No Warranty:** DCI makes no representations or warranties, either expressed or implied, including but not limited to, any implied warranty of merchantability or fitness for a particular purpose. In no event shall DCI be liable for any incidental, indirect, special or consequential damages whatsoever (including, but not limited to, lost profits or interruption of business). You assume the entire risk as to the quality and performance of the Software. DCI liability under this agreement at no time shall exceed any amount paid for the particular program or product license involved.