**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------- X
                                        :
POINT 4 DATA CORPORATION, and           :
DYNAMIC CONCEPTS, INC.,                  :
                                        :
                        Plaintiffs,      :
                                        :          Index No. 11-cv-0726 (CBA)(RLM)
           vs.                           :
                                        :
TRI-STATE SURGICAL SUPPLY &              :
EQUIPMENT, LTD., SJ COMPUTERS, INC.      :
and SHMUEL JUDKOVITZ,                    :
                                        :
                        Defendants.      :
                                        :
--------------------------------------- X
                                        :
TRI-STATE SURGICAL SUPPLY &              :
EQUIPMENT, LTD.,                         :
                                        :
                 Counterclaim-Plaintiff, :
                                        :
           vs.                           :
                                        :
POINT 4 DATA CORPORATION,                :
                                        :
               Counterclaim-Defendant.   :
--------------------------------------- X


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO TRI-STATE SURGICAL SUPPLY & EQUIPMENT, LTD.'S MOTION FOR PARTIAL SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page:**

Table Of Authorities ............................................................................................................. ii

I.      Introduction ............................................................................................................... 1

II.     Statement of Facts ..................................................................................................... 4

III.    Legal Standard .......................................................................................................... 9

IV.     Argument ................................................................................................................. 10

        A.      Summary Judgment is Not Appropriate on the Disgorgement Claim. ................. 10

                1.      Tri-State's Gross Profits Are
                        Attributable To Its Acts Of Circumvention ................................................ 10

                2.      Tri-State's Interpretation Of The DMCA
                        Disgorgement Statute Is Unreasonable ..................................................... 13

                3.      The Statutory Language of 17 U.S.C. 1203(c)(2)
                        Does not Support Tri-State's Position ........................................................ 17

                4.      There is a Clear Causal Connection Between
                        the Acts of Circumvention and Tri-State's Profits ..................................... 18

        B.      Plaintiffs Are Entitled To Statutory Damages Based On
                Each Act Of Circumvention Executed At Each User Login ................................. 20

        C.      At A Minimum, Acts Of Circumvention And Profits
                Attributable Thereto Are Disputed Issues Of Fact ............................................. 21

        D.      Tri-State's Laches And Unclean Hands Defenses
                Are Procedurally And Substantively Invalid ...................................................... 22

Conclusion ......................................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,*
 404 F.3d 566, 607 (2d Cir. 2005)............................................................................22

*Anderson v. Liberty Lobby, Inc.,*
 477 U.S. 242 (1986).........................................................................................................9

*Andreas v. Volkswagen of America Inc.,*
 336 F.3d 789 (8th Cir. 2003) ......................................................................11, 12, 16

*Armstrong v. Virgin Records, Ltd.,*
 91 F. Supp. 2d 628 (S.D.N.Y. 2000).......................................................................24

*Broad. Music, Inc. v. Hearst/ABC Viacom Entm't Services,*
 746 F. Supp. 320 (S.D.N.Y. 1990) ..........................................................................24

*Bucklew v. Hawkins, Ash, Baptie & Co.,*
 329 F.3d 923 (7th Cir. 2003) ....................................................................................11

*Burns, M.D. v. Imagine Films Entertainment, Inc.,*
 No. 92-CV-2435, 1996 U.S. Dist. LEXIS 2105 (W.D.N.Y. Feb. 16, 1996) ..........11

*Business Trends and Analysts, Inc. v. The Freedonia Grp.,*
 887 F.2d 399 (2d Cir. 1989)......................................................................................11

*Davis v. The Gap, Inc.,*
 246 F.3d 152, 176 (2d Cir. 2001).............................................................................14

*Eyal R.D. Corp. v. Jewelex New York, Ltd.,*
 576 F. Supp. 2d 626 (S.D.N.Y. 2008).....................................................................23

*Gala Jewelry, Inc. v. Harring, 05 CIV. 7713(GEL),*
 2006 WL 3734202, *2 (S.D.N.Y. Dec. 18, 2006) ..................................................22

*Ground Zero Museum Workshop v. Wilson,*
 2011 WL 3758582, at *6-8 (D. Md. Aug. 24, 2011) ..............................................15

*Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey,*
 497 F. Supp. 2d 627, 644-45 (E.D. Pa. 2007)........................................................15

*Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.,*
 219 F.3d 104 (2d Cir. 2000).....................................................................................23

*I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.,*
 307 F. Supp. 2d 521, 533 (S.D.N.Y. 2004).............................................................15

*Lawton v. Melville Corp.,*
 116 F.3d 1472 (2d Cir. June 24, 1997) ...................................................................11

*Liebowitz v. Elsevier Sci. Ltd.,*
 927 F. Supp. 688, 704 (S.D.N.Y. 1996) ..................................................................22

*Lowry's Report, Inc. v. Legg Mason, Inc.*,
    271 F. Supp. 2d 737 (D. Md. 2003) .................................................................12

*MacDonald v. Du Maurier*,
    75 F. Supp. 653 (S.D.N.Y. 1946) ..................................................................23

*Mackie v. Rieser*,
    296 F.3d 909 (9th Cir. 2002) .........................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).........................................................................................9

*MDY Indus., LLC v. Blizzard Entm't, Inc.*,
    629 F.3d 928, 951 (9th Cir. Feb. 17, 2011) ...................................................14

*MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*,
    622 F.3d 361, 366 (5th Cir. 2010) .................................................................14

*On Davis v. Gap, Inc.*,
    246 F.3d 152 (2d Cir. 2001)...........................................................11, 14, 19, 20

*Polar Bear Prods. v. Timex Corp.*,
    384 F.3d 700 (9th Cir. 2004) ..............................................................11, 12, 18

*Price v. Fox Entm't Group, Inc.*,
    2007 WL 241387 (S.D.N.Y. 2007).................................................................23

*State Farm Mut. Auto. Ins. Co. v. Valery Kalika, 04 CV 4631 (CBA)*,
    2006 WL 6176152, at *7 (E.D.N.Y. Mar. 16, 2006).....................................22

*United States v. Crippen*,
    2010 WL 7198205, at *5 (C.D. Cal. Nov. 23, 2010).....................................15

*United States v. Diebold, Inc.*,
    369 U.S. 654 (1962).........................................................................................9

*Univ. of Colo. Found. v. Am. Cyanamid Co.*,
    196 F.3d 1366 (Fed. Cir. 1999)......................................................................11

*Universal City Studios, Inc., v. Corley*
    273 F.3d 429 (2d Cir. 2001)............................................................................14

**STATUTES**

17 U.S.C. 1203.......................................................................................10, 14, 17, 20

17 U.S.C. § 1201 ............................................................................................1, 10, 16

Digital Millennium Copyright Act, 17 U.S.C. § 1201 ....................................................1

**OTHER AUTHORITIES**

Cong. Rec. H7091 et seq. (Aug. 4, 1998) ...................................................................13

Cong. Rec. S11890 (October 8, 1998) ........................................................................13

Cong. Rec. E2144 (October 13, 1998).............................................................................13

Cong. Rec. S4887, S4890-91 (May 14, 1998)................................................................13

Cong. Rec. S4884 et seq. (May 14, 1998) .....................................................................13

Cong. Rec. S4891 (May 14, 1998) .................................................................................13

Fed. R. Civ. P. 56(c) .........................................................................................................9

House Judiciary Comm., H. Rept. 105-551 (1998) .......................................................13

22 Am Jur. 2d Damages §§ 4, 300.................................................................................15

Rule 56(d) .........................................................................................................................2

Plaintiff/Counter-Defendant Point 4 Data Corporation ("Point 4") and Plaintiff Dynamic Concepts, Inc. ("Dynamic") respectfully submit this memorandum of law in opposition to Defendant Tri-State Surgical Supply & Equipment Ltd.'s ("Tri-State") Motion for Partial Summary Judgment ("Motion") on claims for disgorgement and multiple statutory damages under the Digital Millennium Copyright Act, 17 U.S.C. § 1201, *et seq.* ("DMCA").

## I.   INTRODUCTION

Tri-State's Motion is fundamentally flawed in two critical respects – it relies on an untenable and unreasonable construction of the DMCA statute, and it demands summary judgment despite acknowledging the existence of key material disputes of fact on the very issues on which judgment is sought.

The principal target of the Motion – Plaintiffs' claims for disgorgement of profits "attributable to" Tri-State's violations of law – hinges entirely on Tri-State's gross misconstrual of statutory language and applicable case law.  Tri-State improperly attempts to conflate the legal standard for determining *liability* under the DMCA with the standard for determining *damages*. This Court previously pointed out the error of Tri-State's novel theory, which is unsupported by any legal authority and at odds with the statutory purpose and legislative history of the DMCA. And for good reason – Tri-State's crabbed interpretation would effectively eliminate the entire category of profit disgorgement damages from any case brought under 17 U.S.C. § 1201(a)(1).

Tri-State also advances a second legal argument on disgorgement, one that contradicts its first argument.  It concedes that that the actual language employed by the DMCA disgorgement statute – calling for disgorgement of profits "attributable to" violative acts – has been consistently interpreted by the federal courts in analogous circumstances quite broadly.  Indeed, the case law relied upon Tri-State in its own Motion holds that "attributable to" allows disgorgement of profits on the basis of traditional principles of tort causation – up to and

1

including recovery of "indirect profits."  Thus, Tri-State is reduced to making the implausible argument that there is no conceivable causal linkage between Tri-State's ability to access and exploit the comprehensive software package it used to operate its entire business, and the profits it earned from the conduct of that business.

The fatal flaw in Tri-State's disgorgement argument is plain enough: causation is a matter of fact and Tri-State itself concedes the existence of facts indicating a causal connection between its violation of the DMCA and its profits.  In particular, once Tri-State made the decision to violate the terms of its software licenses and utilize hacked versions of Plaintiffs' software, the only way it could access those programs was by circumventing the software security package that otherwise would have shut down Tri-State's access.[1]  And Tri-State's own witnesses have given sworn testimony that the Plaintiffs' software was so essential to the operation of Tri-State that absent access to those programs, the entire Tri-State business would have to shut down for at least six months.[2]  But the Court need not even investigate this far.  Because having premised their Motion on a factual question like causation in the middle of discovery with numerous noticed Tri-State depositions still untaken, summary judgment is automatically precluded by Rule 56(d).

Tri-State's motion for summary judgment on statutory damages claims, meanwhile, has been brought seemingly oblivious of the existence of fundamental disputes of fact that render it a non-starter.  Its Motion is founded on the fundamental misunderstanding that Plaintiffs' case is about the "circumvention of a dongle."[3]  But, this case has nothing to do with a dongle.  Rather, it concerns a systematic effort on behalf Tri-State and its co-defendants to circumvent the entire

---

[1] Plaintiffs' Response and Counterstatement to Tri-State's Rule 56.1 Statement of Undisputed Facts ("Counterstatement"), at ¶¶154-56.
[2] Counterstatement, at ¶¶33, 118, 133.
[3] Tri-State Surgical Supply & Equipment Ltd.'s Memorandum in Support of Its Motion for Partial Summary Judgment ("Motion"), at 1.

software-based "Passport" security system employed by the Plaintiffs, including that system's enforcement of user limits and licensing requirements. Rather than simply replacing or "emulating" a hardware dongle, Tri-State and its co-defendants instead installed deliberately "hacked" or "cracked" software code that allowed each of Tri-State's dozens of users to circumvent the Passport security suite at least daily.[4] Thus, the facts show that Tri-State engaged in thousands of separate acts of circumvention in violation of the DMCA.

Tri-State's brief is entirely silent on this basic question of fact. But its mere existence precludes summary judgment on Plaintiffs' claims for statutory damages, which turn entirely on determining how many acts of circumvention occurred. The number of acts of circumvention committed by Tri-State is a matter of fact, not law. And because it is a matter of fact sharply disputed by the parties (and one where the evidence strongly favors the Plaintiffs), it is not amenable to summary judgment.

Finally, Tri-State floats equitable defenses of laches and unclean hands in a last ditch effort to dispose of Plaintiffs' damages claims. In essence, Tri-State is contending that *they* have been harmed because after deliberately and willfully committing acts that are subject to criminal sanction under federal law, Plaintiffs did not sue them quickly enough. Needless to say, Tri-State cannot muster any authority to support this unusual and rather offensive argument. In any event, neither of the two defenses is properly before this Court within the terms of the reference, and neither is applicable to the present Motion because they are equitable defenses that do not bar Plaintiffs' remedies at law.

Tri-State concludes its preliminary statement to the Court by pointing to its status as a local, family-owned business. That is so. It is also true that Tri-State is a multi-million dollar family business that made a deliberate decision to violate the law in wanton disregard of the

---

[4] Counterstatement, at ¶¶40, 41, 148-157.

rights of Plaintiffs, both smaller family-owned businesses.  Tri-State has since used its superior

resources to pursue an aggressive, "take-no-prisoners" approach to discovery and litigation that

has given rise to the very costs it complains about to the Court.  But, of course, none of these

facts have any bearing on the Motion, which presents the Court with relatively straightforward

question of law and fact.

     For all of the foregoing reasons and in light of both the undisputed and disputed material

facts adduced through discovery, Tri-State's Motion should be denied.

## II.   STATEMENT OF FACTS

     This case concerns egregious conduct admitted by Tri-State in flagrant violation of

federal law.  In a parade of devastating admissions thus far in the case, Tri-State has admitted to

deliberate and systematic circumvention of the security measures in Plaintiffs' proprietary

software.  Repeated acts of circumvention were deliberately carried out through underhanded

means, including enlisting the services of an overseas hacker to "crack" Plaintiffs' proprietary

software code.

     For over 20 years, Tri-State used Point 4's Genesys program to carry out numerous

aspects of its business operations including, among other things, order and invoice intake

processing, accounting, sales analysis, purchasing and inventory tracking.[5]  Genesys is a

comprehensive business information management system that incorporates over 1,000 programs

that carry out these operational and accounting functions.[6]  Dynamic's UniBasic, first used by

Tri-State in 1999, is a software platform on which business applications such as Genesys are

developed and deployed to end-users worldwide.[7]

     Tri-State began using Point 4's Genesys program during the early 1980's and upgraded

---

[5] Counterstatement, at ¶¶7, 83.
[6] Counterstatement, at ¶83.
[7] Counterstatement, at ¶¶14, 85.

the software in 1999.[8]  (UniBasic was also installed at that time.)[9]  In connection with the

software upgrade, Tri-State entered into relevant license agreements governing Tri-State's use of

Plaintiffs' software programs (the "1999 Agreement").[10]  Following the installation of the

upgraded software, a dispute arose and Tri-State withheld payment for frivolous reasons that

ultimately led Point 4 and Tri-State to arbitration in 2002.[11]  Tri-State lost the arbitration and was

directed to pay over $55,000 in unpaid fees and $150,000 in attorneys' fees to Point 4.[12]  After

the arbitration, Tri-State did not communicate with Plaintiffs until 2010.[13]

     In 2007, Tri-State purchased a new server and decided to migrate Plaintiffs' software to

the new server.[14]  Tri-State performed the migration without informing or consulting Plaintiffs.[15]

However, due to its failure to consult with or engage the assistance of Plaintiffs, Tri-State's

transfer of Plaintiffs' software to the new server was executed poorly and unprofessionally.[16]  In

particular, Tri-State failed to transfer several key UniBasic files, which were consequently

missing from the new server.[17]  These missing files did not impair the functioning of the Genesys

and UniBasic programs but the resulting incorrect permission settings on Passport did cause Tri-

State users to experience difficulties logging into Genesys, following occasional server failures

(which occurred for reasons unrelated to Plaintiffs' software).  Tri-State users would receive an

error message from UniBasic's software security module, "Passport."[18]  The source of this

problem was the incorrect permission settings for Passport that Tri-State had omitted in its

---

[8] Counterstatement, at ¶¶7-10, 81, 83.
[9] Counterstatement, at ¶81.
[10] Counterstatement, at ¶9, 81.
[11] Counterstatement, at ¶¶16-17.
[12] Counterstatement, at ¶18.
[13] Counterstatement, at ¶¶23, 113.
[14] Counterstatement, at ¶¶21, 111.
[15] Counterstatement, at ¶112.
[16] Counterstatement, at ¶¶21, 34, 117.
[17] Counterstatement, at ¶¶34, 114.
[18] Counterstatement, at ¶¶21, 116, 119.

botched migration.  The Tri-State dongle did not cause any server failures or difficulties with Genesys user logins.[19]

At any time, Tri-State could have solved this minor problem either by contacting Point 4 for service or by entering a simple three-line command sequence.[20]  The required command sequences set forth in the user manual for "Passport," Dynamic's security system, which was freely accessible and available online.[21]  Although Tri-State's IT director Shimon Hoffman and Tri-State's computer consultant defendant Judkovitz were aware of, and at times consulted, the Passport manual and the applicable troubleshooting guidance, neither ever followed the instructions provided therein or sought assistance from Point 4.[22]  Instead, Tri-State employed an independent IT consultant (William or "Ari" Spiegel) to resume operation of Plaintiffs' software each time the server rebooted.[23]

In January 2010, a different IT consultant (Perry Wolfe) for Tri-State contacted Point 4 to inquire about upgrading the Genesys program.[24]  In February and March, Tri-State's CEO and a Tri-State employee followed up to request estimates of costs for such an upgrade.[25]  Point 4 responded with a price quotation for a fully upgraded version of Genesys and UniBasic.[26]  At no point did Tri-State's consultant or George Hoffman inform Point 4 of any difficulties running Genesys or problems with the dongle, or that it had transferred Genesys to a new server in 2007.[27]

Also in early 2010, a Tri-State representative contacted Dynamic concerning a complaint

---

[19] Counterstatement, at ¶¶21, 34, 117.
[20] Counterstatement, at ¶¶34, 120-21.
[21] Counterstatement, at ¶¶120-21.
[22] Counterstatement, at ¶121.
[23] Counterstatement, at ¶¶22, 122.
[24] Counterstatement, at ¶¶136-37.
[25] Counterstatement, at ¶¶139-40.
[26] Counterstatement, at ¶140.
[27] Counterstatement, at ¶¶23, 127, 132, 137.

about a system "freeze."[28]  The Dynamic representative who answered the call looked up the license and determined that the system in question had been installed by Point 4.[29]  Accordingly, following standard policy, he referred Tri-State to Point 4.  At no point did Tri-State inform Dynamic of any difficulties with the dongle or Point 4 or that it had transferred UniBasic to a new server in 2007.[30]

Tri-State did not seek information, advice or support from either Dynamic or Point 4 regarding resuming use of Plaintiffs' software following a server failure.[31]  Rather, in June of 2010, Tri-State, through defendants Judkovitz and SJ Computers, engaged the services of an overseas hacker to systematically circumvent the security measures of Plaintiffs' software.[32]  Tri-State paid the hacker USD $1000 for this "crack."[33]

By way of background, the security mechanisms of Plaintiffs' software consist of the Passport software module.[34]  Passport incorporates software code and scripts that protect UniBasic and all programs that run on UniBasic (including Genesys) from access or use that is unauthorized or inconsistent with license restrictions.[35]  ████████████████████ ████████████████████████████████████████████████████ ███████████

Tri-State's Motion is premised on its erroneous belief that the security measures of Plaintiffs' software consist entirely of a hardware dongle that physically attaches to the

---

[28] Counterstatement, at ¶129.
[29] Counterstatement, at ¶131.
[30] Counterstatement, at ¶¶27, 130.
[31] Counterstatement, at ¶¶130, 139-41.
[32] Counterstatement, at ¶143.
[33] Counterstatement, at ¶147.
[34] Counterstatement, at ¶¶88-102.
[35] Id.
[36] Id.

computer's COM port.[37]  Tri-State is mistaken. ████████████████████



In the course of seeking to circumvent the security measures of Plaintiffs' software, Tri-State copied Plaintiffs' software code and emailed DongleLabs, an overseas hacker.[42]  The hacker then created a modified version of Plaintiffs' software code, or "crack."[43] ████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████████

---

[37] Motion, at 1.
[38] Counterstatement, at ¶¶102, 108.
[39] Counterstatement, at ¶102.
[40] Id.
[41] Id.
[42] Counterstatement, at ¶¶38, 143, 145.
[43] Counterstatement, at ¶¶40, 146.
[44] Counterstatement, at ¶¶40, 155.
[45] Counterstatement, at ¶¶40, 149-56.
[46] Counterstatement, at ¶¶41, 149-56.
[47] Counterstatement, at ¶157.

███████████████████████████ ██ ████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████ ██

Tri-State continued to use this modified version of Plaintiffs' software until March 7, 2011, when Judge Dearie ordered that Plaintiffs could remove the modified software.[50] Plaintiffs' software supported Tri-State's entire business operations and therefore was crucial for the operation of Tri-State's business.[51]  Tri-State employees previously stated, under the penalty of perjury, that Plaintiffs' software was indispensible to the operation of its business such that preventing its use, even temporarily, would destroy Tri-State's business.[52] ███████████████

██████████████████████████████████████ █

## III.  LEGAL STANDARD

Summary judgment is not appropriate where there is a genuine dispute as to material facts.  *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986).  A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  In assessing a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in the affidavits, attached exhibits, and depositions submitted must be viewed in the light most favorable to the party opposing the motion."  *United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962).  Here, the facts upon which Tri-State relies in seeking summary judgment either support Plaintiffs' claims or are genuinely in dispute.

---

[48] Id.
[49] Counterstatement, at ¶¶154, 156.
[50] Counterstatement, at ¶148.
[51] Counterstatement, at ¶158.
[52] Counterstatement, at ¶¶33, 133.
[53] Counterstatement, at ¶¶33, 158.

IV.   **ARGUMENT**

   A.   **Summary Judgment is Not Appropriate on the Disgorgement Claim.**

The DMCA provides that a plaintiff may recover "actual damages and any additional profits of the violator," which includes "*any profits of the violator that are attributable to the violation* and are not taken into account in computing the actual damages…"  17 U.S.C. § 1201(a)(1), 1203(c)(1)-(2) (emphasis added).

To prevail on its Motion, Tri-State must show (which it fails to do) that, as a matter of law and with no material facts in dispute, *not a single dollar* of Tri-State's profits earned during the period it used hacked version of Plaintiffs' software is "attributable to" its acts of circumvention.  The fate of Tri-State's Motion thus rises and falls on the meaning of the term "attributable to."  Yet Tri-State fills its brief with nine pages of argument before even attempting to address the basic question of what this critical statutory language actually means.[54]  This seemingly strange oversight is not surprising.  As Tri-State concedes, the federal courts have consistently interpreted the term "attributable to" to require merely some causal nexus between a legal violation and the profits sought to be disgorged, and thus (among other things) permit disgorgement of "indirect" as well as "direct" profits.[55]  Because it is a trivial matter for Plaintiffs to demonstrate a causal linkage between Tri-State's violations in accessing Plaintiffs' mission-critical software programs, and Tri-State's ability to run a profitable business, there is no basis for summary judgment.

   1.   **Tri-State's Gross Profits Are
Attributable To Its Acts Of Circumvention**

Tri-State's profits are, in whole or in part, "attributable to" the violation, as expressly provided for in the statute.  Although no case has yet defined the term "attributable to" in a

---

[54] Motion, at 16-25.
[55] Motion, at 25-26.

DMCA case, many courts have defined the identical phrase in the Copyright Act.  The Second

Circuit, along with other sister circuits, has consistently held that profits may be "attributable to"

a violative act of infringement as long as there is some degree of causation between the profits

and the infringement.  *See On Davis v. Gap, Inc.,* 246 F.3d 152 (2d Cir. 2001) ("attributable to"

requires that profits be "reasonably related" to infringement); *Polar Bear Prods. v. Timex Corp*.,

384 F.3d 700, 711 (9th Cir. 2004) (plaintiff "is bound to no more and no less than its statutory

obligation to demonstrate a causal nexus between the infringement and the profits sought.").  *See*

*also Lawton v. Melville Corp*., 116 F.3d 1472 (2d Cir. June 24, 1997) (requiring "some nexus" or

"some degree of causation").

Disgorged profits can be from an indirect source as long as they are reasonably related to

the violation.  *See, e.g., Polar Bear,* 384 F.3d at 708 (parties can receive indirect profits remedy

upon establishing existence of a causal link); *Univ. of Colo. Found. v. Am. Cyanamid Co*., 196

F.3d 1366, 1375 (Fed. Cir. 1999) (indirect profits may be apportioned upon showing nexus with

infringement); *Bucklew v. Hawkins, Ash, Baptie & Co.,* 329 F.3d 923, 933 (7th Cir. 2003) (profits

from indirect sources may be disgorged); *Andreas v. Volkswagen of America Inc.,* 336 F.3d 789,

796 (8th Cir. 2003) (profits can be disgorged "once [the] nexus is established in either a direct or

indirect profits case"); *Burns, M.D. v. Imagine Films Entertainment, Inc.,* No. 92-CV-2435, 1996

U.S. Dist. LEXIS 2105 (W.D.N.Y. Feb. 16, 1996) ("Profits attributable to the infringement could

include even those [profits] attributable only indirectly.") (citing 3 Nimmer on Copyright

§ 14.03, at 14-32).  Indeed, the Second Circuit has even recognized the possibility of disgorging

indirect profits in the form of enhanced goodwill and market recognition.  *See Business Trends*

*Analysts, Inc. v. The Freedonia Grp.,* 887 F.2d 399, 404 (2d Cir. 1989) (non-quantifiable profits

can be awarded "so long as the amount of the award is based on a factual basis rather than undue

speculation.").

Tri-State acknowledges the legal consensus on the courts' construal of "attributable to," as it must.[56]  But it incorrectly suggests that disgorgement claims alleging indirect profits must make a "heightened" threshold showing of causation.[57]  The law is quite to the contrary.  Indeed the case cited by Tri-State, *Lowry's Report, Inc. v. Legg Mason, Inc.*, 271 F. Supp. 2d 737 (D. Md. 2003), merely mentions the requirement of a "causal link" and is silent on a "heightened" showing.  The circuit courts that have addressed the question have answered resoundingly in the negative.  *See, e.g.*, *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002) (rejecting differentiation between direct and indirect profits); *Andreas*, 336 F.3d at 796 ("Although cases distinguish between direct and indirect profits, the statute does not.").

Given the consistent interpretation applied to the term "attributable to," Tri-State's attempt to evade disgorgement arguing that its profits are generated by the sale of medical supplies, not software,[58] is nonsensical.  There is no reason why illegal circumvention of one kind of product cannot facilitate, directly or indirectly, a company's ability to profit with respect to another product.  The case law in the copyright context makes this abundantly clear: defendants can be compelled to disgorge profits obtained from sales of one kind of product, where the act of infringement relates to a product or work otherwise unrelated to their business. *See, e.g., Andreas*, 336 F.3d 789 (profits from sale of car may be awarded for copyright infringement of art work); *Polar Bear*, 384 F.3d at 708 (finding profits from watch sales can be disgorged to the extent causally related to infringement of kayaking film footage).

While it is true that the overwhelming authority regarding the broad application of "attributable to" arises in copyright cases, the legislative history and statutory objective of the

---

[56] Motion, at 25-26.
[57] Motion, at 26-27.
[58] Motion, at 24, 26, 29.

DMCA counsel toward an even more generous interpretation. The DMCA was specifically designed and intended to improve protection of copyrighted works in the digital environment and to deter the unauthorized circumvention of protection technologies. *See, e.g.* House Judiciary Comm., H. Rept. 105-551 (Part I) at 10 (1998); House Commerce Comm., H. Rep. 105-551 (Part 2) (1998) at 38; Cong. Rec. S4891 (May 14, 1998). Indeed, sponsors and supporters of the legislation repeatedly pointed to the strong national interest in enacting measures to deter the very conduct that occurred here – circumvention by overseas hackers of protection measures used to control access to domestic content. *See, e.g.,* Cong. Rec. S4884 *et seq.* (May 14, 1998); Cong. Rec. H7091 *et seq.* (Aug. 4, 1998). For example, Senator Ashcroft, who played a "significant role" in the legislation, explained that "[p]iracy is a large and growing problem . . . particularly to our software industry" and thus a key purpose was to "effectively deter piracy." Cong. Rec. S4887, S4890-91 (May 14, 1998). The Senator concluded by noting that "It is vital we do everything we can to protect and defend this vital sector of the economy from foreign piracy." *Id.* at S4893. Others echoed this deterrence rationale. *See, e.g.*, S11890 (Sen. Lieberman) ("It will … send a powerful message to intellectual property pirates that we will not tolerate theft"); E2144 (Rep. Tauzin) (legislation intended to "send a signal to the rest of the world" that "authors and their works will be protected from pirates who pillage their way through cyberspace"). Therefore, reading the disgorgement remedy provision in a manner that is significantly narrower than its application under the copyright laws would be inconsistent with the policy objective of the statute.

### 2. Tri-State's Interpretation Of The DMCA Disgorgement Statute Is Unreasonable

In contradiction to the plain meaning of the statute, analogous case authority, and the legislative intent underlying the DMCA, Tri-State insists that profits "attributable to" the

circumvention are limited only to the immediate profits realized by the act of circumvention per se.  Tri-State proposes an extremely narrow construction of the statute that would exclude any profits generated as a result of the circumvention.  Its interpretation effectively rewrites the statute to replace profits "*attributable to* the violation" with "profits *of* the violation."  As previously discussed, Tri-State's proposed re-writing of the "attributable" language in 17 U.S.C. § 1203(c)(1)-(2) contradicts the way courts have consistently interpreted the exact same language in the copyright context and is unreasonably narrow in light of the policy objective and clear statutory intent of deterring unauthorized access of protected works.

Tri-State's only basis for its extraordinarily cramped reading of the DMCA disgorgement provision is the argument that because *liability* under the DMCA requires only an act of infringement, and not subsequent illegal use of protected materials, that *damages* under the DMCA cannot be based in any way on such subsequent use.[59]  Thus, Tri-State relies on *Universal City Studios, Inc., v. Corley*, where the issue before the court was whether using circumvention technology to make fair use of copyrighted materials would violate the DMCA.[60]  In that narrow and distinguishable context concerning DMCA *liability* (not damages), the court held that such conduct still constitutes a violation of the DMCA because liability under the statute is  triggered by the mere act of circumvention, and not the propriety of any subsequent use of the underlying material.  273 F.3d 429 (2d Cir. 2001).  The court never addressed the issue of what damages flow in the event of a DMCA violation.[61]

---

[59] Motion, at 18-25.

[60] Motion, at 18-19.

[61] All of the other cases cited by Tri-State are similarly inapposite.  *Davis v. The Gap, Inc.*, 246 F.3d 152, 176 (2d Cir. 2001) supports Plaintiffs' position that profits are recoverable upon showing a "reasonable relationship."  The remainder of the cases cited by Tri-State address only DMCA liability – whether the conduct at issue violated 17 U.S.C. § 1201(a); they do not consider or decide the issue of what damages would flow from such a violation.  *See MDY Indus., LLC v. Blizzard Entm't, Inc.*, 629 F.3d 928, 951 (9th Cir. Feb. 17, 2011) (holding defendant liable for trafficking in technology designed to control access to copyrighted works, but not addressing damages); *MGE UPS Sys., Inc. v. GE Consumer & Indus., Inc.*, 622 F.3d 361, 366 (5th Cir. 2010) (holding no liability under

This Court previously noted the inapplicability of *Corley* to the issue of damages, in the December 9, 2011 hearing, noting "that case deal[s] with the issue of fair use" and "not . . . with the measure of damages."[62]  Tri-State's brief offers no explanation or authority to suggest why cases expanding the scope of liability under the DMCA should be applied in a manner to sharply restrict the scope of damages recovery.  To the contrary, ordinary black letter damages doctrine permits recovery of any damages foreseeably and causally connected to a legal wrong.  *See* 22 Am. Jur. 2d Damages §§ 4, 300 (explaining damages and causation).  Tri-State's interpretation is akin to arguing that if a thief picks the lock on a coin-operated locker to steal cash inside, the only profits "attributable to" the lock picking is 25 cents and does not include the money.

Once again, copyright law provides a useful point of comparison.  Using Tri-State's restrictive view of "attributable to" in the copyright context would limit disgorgement to recovery of only those profits earned by the act of infringement itself.  Thus, for example, if a car manufacturer lifted eight lines of text from a copyrighted work and inserted it in an advertisement, then under Tri-State's interpretation, disgorgement damages would be limited to the profits earned from the act of copying the text.  Since a car company is not in the business of selling art works and incurred only costs in incorporating the work into an advertisement, under Tri-State's construction, it could not claim disgorgement damages.  But in real life, the Eighth Circuit found precisely to the contrary – holding that the plaintiff could recover profits from the

§ 1201(a)(1) where plaintiff failed to present sufficient evidence of circumvention of defendants' software protections); *Ground Zero Museum Workshop v. Wilson*, 2011 WL 3758582, at *6-8 (D. Md. Aug. 24, 2011), *reconsideration denied* (Nov. 4, 2011) (holding no liability under § 1201(a)(1) where plaintiffs failed to allege facts showing defendant accessed website without using a security pass code issued by plaintiffs); *United States v. Crippen*, 2010 WL 7198205, at *5 (C.D. Cal. Nov. 23, 2010) (granting motion to exclude evidence of fair use at trial because fair use held not relevant to liability under § 1201(a)); *Healthcare Advocates, Inc. v. Harding, Earley, Follmer & Frailey*, 497 F. Supp. 2d 627, 644-45 (E.D. Pa. 2007) (holding no liability under § 1201(a)(1) where facts showed defendant did not take any action to bypass plaintiff's web security and merely benefitted from a malfunction in Internet Archives' servers); *I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys., Inc.*, 307 F. Supp. 2d 521, 533 (S.D.N.Y. 2004) (holding no liability under § 1201(a) where defendant used password issued by plaintiff to another entity to access plaintiff's protected website without plaintiff's authorization).
[62] Declaration of Jason Koral, dated February 10, 2012 ("Koral Dec."), Ex. 18 (Tr. of December 9, 2011 hearing) at 24.

sales of the underlying automobile.  *Andreas,* 336 F.3d at 796.  Indeed, every federal court to

consider that issue has rejected Tri-State's proposed construction, holding that disgorgement

damages are not limited to profits from the act of infringement but may include any gains –

direct or indirect – that have a "causal nexus" with the acts on infringement.  *See* Section IV.A.1,

*supra*.

In addition, application of Tri-State's reading to the DMCA would have particularly

illogical results, effectively eliminating the statutory entitlement to disgorgement in all cases

brought for violations of § 1201(a)(1).  Under Tri-State's construction, anyone who bypasses

security mechanisms of a protected work is immunized from disgorgement liability unless they

realize a profit on the act of circumvention itself.[63]  But the only circumstance under which a

circumventing party may realize a profit on the circumvention, rather than use, of the protected

work is if it sells the hacked work or receives payment for the circumvention.  Those situations

fall under § 1201(a)(2), which prohibits trafficking in circumvention technology such as selling

"jailbroken" devices or offering circumvention and hacking services.  Thus, adopting Tri-State's

interpretation would write the terms "attributable to" out of the statute and virtually eliminate the

entire disgorgement category of damages for all cases brought under § 1201(a)(1).  Needless to

say, Tri-State provides no authority for the proposition that it is reasonable to interpret a general

damages provision as to be inapplicable to any entire statutory category of violations.

---

[63]  Note that even if the plaintiff is in the exact same business as the violator, Tri-State's construction would still
block any disgorgement recovery.  For example, imagine Tri-State was a competitor to the Plaintiffs and hacked the
Plaintiffs' software in order to steal features of the software.  Under Tri-State's crabbed reading of the DMCA, no
disgorgement could occur, because the defendant's profits would stem not from the mere act of circumvention, but
the subsequent use of the features accessed as a result of the circumvention.  Indeed, assuming hypothetically that a
single act of circumvention occurred to scan access, under Tri-State's theory, damages under this disturbing scenario
would be limited a single statutory award of $250 to $2500.  Such an absurd result cannot possibly be squared with
the statutory purpose and Congressional intent behind the DMCA.

3. **The Statutory Language of 17 U.S.C. 1203(c)(2)**
   **Does not Support Tri-State's Position**

Recognizing that the interpretation of the term "attributable to" in the copyright context

dooms its Motion, Tri-State places great weight on a supposed distinction between the term

"violation" in the DMCA and the term "infringement" in the Copyright Act.[64]  But this

distinction has no bearing on the legal question at issue here – namely, the extent of the causal

nexus required as between the liability triggering event (however defined) and subsequent

profits.  In both statutes, the liability triggering event – a "violation" (i.e. act of circumvention) in

the case of the DMCA or an act of infringement in the case of the Copyright Act – is easily

distinguished from subsequent efforts to exploit those events.  As previously explained, under

the Copyright Act, the term "attributable to" has been consistently interpreted as allowing

plaintiffs to draw a causal linkage between the infringing acts, and profits directly or indirectly

earned as a result of exploiting those acts.  The exact same logic applied to the exact same

"attributable to" language of the DMCA permits Plaintiffs in this case to recover the profits

earned from the fruits of Tri-State's acts of circumvention.

Similarly, Tri-State's invocation of the Copyright Act's so called "burden shifting"

mechanism is a non-sequitur.  That language in the Copyright Act has nothing to do with the

threshold issue of whether or not profits can be disgorged.  Rather, it relates solely to the method

used to calculate the precise amount of the profits to be disgorged.  Calculation of the amount of

profits for disgorgement is a factual question on which much discovery has yet to be taken, and

---

[64] Tri-State is mistaken in its belief that Plaintiffs seeks damages for copyright infringement.  As this brief and the
supporting materials demonstrate, Plaintiffs seek only disgorgement of profits attributable to Tri-State's violations of
the DMCA.  Tri-State's confusion of this point apparently stem from ████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

is not at issue in this Motion

### 4.   There is a Clear Causal Connection Between the Acts of Circumvention and Tri-State's Profits

Tri-State's entire business depended on Plaintiffs' software platform.[65]  According to the sworn declaration Tri-State submitted in opposition to preliminary injunction motion, the company could not have operated its business without continuous access to Genesys and UniBasic during the entire 8-month period.[66]  ███████████████████████ ███████████████████████████████████████████████ ███████████████████████████  That evidence provides more than sufficient relationship between Tri-State's circumvention and profits earned during the relevant period.  Even in an indirect profits case, Plaintiffs need only present evidence that "the infringement at least partially caused the profits that the infringer generated as a result of the infringement."  *Polar Bear*, 384 F.3d at 711.  Having made the decision to violate the terms of their software licenses and install an illegal, hacked version of Plaintiffs' software, Tri-State made their business dependent on their ability to maintain access to that software.  The evidence shows that after Tri-State decided to illegally hack Plaintiffs' software, Tri-State's entire business depended on dozens of daily routine acts of circumvention via the execution of the "crack."

Now that Tri-State's prior sworn declaration has proven painfully inconvenient for its legal position, Tri-State attempts to run away from it.  But Mr. Geisler's statement is unequivocal.  He attests bluntly that "[w]ithout a running Genesys software, the Tri-State

---

[65] Counterstatement, at ¶158.
[66] Ard Dec., Ex. 2 (Geisler Dec.), at ¶¶37-40.
[67] Koral Dec., Ex. 1 (S. Hoffman Depo. Tr.), at 153:17-154:14, 155:1-22.

business comes to immediate halt and 40 employees become idled."[68]  Even preliminary denial

of access to Genesys, according to Mr. Geisler, "would result in the destruction of Tri-State's

business."[69]

       Tri-State now contends that Tri-State did not depend on "Plaintiff's particular brand,"

and could have "migrated" to another software package.[70]  But Mr. Geisler addresses this very

point as well, noting that such migration would take six months, during which period competitors

would poach all of Tri-State's business.[71]  And Mr. Geisler's sworn statement is borne out by the

fact that when Tri-State did change over to another program after this lawsuit was filed, it took

months of time and hundreds of thousands of dollars in costs.  Such a maneuver was only

possible because during that entire time, Tri-State was able to reap the benefits of full use of

Plaintiffs' software for the transition period, pursuant to the Court-ordered consent injunction.

       Moreover, what Tri-State could have done is irrelevant.  What Tri-State actually did was

to install a modified version of Plaintiffs' software and to use the "crack" to circumvent access

restrictions.  It was that access over a period of 8 months, and nothing else, that permitted Tri-

State to operate its business, book and ship sales, collect and record invoices, and thus enjoy its

profits.[72]

       Tri-State also points to case law indicating that recovery of indirect profit streams must

be limited to the specific type of profits related to the violation.[73]  Thus, in *On Davis v. The Gap,

Inc.*, 246 F.3d 152, 160 (2d Cir. 2001), the Second Circuit addressed The Gap's infringement of

an eyeglass design, which occurred when The Gap ran a print advertisement in which individuals

---

[68] Ard Dec., Ex. 2 (Geisler Dec.), at ¶37.
[69] Ard Dec., Ex. 2 (Geisler Dec.), at ¶38.
[70] Motion, at 30.
[71] Ard Dec., Ex. 2 (Geisler Dec.), at ¶¶39-40.
[72] Counterstatement, at ¶¶40, 146-56.
[73] Motion, at 27.

wearing the infringing design appeared.  The Court ruled that the infringing advertisement for

eyewear products might only give rise to disgorgement of profits from eyewear products and

accessory sales, and not from entire vast Gap operation.  *Id.* at 160-61.  But the circumstances

here could not be more different.  As Mr. Geisler's affidavit attests, Tri-State's access to

Plaintiffs' software was not a minor component of some specific profit stream, such as the sale

of gauze pads.  Rather, the efficient operation of the entire Tri-State enterprise depended on

consistent and continuous access to the Plaintiffs' software.[74]

Finally, to the extent there exist genuine issues of fact as to precisely what portion of Tri-

State's profits is attributable to the circumvention of Plaintiffs' software, those are factual

matters appropriate for trial, not summary judgment.  Tri-State's invocation of the need of

"evidence" to support damages claims makes its present Motion particularly inexplicable, given

that it has been brought months prior to the termination of fact discovery, and with significant

discovery relating to these very damages issues still left to complete.

> **B.      Plaintiffs Are Entitled To Statutory Damages Based On**
> **Each Act Of Circumvention Executed At Each User Login**

The DMCA's statutory damages provision provides simply that damages of $250 to

$2500 may be awarded "per act of circumvention . . ."  17 U.S.C.1203(c)(3)(a).  Thus, the only

question is determining the number of acts of circumvention.  But the number of acts of

circumvention is not only a fact question, it is the very question of fact which Tri-State candidly

concedes is a matter of dispute between the parties, thus dooming its motion.

The facts obtained through discovery to date demonstrate that Tri-State's software

"crack" embedded new code into Plaintiffs' software.[75]  █████████████████████████

███████████████████████████████████████████████████████████████████

---

[74] Ard Dec., Ex. 2 (Geisler Dec.), at ¶¶37-38.
[75] Counterstatement, at ¶¶40, 149.

██████████████████ █████████████████████████

████████████████████████████████████████████████

██████████████████████████ Thus, a separate

distinct act of circumvention occurred at each user login, amounting to well over ten thousand

acts of circumvention over an eight month period.

Tri-State also incorrectly asserts that only one violation could have occurred because only

"one dongle" was bypassed.[78]  This is a classic red herring.  This case is not about bypassing or

replacing a hardware dongle.  It is about the systematic circumvention of an entire software-

based security suite of which the hardware dongle was merely one passive component, and an

optional one at that.  That circumvention was implemented through a software "crack" in a

manner such that an active circumvention occurred at every user login.

### C.    At A Minimum, Acts Of Circumvention And Profits Attributable Thereto Are Disputed Issues Of Fact

Once this Court rejects Tri-State's irrational interpretation of the disgorgement provision,

the Motion necessarily fails due to the numerous remaining disputes over material facts.  The

parties are in factual dispute over, among other things, what conduct constitutes an act of

circumvention  in this case, the mechanism of Tri-State's crack, the significance of Plaintiffs'

software to Tri-State's business and its profitability, the apportionment of Tri-State's profits for

disgorgement, and the extent and sustainability of Tri-State's business operations without

Plaintiffs' software.  Moreover, as discovery is still ongoing, many Tri-State depositions are left

untaken, and Tri-State continues to contest the need to produce business documents, to the extent

the Court were to find any evidentiary deficiencies, deferral or denial of the Motion would be

---

[76] Counterstatement, at ¶¶149-56.
[77] Counterstatement, at ¶¶154, 156.
[78] Motion, at 31.

appropriate pursuant to Rule 56(d).

Plaintiffs have made a prima facie showing that: 1) an act of circumvention occurred when, at each user login, the hack script implemented a bypass of the security module; and that 2) Tri-State could not have operated its business and earned the amount of profits it did, without Plaintiffs' software.  Such showing, coupled with the remaining issues of material facts, is sufficient to defeat Tri-State's Motion.

### D. Tri-State's Laches And Unclean Hands Defenses Are Procedurally And Substantively Invalid

Tri-State advances defenses based on laches and unclean hands, both of which are procedurally and substantively flawed.  As a procedural matter, Plaintiffs respectfully note that these issues are not properly before the Court.  Tri-State's Motion is for partial summary judgment relating to two specific damages theories, and equitable defenses are not within the scope of matters referred to the Court.  Moreover, laches and unclean hands are equitable defenses that cannot bar or limit Plaintiffs' remedies at law.  *See State Farm Mut. Auto. Ins. Co. v. Valery Kalika,* 04 CV 4631 (CBA), 2006 WL 6176152, at *7 (E.D.N.Y. Mar. 16, 2006) ("Thus, laches may be raised as a defense only against claims in equity and not at law[.]") (internal quotations omitted); *Liebowitz v. Elsevier Sci. Ltd.,* 927 F. Supp. 688, 704 (S.D.N.Y. 1996) ("Laches is a defense only against claims in equity and not at law"); *Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc.,* 404 F.3d 566, 607 (2d Cir. 2005) ("Unclean hands is an equitable defense to equitable claims."); *Gala Jewelry, Inc. v. Harring,* 05 CIV. 7713(GEL), 2006 WL 3734202, *2 (S.D.N.Y. Dec. 18, 2006) ("Plaintiff correctly points out that the law of this circuit restricts the "unclean hands" doctrine to suits in equity…").

Substantively, Tri-State's brazen invocation of these equitable defenses rests on sheer chutzpah, not legal principle.  The gravamen of Tri-State's argument is that Plaintiffs, not Tri-

State, are to blame for the legal consequences of Tri-State's deliberate decision to crack

Plaintiffs' software in violation of the DMCA.  The law is to the contrary; equitable defenses

such as laches and unclean hands are not available to defendants like Tri-State who have

engaged in willful violations of law.  *See, e.g., Hermes Int'l v. Lederer de Paris Fifth Ave., Inc.*,

219 F.3d 104, 107 (2d Cir. 2000) (rejecting laches defense in copyright case because "laches is

not a defense . . . when the defendant intended the infringement.").

      The fact that Plaintiffs took the time to properly investigate Tri-State's surreptitious

lawbreaking and consult multiple attorneys for advice before making very serious allegations in

a formal legal pleading is not evidence of unfairness to the defendants.[79]  Tri-State cannot and

does not point to any legal authority for such an extraordinary and unprecedented proposition.

Tri-State's present troubles are entirely of its own making.  At any time, it could have easily cut

off its present legal exposures, through the simple expedient of ceasing its continuing, willful

violation of the law.

      Tri-State's arguments also fail because laches and unclean hands doctrines require fact-

specific inquiries.[80]  With respect to laches, Plaintiffs contend that the facts demonstrate that it

acted appropriately in investigating the facts and considering its legal options prior to filing

suit.[81]  To the extent Tri-State disputes the reason for the delay and whether the delay was

reasonable and in good faith, such disputes are questions for the trier of facts and inappropriate

for summary judgment.  *See MacDonald v. Du Maurier*, 75 F. Supp. 653, 654 (S.D.N.Y. 1946)

("Whether or not plaintiff was guilty of laches, is, under all the circumstances herein [where

---

[79] Counterstatement, at ¶¶161-67.

[80] Concerning laches in particular, Tri-State's defense is barred as a matter of law to the extent the underlying claims were timely brought under the applicable statute of limitations.  *See Price v. Fox Entm't Group, Inc.*, 2007 WL 241387, at *3 (S.D.N.Y. 2007) ("[L]aches may not be used to bar timely filed copyright infringement claims, both legal and equitable, that do not involve ongoing infringement."); *Eyal R.D. Corp. v. Jewelex New York, Ltd.*, 576 F. Supp. 2d 626, 644 (S.D.N.Y. 2008) (suggesting that laches likely does not apply to claims brought within statute of limitations).

[81] *See* footnote 79, *supra*.

reason for delay was disputed], a question of fact to be submitted to the triers of the issues.");

*Armstrong v. Virgin Records, Ltd.*, 91 F. Supp. 2d 628, 643 (S.D.N.Y. 2000) ("Given the fact-specific nature of a court's inquiry, the resolution of laches-related disputes is dependent 'on the circumstances peculiar to each case.") (citations omitted).  Similarly, the doctrine of unclean hands "is peculiarly fact-specific[.]"  *Broad. Music, Inc. v. Hearst/ABC Entm't Services*, 746 F. Supp. 320, 329-30 (S.D.N.Y. 1990).

### CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that this Court deny Tri-State's Motion in its entirety.

Dated:  New York, New York
        February 10, 2012

                                      Respectfully submitted,

                                      **COOLEY LLP**

                                      By:  ___/s/ Jason Koral_____
                                                 Jason Koral
                                             Karen K. Won

                                      1114 Avenue of the Americas
                                      New York, New York, 10036
                                      Tel:  (212) 479-6000
                                      Fax:  (212) 479-6275
                                      (jkoral@cooley.com)
                                      (kwon@cooley.com)

                                                      -AND-

                                      **GREENWALD & HOFFMAN, LLP**
                                      Paul Evan Greenwald
                                      1851 E. First Street, Suite 860
                                      Santa Ana, California, 92705
                                      Tel:  (714) 285-0025
                                      Fax:  (714) 285-0028
                                      (pegreenwald@ghlaw.us )

                                      *Attorneys for Plaintiffs*

24
