UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
POINT 4 DATA CORP., et al.,

                              Plaintiffs,

                        -against-

TRI-STATE SURGICAL SUPPLY &
EQUIPMENT, LTD., et al.,

                            Defendants.
------------------------------------------------------------x

**MEMORANDUM
AND ORDER/
REPORT AND
RECOMMENDATION**

11-CV-726 (CBA)

**ROANNE L. MANN, UNITED STATES MAGISTRATE JUDGE:**

      For a number of years, plaintiffs Point 4 Data Corporation and Dynamic Concepts, Inc.

(collectively, "plaintiffs") licensed computer software to defendant Tri-State Surgical Supply &

Equipment, Ltd. ("Tri-State").  In this action, plaintiffs allege that Tri-State, along with

defendants SJ Computers, Inc. and Shmuel Judkovitz (collectively, with Tri-State,

"defendants"), unlawfully hacked into and modified plaintiffs' software in order to enable Tri-

State to circumvent the software's security protections.  Plaintiffs allege that these acts violated

Tri-State's licensing agreements; other aspects of New York common law; the Lanham Act, 15

U.S.C. § 1125(a); and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 1201 *et*

*seq.*  See Complaint (Feb. 14, 2011) ("Compl."), Electronic Case File ("ECF") Docket Entry

("DE") #1.

      After fact and expert discovery closed, the parties cross-moved for summary judgment

on various claims, affirmative defenses and counterclaims.  On January 17, 2013, the

Honorable Carol B. Amon referred the cross-motions to the undersigned magistrate judge for a

report and recommendation.  See Order (Jan. 17, 2013).  In connection with plaintiffs' motion for summary judgment, plaintiffs have submitted a declaration from each of their respective principals.  Tri-State seeks to strike these two declarations as untimely expert disclosures under Rules 26 and 37 of the Federal Rules of Civil Procedure (the "FRCP").

As explained more fully below, the Court grants, in substantial part, Tri-State's motion to strike.  In addition, for the reasons that follow, the undersigned magistrate judge recommends that the District Court grant in part and deny in part the parties' cross-motions for summary judgment as detailed herein, such that the only claims remaining in the case would be plaintiffs' two breach of contract claims against Tri-State.

## BACKGROUND[1]

### I.    The 1999 Agreement and the Software's Security Protections

Defendant Tri-State is a Brooklyn-based distributor of medical and surgical supplies. See Tri-State's Rule 56.1 Statement of Uncontroverted Material Facts (Nov. 15, 2012) ("Tri-State 56.1") ¶¶ 1-2, DE #263; Plaintiffs' Response and Counterstatement to Tri-State's Rule 56.1 (Dec. 17, 2012) ("Pl. 56.1") ¶¶ 1-2, DE #280.  In 1999, Tri-State and plaintiff Point 4 Data Corporation ("Point 4") entered into an agreement, titled "Equipment Purchase, Software License, Programming and Installation Services Agreement" (hereinafter, the "1999 Agreement").  See Tri-State 56.1 ¶ 5; Pl. 56.1 ¶ 5; 1999 Agreement, DE #309-1.  As part of the 1999 Agreement, Tri-State purchased a license to use Point 4's accounting software, Genesys.  See Tri-State 56.1 ¶ 6; Pl. 56.1 ¶ 6; Genesys Distribution Accounting Software

---

[1]   Unless otherwise noted, all facts set forth in this opinion are undisputed.

License Agreement ("Genesys License"), DE #283-3.  Genesys operates using UniBasic, a computer-development language for Unix-based computer operating systems; UniBasic is distributed by plaintiff Dynamic Concepts, Inc. ("DCI" or "Dynamic").[2]  See Tri-State 56.1 ¶ 8; Pl. 56.1 ¶ 8.  Because UniBasic was necessary in order to operate Genesys, the 1999 Agreement also provided Tri-State with a license to use UniBasic.  See Tri-State 56.1 ¶ 7; Pl. 56.1 ¶ 7; Software Selection Number (SSN) and License Agreement ("UniBasic License"), DE #283-4.[3]  Both the Genesys license and the UniBasic license were limited to 48 concurrent users.  See 1999 Agreement, DE #309-1 at 15-16.

UniBasic is embedded with security protections to enforce licensing restrictions, such as the number of concurrent users.  See Pl. 56.1 ¶ 169, Tri-State Opp. 56.1 ¶ 169.  To this end, each installation of UniBasic is identified by a unique license number that is paired with a corresponding Software Selection Number ("SSN").  See Expert Report of Barbara Frederiksen-Cross (Nov. 30, 2011) ("Cross Report") ¶ 24, DE #309-19.  "The license number identifies a specific licensed hardware platform, and the corresponding SSN contains encrypted data that identif[y] the particular product version and the number of concurrent users that are licensed for that platform."  Id.

The software that communicates with UniBasic regarding these licensing checks is called Passport Licensing Security Software ("Passport").  See id. ¶ 25.  In Tri-State's case,

---

[2]  On occasion, Genesys and UniBasic are collectively referred to herein as "the Software."

[3]  The parties dispute when the Genesys license was delivered to Tri-State and whether the UniBasic license was ever so delivered.  See Declaration of Jonah Geisler (Mar. 2, 2011) ¶¶ 9-11, 13, 16, 27, DE #22 (averring that, inter alia, the Genesys license is dated after the execution of the 1999 Agreement, and the UniBasic license agreement was never received by Tri-State); Pl. 56.1 ¶ 186; Tri-State's Response to Plaintiffs' Counterstatement of Undisputed Facts (Jan. 15, 2013) ("Tri-State Opp. 56.1") ¶ 186, DE #267.

Passport communicated with an external hardware device called a dongle, which was attached to the server.  See id.  In essence, "the Passport software reads information from the SSN file and uses this information to derive a string of characters (a 'seed') that is sent to [the dongle]." Id. (footnote omitted).  "Firmware in the dongle generates a license string using this seed, and returns the license string to Passport."[4]  Id.  Passport "validates the returned license string against expected results[,]" in order to authenticate the license.  See id.

## II.     The Recurring Problem and Tri-State's Retention of DongleLabs

After the 1999 Agreement was executed, a dispute arose between Point 4 and Tri-State, resulting in a 2002 arbitration hearing, and the parties thereafter ceased communicating.  See Tri-State 56.1 ¶¶ 13-14; Pl. 56.1 ¶¶ 13-14.  In 2007, Tri-State moved the Software from the server upon which it was initially installed to a new server (the "2007 Server"), but did not inform either Point 4 or DCI of this transfer.  See Pl. 56.1 ¶ 195; Tri-State Opp. 56.1 ¶ 195. Whenever Tri-State was required to reboot the 2007 Server (for example, if the server froze), Tri-State was unable to access the Software following the reboot (hereinafter, the "Recurring Problem").  See Pl. 56.1 ¶¶ 197, 199; Tri-State Opp. 56.1 ¶¶ 197, 199.  From 2007 to 2010, to address this access issue, Tri-State relied on its Information Technology ("IT") consultant, Ari Spiegel ("Spiegel"), who would arrange a temporary fix of the Recurring Problem (and thereby render the Software operable) through a series of steps unknown to Tri-State.  See Pl. 56.1 ¶ 206; Tri-State Opp. 56.1 ¶ 206.  The parties dispute the cause of the Recurring Problem.  See Pl. 56.1 ¶¶ 200-01; Tri-State Opp. 56.1 ¶¶ 200-01.

---

[4] Where a dongle is not used, the license number is generated by software.  See Cross Report ¶ 25.

On February 25, 2010, Tri-State again experienced the Recurring Problem when its 2007 Server froze.  See Tri-State 56.1 ¶ 16; Pl. 56.1 ¶ 16.  At this time, due to a dispute between Tri-State and Spiegel regarding payment, Spiegel was unavailable to address the Recurring Problem.  See Pl. 56.1 ¶ 209; Tri-State Opp. 56.1 ¶ 209.  That day, a person acting on behalf of Tri-State called DCI to discuss the frozen server, and DCI referred the caller to Point 4.  See Tri-State 56.1 ¶¶ 17-19; Pl. 56.1 ¶¶ 17-19.  Tri-State then called Point 4 to discuss the Software.[5]  Tri-State eventually brought in Spiegel the next day to address the Recurring Problem.  See Pl. 56.1 ¶ 218; Tri-State Opp. 56.1 ¶ 218.

On March 17, 2010, Point 4's then Vice President ("VP"), Michelle Nicol ("Nicol"), emailed Nissi Kugler ("Kugler") of Tri-State, informing him that Tri-State would have to pay $32,637 in order to update Tri-State's system "to the latest version of UniBasic and Genesys." See Email (Mar. 17, 2010), DE #283-26; Pl. 56.1 ¶ 224; Tri-State Opp. 56.1 ¶ 224.[6]  Tri-State chose not to upgrade the Software.  See Pl. 56.1 ¶ 224; Tri-State Opp. 56.1 ¶ 224.

---

[5]  The parties dispute the substance of their communications on February 25, 2010.  Plaintiffs contend that "[n]either Dynamic nor Point 4 had any conversation about an allegedly malfunctioning dongle."  Pl. 56.1 ¶ 20; see also id. ¶ 213 (Tri-State never informed DCI's representative that Tri-State was "having an emergency or any problem with UniBasic, Genesys or the dongle"); id. ¶ 215 (Tri-State made "no mention of a dongle problem" in its February 25, 2010 call with Point 4).  In contrast, Tri-State claims that it explained to DCI's representative that Tri-State's server froze due to the dongle's malfunctioning and claims that a "dongle problem" was mentioned in its conversation with Point 4.  See Tri-State Opp. 56.1 ¶¶ 213, 215.

[6]  Tri-State claims, and plaintiffs dispute, that Point 4's offer to upgrade was unsolicited.  See Pl. 56.1 ¶ 224; Tri-State Opp. 56.1 ¶ 224.  The parties also dispute whether (as plaintiffs assert) Tri-State requested that the upgrade increase to 64 concurrent users.  See Pl. 56.1 ¶ 216; Tri-State Opp. 56.1 ¶ 216.

Thereafter, Tri-State began to search for a more long-term solution to the Recurring Problem.  See Tri-State 56.1 ¶ 22; Pl. 56.1 ¶ 22.  One of Tri-State's other IT consultants, defendant Shmuel Judkovitz ("Judkovitz"), of defendant SJ Computers, Inc. ("SJ Computers"), believed that the Recurring Problem related to the dongle, the hardware component of UniBasic's security licensing protections.  See Tri-State 56.1 ¶ 23.  Therefore, Judkovitz, on behalf of Tri-State, retained an overseas entity called DongleLabs to assist them with the Software.  See Tri-State 56.1 ¶ 24; Pl. 56.1 ¶ 24.[7]  In connection with this assistance, Judkovitz provided DongleLabs with access to the UniBasic code.[8]  See Pl. 56.1 ¶ 229; Tri-State Opp. 56.1 ¶ 229.  Thereafter, DongleLabs' employee, Nima Goldstein ("Goldstein"), made certain modifications to Tri-State's copy of UniBasic (hereinafter, the "Modified UniBasic").  See Pl. 56.1 ¶ 230; Tri-State Opp. 56.1 ¶ 230  Although the parties dispute the exact number and nature of the DongleLab modifications, see discussion *infra* pp. 10-12, it is undisputed that the modifications enabled Tri-State to avoid the Recurring Problem by altering certain aspects of UniBasic's security mechanisms.  See Tri-State 56.1 ¶ 33; Pl. 56.1 ¶ 33.

---

[7]  Plaintiffs dispute that Judkovitz believed the Recurring Problem was related to the dongle. See Pl. 56.1 ¶ 23.  In doing so, plaintiffs cite their response to a factual statement concerning the purpose of a test Judkovitz performed on July 11, 2010, in which Judkovitz exceeded the 48-user license limit.  See id. ("Denied.  See response to Statement 30.").  Although not explicitly stated therein, plaintiffs appear to be taking the position that Judkovitz did not truly believe the dongle malfunctioned because his real intent in hiring DongleLabs was to circumvent the user limit.  However, in the cited response to Statement 30 of Tri-State's Rule 56.1 Statement, plaintiffs assert that "*one* purpose of Judkovitz's test was to confirm that Tri-State could exceed the 48 user limit . . . ," see Pl. 56.1 ¶ 30 (emphasis added), and they do not claim that exceeding the user limit was Judkovitz's *only* purpose in conducting the test and retaining DongleLabs.  Thus, plaintiffs have failed to create a genuine issue of material fact as to whether Judkovitz believed that the cause of the Recurring Problem was a malfunctioning dongle.

[8]  The parties disagree as to whether Judkovitz sent the entire UniBasic code or whether he disclosed only a binary file.  See Pl. 56.1 ¶ 229; Tri-State Opp. 56.1 ¶ 229.

### III.     Plaintiffs' Awareness of Tri-State's Activities

In late June 2010, around the time that DongleLabs completed the modifications, Judkovitz spoke with a UniBasic specialist, Roger Petersen ("Petersen"), seeking help in connection with Tri-State's Software.  See Tri-State 56.1 ¶ 35; Pl. 56.1 ¶ 35.  During the discussion, Petersen began to suspect that Tri-State was using an unlicensed copy of UniBasic and had moved the Software to a server other than the one upon which it was originally installed pursuant to the 1999 Agreement.  See Tri-State 56.1 ¶ 36; Pl. 56.1 ¶ 36.  Later that week, Petersen reached out to DCI Chief Executive Officer ("CEO") Douglas Chadwick ("Chadwick") to share Petersen's concerns.  See Tri-State 56.1 ¶¶ 34-36; Pl. 56.1 ¶¶ 34-36. On July 6, 2010, Chadwick called Point 4's CEO, Don Burden ("Burden"), to relay what Petersen had told him about Tri-State.  Tri-State 56.1 ¶ 37; Pl. 56.1 ¶ 37; Email from Douglas Chadwick (July 6, 2010), DE #309-31 at 2.  That same day, Chadwick followed up via email with Nicol, Point 4's VP, who responded:

> We have been waiting for them to do something like this for 10 years.  I knew it was just a matter of time until they would try and go around (both of us) . . . . These guys are cheap SOB's and they will do anything to get around the system.

Id.  Two days later, Nicol informed Chadwick that Burden wanted to send a letter to Tri-State to "get something done."  See Email (July 8, 2010), DE #309-39.  Later that day, Chadwick forwarded to Petersen, for his comments, a draft of a letter to Tri-State, since Petersen was the UniBasic specialist who had spoken with Judkovitz and had apparently seen the Modified UniBasic.  See Email from Douglas Chadwick (July 8, 2010), DE #309-33 at 3-4.

In or around the time period that Point 4 and DCI became alerted to Tri-State's activities, Judkovitz uploaded the Modified UniBasic on to a computer (the "Demo

Computer"), in order to test the Modified UniBasic before uploading it to the 2007 Server.
See Tri-State 56.1 ¶¶ 28, 30.[9]  During this test, Judkovitz confirmed that the Modified
UniBasic allowed him to bypass the Software's 48-user licensing limits.  See Tri-State 56.1
¶ 29; Pl. 56.1 ¶ 29.  On or around July 19, 2010, Judkovitz loaded the Modified UniBasic on
to Tri-State's 2007 Server and, as a result, Tri-State was able to access the Software without
issue.  Id. ¶ 32; Pl. 56.1 ¶ 32.

By August 10, 2010, neither Point 4 nor DCI had sent to Tri-State the previously
described letter regarding the suspected hack.  See Tri-State 56.1 ¶ 41; Pl. 56.1 ¶ 41.  Soon
thereafter, plaintiffs changed course and decided not to send such a letter to Tri-State.  See Tri-
State 56.1 ¶ 42; Pl. 56.1 ¶ 42.  Instead, plaintiffs retained a private investigator and waited
seven more months before filing suit in February 2011 (hereinafter, the "Waiting Period").
Pl. 56.1 ¶ 245; Tri-State Opp. 56.1 ¶ 245.

## IV.  The Procedural History and Plaintiffs' Expert Disclosure

On February 11, 2011, plaintiffs filed a complaint in this District, as well as a motion
for an *ex parte* temporary restraining order and preliminary injunction.  See Compl.[10]
Although the complaint includes a cause of action under the DMCA, neither Genesys nor
UniBasic were registered works with the United States Copyright Office, and thus, neither

---

[9]  Plaintiffs dispute the purpose of the transfer to the Demo Computer, but cite no evidence to
support their position.  See Pl. 56.1 ¶ 28.

[10]  The complaint asserts a claim under the DMCA against all three defendants; unfair
competition in violation of the Lanham Act, against all three defendants; two breach of
contract claims against Tri-State, brought by Point 4 and DCI, respectively; breach of the
covenant of good faith and fair dealing against Tri-State; unfair competition under New York
common law, against Tri-State; and unjust enrichment against all defendants.  See Compl.

plaintiff has alleged copyright infringement.[11]  See generally id.; see Tri-State 56.1 ¶ 76; Pl. 56.1 ¶ 76.  On March 7, 2011, after defendants answered the complaint, see [Tri-State's] Answer (Feb. 24, 2011) ("Ans."), DE #11; [Judkovitz/SJ Computers] Answer (Feb. 24, 2011), DE #14, the Honorable Raymond J. Dearie, the district judge originally assigned to this matter, entered a preliminary injunction, and the parties commenced discovery.  See generally Order (Mar. 23, 2011), DE #32.

On June 14, 2011, the parties appeared before the undersigned magistrate judge for an initial discovery scheduling conference.  See Minute Entry (June 14, 2011) ("6/14/11 Minute Entry"), DE #46.  Towards the conclusion of the conference, Tri-State raised the issue of whether or not Point 4 or DCI's principals, Burden and Chadwick, respectively, would be designated as experts in this matter, given "the software at issue in this case."  See Transcript (June 14, 2011) ("6/14/11 Tr.") at 21, DE #49.  While acknowledging that experts who are not specially retained for litigation are not required to file formal expert reports under Rule 26 of the FRCP, Tri-State argued that, in this case, Burden and Chadwick, if so designated as experts, should be required to do so.  Id.  In response, plaintiffs' then counsel[12] stated: "We've made no decision as to whether our clients will be used as testimony experts in this case."  Id.  Following the conference, the Court issued an order requiring, *inter alia*, that plaintiffs make their expert disclosures no later than November 30, 2011.  See 6/14/11 Minute Entry.

---

[11]  Registration with the U.S. Copyright Office is a prerequisite to bringing a claim for copyright infringement.  See 17 U.S.C. § 411.

[12]  On November 13, 2012, plaintiffs' current counsel substituted into the case in place of two law firms that had previously represented plaintiffs.  See Stipulation and Order (Nov. 13, 2012), DE #259.

Two weeks later, on June 30, 2011, Chadwick, on behalf of DCI, amended DCI's responses to various interrogatories propounded by Tri-State, including ones relating to plaintiffs' DMCA claim.  See DCI Amended Responses to First and Second Set of Interrogatories (June 30, 2011) ("6/30/11 DCI Amended Response"), DE #310-14.  Notably, DCI asserted in one response that it believed that Tri-State had committed 17,394 separate "acts of circumvention," as defined in the DMCA.  See id., Interrog. #8, at p. 10 ¶ VI.

On November 30, 2011, the deadline set by the Court, plaintiffs timely disclosed three experts: Barbara Frederiksen-Cross ("Cross"), Steven Moritsugu ("Moritsugu"), and Alan J. Cox ("Cox").  See generally Cross Report; Expert Report of Steven Moritsugu (Nov. 30, 2011) ("Moritsugu Report"), DE #309-26; Expert Report of Alan J. Cox, PhD. (Nov. 30, 2011) ("Cox Report"), DE #309-48.  Plaintiffs did not disclose Chadwick or Burden as experts.  See Tri-State 56.1 ¶ 145.[13]  Cross and Moritsugu were both tasked with identifying what modifications had been made by DongleLabs to UniBasic.  See Cross Report ¶ 2; Moritsugu Report ¶ 6.[14]  In their respective reports, Cross and Moritsugu each identified three changes to UniBasic.  See Cross Report ¶ 38; Moritsugu Report ¶ 9.  One month after plaintiffs disclosed the Cross and Moritsugu reports, DCI amended its interrogatory responses

---

[13]  Confusingly, plaintiffs seek to strike this portion of Tri-State's Rule 56.1 Statement as argument, not fact.  See Pl. 56.1 ¶ 145.  Notwithstanding the obvious factual nature of whether a party has disclosed a witness as an expert, plaintiffs cite no portion of the record suggesting that Chadwick and/or Burden were so disclosed.  See id.

[14]  Plaintiffs retained Cox as their damages expert.  See generally Cox Report.

again, now stating that there had been 17,393 acts of circumvention,[15] as defined in the

DMCA.  See DCI Second Amended Interrogatory Responses to Certain Interrogatories (Dec.

30, 2011), Interrog. #8, at p. 8 ¶ II, DE #309-69.

Thereafter, Tri-State moved for partial summary judgment with respect to plaintiffs'

demand for damages under the DMCA.  See Motion for Partial Summary Judgment (Jan. 13,

2012), DE #125.  In opposition to that motion, plaintiffs filed a declaration by Chadwick, in

which he stated that DongleLabs had made four modifications: three to UniBasic and -- in a

theory not addressed by either of plaintiffs' retained experts -- one to Passport.  See

Declaration of Douglas Chadwick (Feb. 10, 2012) ("Chadwick PSJ Decl."), DE #141.  With

respect to Passport, Chadwick alleged that DongleLabs had:

> . . . embedded into the Passport start-up software a modified script that was
> programmed to execute each time a Tri-State user logged in to UniBasic or
> Genesys.  That script issued instructions to bypass the automatic start-up of
> Passport . . . .

Chadwick PSJ Decl. ¶ 21 (hereinafter, the "PSJ Passport Modification").  It was the PSJ

Passport Modification that served as the basis for plaintiffs' claim that Tri-State had committed

"well over ten thousand acts of circumvention" under the DMCA -- i.e., one "act" per login

by a Tri-State employee.  See Plaintiffs' Memorandum of Law in Opposition to Tri-State's

Motion for Partial Summary Judgment (Feb. 10, 2012) at 20-21, DE #140.  In its reply on that

motion, Tri-State objected to the Chadwick Declaration but ultimately agreed to the facts

asserted therein for purposes of the motion for partial summary judgment only.  See Tri-State

---

[15]  For reasons not clear from the record, DCI reduced by one the number of acts of
intervention that it claimed had occurred.

Reply Memorandum in Further Support of Its Motion for Partial Summary Judgment (Feb. 21, 2012) ("Tri-State PSJ Reply) at 3 & n.3, DE #133 (reserving Tri-State's right to challenge plaintiffs' version of the facts "at trial or in connection with other motions").[16]

A few weeks later, at Chadwick's deposition, Tri-State again inquired whether Chadwick would be designated as an expert, after noting that DCI's retained expert, Cross, had identified only three modifications, while Chadwick testified as to four. See Excerpts of Chadwick Deposition (Mar. 6, 2012) ("Chadwick Dep. Tr.") at 113, DE #310-2. Plaintiffs' counsel replied: "That designation hasn't been given to Mr. Chadwick yet." Id. Later that month, Tri-State timely disclosed its expert, Nigel Jones ("Jones"), as both an affirmative expert and a rebuttal expert to Cross and Moritsugu. See Expert Report by Nigel Jones (Mar. 30, 2012) ¶ 1, DE #309-9; see also Amended Discovery Schedule (Feb. 24, 2012), DE #146.

Three weeks later, Cross and Moritsugu each served a report to rebut certain conclusions reached by Jones. See Rebuttal Expert Report of Barbara Frederiksen-Cross (Apr. 20, 2012) ("Cross Rebuttal Report"), DE # 309-46; Rebuttal Expert Report of Steven Moritsugu (Apr. 20, 2012) ("Moritsugu Rebuttal Report"), DE # 309-47. Neither rebuttal report addressed the PSJ Passport Modification identified by Chadwick in his declaration. See generally Cross Rebuttal Report; Moritsugu Rebuttal Report. Plaintiffs at no time sought permission to supplement any of the Cross or Moritsugu reports to address the PSJ Passport

---

[16] The Court's Report and Recommendation ("R&R") on Tri-State's motion for partial summary judgment by Tri-State was adopted in full by the District Court. See Point 4 Data Corp. v. Tri-State Surgical Supply & Equip., 11-CV-726 (CBA), 2012 WL 3306600 (E.D.N.Y. June 13. 2012), adopted, 2012 WL 3306575 (E.D.N.Y. Aug. 13, 2012).

Modification.[17]  See Tri-State 56.1 ¶ 147.  Nor did plaintiffs ever designate either Chadwick or

Burden as a non-retained expert under Rule 26(a)(2)(c).

## V.    Current Motions

In late 2012, with fact and expert discovery closed, the parties cross-moved for

summary judgment.  Tri-State filed its motion first, seeking summary judgment dismissing

each of plaintiffs' seven claims, as well as summary judgment in Tri-State's favor on three of

the affirmative defenses interposed in its answer (to wit, laches, unclean hands, and failure to

mitigate damages).  See Tri-State SJ Mem., DE #264; see generally Ans., DE #11.  In

particular, Tri-State argues that plaintiffs' claim under the DMCA -- the heart of plaintiffs'

case -- should be dismissed because, *inter alia*, plaintiffs failed to establish that the Software

was protected by U.S. copyright law.[18]  See Tri-State SJ Mem. at 15-17.  Tri-State also

contends that plaintiffs failed to present sufficient admissible evidence that there were, in fact,

---

[17]  Plaintiffs dispute Tri-State's assertion that none of plaintiffs' expert reports mentions the PSJ Passport Modification.  See Pl. 56.1 ¶ 147.  Plaintiffs cite nothing in the record to refute this fact, which thus is deemed admitted.  Furthermore, the Court rejects plaintiffs' characterization of Tri-State's assertion as mere argument.  See id.

Moreover, while Cross testified at her deposition that her report referenced a fourth modification, that modification related to the Unix user profile, not to Passport.  See Tri-State's Memorandum of Law in Support of Summary Judgment (Nov. 15, 2012) ("Tri-State SJ Mem.") at 37, DE #264; Deposition Transcript of Barbara Frederiksen-Cross (June 20, 2012) at 51-54, DE #309-20.  On reply, plaintiffs confirm that Cross's fourth modification was not the same as the SJ Passport Modification.  See Plaintiffs' Reply in Support of Their Cross-Motion (Jan. 22, 2012) ("Pl. Reply") at 19 n.20, DE #285.

[18]  The DMCA violation alleged in this action, 17 U.S.C. § 1201(a)(1)(A), prohibits a person from circumventing "a technological measure that effectively controls access to *a work protected under this title*" — Title 17 of the United States Code, i.e. the Copyright Act of 1976, 17 U.S.C. § 101 *et seq.* (the "Copyright Act").  See 17 U.S.C. § 1201(a)(1)(A); Compl. ¶ 35.  For more on copyrightability, see discussion *infra* pp. 35-43.

four modifications.  See id. at 35-39.  To this end, Tri-State challenges the Chadwick PSJ

Declaration as expert opinion that was not timely disclosed.  See id. at 35-36.

Plaintiffs oppose Tri-State's motion and affirmatively move for summary judgment in

their favor on all but their unfair competition and unjust enrichment claims; plaintiffs also seek

summary judgment dismissing all of the counterclaims asserted by Tri-State.[19]  See Plaintiffs'

Memorandum of Law in Support of Summary Judgment and in Opposition to Tri-State's

Motion ("Pl. SJ Opp."), DE #279.  In support of their motion, plaintiffs provide affidavits by

Burden, of Point 4 (hereinafter, the "Burden SJ Declaration"), and by Chadwick, of DCI

(hereinafter, the "Chadwick SJ Declaration").  See Declaration of Don Burden (Dec. 17, 2012)

("Burden SJ Decl."), DE #281; Declaration of Douglas Chadwick (Dec. 17, 2012)

("Chadwick SJ Decl."), DE #282.  Both the Burden SJ Declaration and the Chadwick SJ

Declaration address issues pertaining to copyrightability of Genesys and UniBasic,

respectively.  In addition, the Chadwick SJ Declaration alters Chadwick's explanation as to

how DongleLabs modified Passport from the description he previously provided in his

declaration opposing the prior motion for partial summary judgment (hereinafter, the "SJ

Passport Modification").  For the first time, Chadwick explains, *inter alia*:

> On the image drive, a hacked Passport startup-script is installed in the DCI
> directory removing the command to start the Passport software and replacing it
> with a one-line command to do nothing.  The replacement command, "echo[,]"
> is a Unix command directive to, in this case, display nothing on a user[']s
> terminal.

Chadwick SJ Decl. ¶ 21, DE #282.

---

[19]  Tri-State has interposed five counterclaims, each asserted against Point 4 only: for breach of contract; breach of the covenant of good faith and fair dealing; fraudulent inducement; indemnification; and contribution.  See Amended Counterclaim[s] (May 10, 2011) ("Am. Counterclaims"), DE #42.

Tri-State, in its reply on its own motion and in opposition to plaintiffs' motion, moves to strike the Burden SJ Declaration and the Chadwick SJ Declaration, arguing that Burden and Chadwick are offering expert testimony despite the fact that neither had been timely disclosed as an expert prior to the Court's deadline of November 30, 2011. See Tri-State's Memorandum of Law in Further Support and in Opposition (Jan. 15, 2013) ("Tri-State Reply & Opp.") at 15-18, DE #266. Tri-State also objects to certain documents attached to those affidavits as "new and untimely evidence[.]" See id. at 14. In response, plaintiffs contends that Chadwick and Burden are fact witnesses, not expert witnesses, and that the documents complained of by Tri-State had, in fact, been produced. See Pl. Reply, DE #285.[20]

Because the outcome of Tri-State's motion to strike necessarily determines the evidence that the Court will consider in addressing the parties' cross-motions for summary judgment, it is appropriate for the Court, as an initial matter, to resolve the defense motion to strike.

## TRI-STATE'S MOTION TO PRECLUDE UNDISCLOSED EXPERT TESTIMONY

### I.     The Burden and Chadwick SJ Declarations: Lay Versus Expert Opinions

Tri-State has identified two main subject matters for which Burden and/or Chadwick allegedly provide untimely expert testimony: (1) copyrightability of Genesys and UniBasic (by both Burden and Chadwick); and (2) the SJ Passport Modification (by Chadwick). See Tri-State Reply & Opp. at 14-16, 37-42, DE #266; see also Tri-State SJ Mem. at 35-36, DE #264

---

[20]  With the Court's permission, see Order (June 12, 2013), DE #308, Tri-State filed a sur-reply addressing matters raised for the first time in plaintiffs' reply. See Tri-State's Sur-Reply Memorandum of Law in Further Support and Opposition (Jan. 31, 2013) ("Tri-State Sur-Reply"), DE #295-1.

(arguing that Chadwick's averments regarding PSJ Passport Modification constitute untimely expert opinion).

First, with respect to copyrightability, plaintiffs respond that the Burden and Chadwick SJ Declarations "are *purely factual* in nature, and merely set forth certain attributes relevant to the copyrightability of their software products," and that, to the extent any opinion is asserted, it is lay opinion under Rule 701 of the Federal Rules of Evidence (the "FRE").   See Pl. Reply at 7, DE #285 (emphasis in original).  Second, with respect to the SJ Passport Modification, plaintiffs contend that Chadwick's evidence "concerns only factual matters within his own personal knowledge, based upon his own investigation and analysis of [DongleLab's modifications] and review of the actual modified start[-]up script, and is rationally based upon his own perception as a witness within the meaning of [Rule 701(a) of the FRE]."  Pl. SJ Opp. at 35, DE #279; see also Pl. Reply at 18, DE #285 (Chadwick was able to "visually observe" the SJ Passport Modification "through the ordinary use of his computer, without the assistance of any reverse engineering technology").

### A.    Legal Standard

The admissibility of expert testimony is governed by Rule 702 of the FRE, which provides that a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may furnish opinion testimony if, *inter alia*, "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue[.]"  See Fed. R. Evid. 702(a).  Rule 701, on the other hand, governs opinion testimony by a lay witness.  See Fed. R. Evid. 701.  Pursuant to Rule 701(c), which was added in 2000, a lay witness may be permitted to provide opinion testimony only if

that testimony is "*not* based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed R. Evid. 701(c) (emphasis added). One of the purposes of subsection (c) of Rule 701 is "to eliminate the risk that the reliability requirements set forth in Rule 702 [with respect to expert testimony] will be evaded through the simple expedient of proffering an expert in lay witness clothing." See Fed. R. Evid. 701 advisory committee's note (2000 Amendments). "By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade *the expert witness disclosure requirements* set forth in" Rule 26 of the FRCP. See id. (emphasis added).

The referenced "expert witness disclosure requirements" in Rule 26 differ depending on the nature of the designated expert. Under Rule 26(a)(2)(B), parties must disclose any "retained or specially employed" expert witness and provide a written report, "prepared and signed by the witness," containing, among other things, "a complete statement of all opinions the witness will express and the basis and reasons for them[.]" See Fed. R. Evid. 26(a)(2)(B)(i). By contrast, Rule 26(a)(2)(C) addresses disclosure of non-retained experts (such as treating physicians). See Fed. R. Civ. P. 26(a)(2)(C). Non-retained expert disclosure need not include a formal narrative report, but the disclosure must state the subject matter on which the witness is expected to testify and "a summary of the facts and opinions to which the witness is expected to testify." See Fed. R. Civ. P. 26(a)(2)(C)(i)-(ii).

### B.  Application of Legal Standard

#### 1.    The Burden SJ Declaration

The Burden SJ Declaration contains both lay and expert testimony. See generally Rule 701 advisory committee's note (2000 Amendments) ("Certainly it is possible for the same

witness to provide both lay and expert testimony in a single case."); <u>Bank of China, N.Y.</u>
<u>Branch v. NBM, LLC</u>, 359 F.3d 171, 182 (2d Cir. 2004) (recognizing that a single witness
may provide both lay and expert testimony). For example, Burden's assertion that Genesys is
a system appropriate "for medium to large companies" is lay opinion, as it is based on
Burden's personal knowledge and experience as the CEO of Point 4. <u>See</u> Burden SJ Decl. ¶ 2,
DE #281. The advisory committee note for Rule 701 specifically states that testimony by an
owner or officer of a business based on "particularized knowledge that the witness has by
virtue of his or her position in the business" -- such as testimony concerning "the value or
projected profits of the business" -- does not constitute expert opinion. <u>See</u> Fed R. Evid. 701
advisory committee's note (2000 Amendments). Certain other aspects of Burden's testimony
likewise fall within this rubric. <u>See</u> Burden SJ Decl. ¶ 2, DE #281 (averring that Genesys is a
"comprehensive" system).

  The Burden SJ Declaration does not, however, merely provide background information
about Point 4 and Genesys. Rather, in attempting to convince the Court that Genesys is
protected under the Copyright Act, Burden utilizes his technical and specialized knowledge to
provide opinions about Genesys in the context of the software industry generally. <u>See, e.g.</u>,
Burden SJ Decl. ¶ 4, DE #281 ("*No other ERP system* utilizes this unique combination of
Menu, Program and Operator organization") (emphasis added); <u>id</u>. ¶ 7 ("*Unlike other*
*applications* that rely on the definitions of general ledger accounts as to their placement on a
balance sheet or P&L statement, Genesys allows the user to create multiple variations of these
key accounting documents.") (emphasis added); <u>id</u>. ¶ 11 ("This methodology of creating and
customizing reports *is unique to Genesys*.") (emphasis added). If the above-cited examples

18

were not enough to show that Burden is essentially providing expert evidence as to

copyrightability, his statement in paragraph 15 of his declaration removes any conceivable

doubt on this issue:

> In view of the foregoing, I believe that the Genesys source and object code, as
> well as certain non-literal elements – including the selection, arrangement and
> organization of data, the selection[,] arrangement and organization of the user
> interface, the overall structure and organization of the program, and the specific
> images, text, arrangement and organization of the screen displays – constitutes
> copyrightable subject matter under title 17 of the United States Code.

Burden SJ Decl. ¶ 15, DE #281.

Thus, as shown in these examples, the opinions proffered by Burden are those of an

expert with specialized, technical knowledge. See, e.g., DVL, Inc. v. Gen. Elec. Co., 490

F.App'x 378, 381 (2d Cir. Aug. 2, 2012) (affirming district court's conclusion that purported

lay witness opined as an expert when he "relied on technical and scientific knowledge in

making most of the observations and conclusions in [his] declarations"); see also Fournier v.

Erickson, 242 F.Supp.2d 318, 337-38 (S.D.N.Y. 2003) (media buyer could testify about what

she would have charged for use of photographs, but she could not testify as to industry

standards for licensing fees, nor could she testify about similarities between a copyrighted

photograph and an alleged infringing photograph, "[t]o the extent such questioning would be

framed so as to elicit answers suggesting specialized knowledge as an expert"); cf. Tegg Corp.

v. Beckstrom Elec. Co., No. 08-CV-435, 2008 WL 2682602, at *11 (W.D. Pa. July 1, 2008)

(court in copyright infringement case found that plaintiff software company, in relying on

current and former employees as lay witnesses to support its allegation that two software

products were substantially similar, did not submit evidence sufficient to merit a preliminary

injunction, especially where plaintiff also sought expedited discovery "primarily so that it can have an expert witness evaluate whether the two software products" were substantially similar).

Plaintiffs' reliance on the Second Circuit's decision in Medforms, Inc. v. Healthcare Management Solutions, Inc., 290 F.3d 98 (2d Cir. 2002), is unavailing.  See Pl. Reply at 8, DE #285.  In Medforms, the Second Circuit held that the trial court did not abuse its discretion in allowing a computer programmer to testify "based on his everyday experience as a computer programmer and specifically on his work on [the copyrighted software]," because that testimony was "not based on scientific, technical or other specialized knowledge within the scope of expert testimony."  See 290 F.3d at 111.

First, it should be noted that Medforms involved a motion for a new trial, under a standard of review that gives great deference to trial courts.  See id. at 106 ("A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.") (internal quotation and citation omitted); id. at 110 ("The evidentiary rulings of the district court are entitled to substantial deference and are reviewed only for clear abuse of discretion."). Second, and more importantly, the copyright issue in Medforms related to authorship (i.e., what contributions had been made by the claimed author of the software, who at the time had been working under the supervision of the challenged witness); the authorship analysis is distinct from copyrightability, which necessarily requires not just testimony on the software at the center of the copyright dispute (with which a witness might have personal knowledge) but

also a comparison with similar software in the industry.  See *infra* pp. 35-43 (discussion on copyrightability).  Furthermore, the trial in Medforms took place prior to the 2000 amendments to Rule 701, which added subsection (c) to Rule 701 in order to "ensure[] that a party will not evade the expert witness disclosure requirements set forth in [Rule 26] by simply calling an expert witness in the guise of a layperson."  See Fed. R. Evid. 701 advisory committee's note (2000 Amendments).

To be sure, the Medforms panel downplayed the significance of Rule 701(c), which, for the first time, expressly excluded from the definition of "lay opinion" any opinion "based on scientific, technical or other specialized knowledge within the scope of Rule 702."[21]  See *supra* pp. 16-17.  Nevertheless, in cases decided after Medforms, the Second Circuit has examined subsection (c) in greater depth and has highlighted the importance of the new language.  For example, in United States v. Garcia, the Second Circuit held that, in considering whether lay opinion runs afoul of Rule 701(c), "a court must focus on the 'reasoning process' by which a witness reached his proffered opinion," and if the opinion "rests 'in any way' upon scientific, technical, or other specialized knowledge, its admissibility must be determined by Rule 702, not Rule 701."  413 F.3d 201, 215 (2d Cir. 2005) (citations omitted).  In other words, a lay opinion must be "informed by reasoning processes familiar to the *average person in everyday*

---

[21] The Second Circuit in Medforms noted the intervening rule change and remarked that "the spirit of the [new] requirement had been established in case law."  Medforms, 290 F.3d at 111.  Nevertheless, in contrast to the current version of Rule 701, the prior iteration of the rule did not contain language excluding from its ambit opinion testimony based on specialized knowledge "within the scope of Rule 702"; thus, a trial court's decision to admit "lay opinion" testimony under the old Rule 701 was far less likely to be reversed on appeal under a "clear abuse of discretion" standard.

21

*life* rather than by scientific, technical or other specialized knowledge." Id. at 216 (emphasis added).[22]

More recently, in 2012, the Second Circuit applied the lay opinion standard it articulated in Garcia to an environmental engineer, and the Court determined that evidence proffered through the engineer went beyond Rule 701 lay opinion. See DVL, 490 F.App'x at 380-82. In DVL, the engineer, while employed by a state environmental agency, had supervised the investigation and remedial clean-up of property that had been contaminated with pollutants. See id. at 379-80. In connection with cross-motions for summary judgment, the plaintiff in DVL submitted declarations by the engineer that opined on the origin of certain pollutants found on the property. See id. at 380. Although the district court acknowledged the engineer's "personal role" in investigating the contamination of the site, the district court concluded that most of the engineer's averments "offer[ed] the opinion of a highly qualified individual drawing upon his expertise to reach conclusions surpassing his own experience of the events at issue." DVL, Inc. v. Gen. Elec. Co., 811 F.Supp.2d 579, 590-91 (N.D.N.Y.

---

[22]   The issue presented in Garcia was whether the opinions of an agent with the Drug Enforcement Agency concerning a criminal defendant's particular role in a cocaine distribution conspiracy constituted lay opinion under Rule 701. See Garcia, 413 F.3d at 209-10. The Second Circuit rejected the government's argument that the agent's testimony was based solely on his investigation of the conspiracy. See id. at 216. In doing so, the panel held that the agent's opinions were based on his experience involving "wiretaps, database information and surveillance observations," that his reasoning process was "not that of an average person in everyday life; rather, it was that of a law enforcement officer with considerable specialized training and experience in narcotics trafficking." Id. at 216-17 (citation omitted). The standard articulated and applied by the Second Circuit in Garcia thus bears no resemblance to the definition of expert opinion that plaintiffs would have this Court adopt. See Pl. Reply at 8, DE #285 (stating, without citation to any case law, that "an expert applies a body of knowledge to a new and unfamiliar situation").

2010) (striking engineer's opinions on account of plaintiff's failure to timely disclose him as an expert witness). The Second Circuit affirmed, stating that the engineer's opinions (such as one based on the way the flow of water affects the migration of pollutants) "could not have been based on the 'reasoning processes familiar to the average person in everyday life,' since ordinary lay persons would have no knowledge of the conditions under which chemical contamination of soil can migrate from site to site." DVL, 490 F.App'x at 381 (quoting Garcia, 413 F.3d at 216). As the Second Circuit reasoned, "the persuasiveness of [the engineer's] conclusions could only derive from specialized knowledge regarding the chemical properties of [pollutants] that [the engineer] had developed over several decades of working on hazardous waste clean-up projects." Id. at 381.

Therefore, consistent with the rationale and holdings of Garcia and its progeny, including, but not limited to, DVL, the Court concludes that Burden's opinions regarding the copyrightability of the Genesys software, which are based on his comparison of technical features of one software program with other, unspecified programs, do not constitute lay opinion within the meaning of Rule 701. Therefore, paragraphs 4 through 15 of the Burden SJ Declaration constitute expert opinions.

### 2.      The Chadwick SJ Declaration

#### a.      Copyrightability

The Chadwick SJ Declaration likewise includes expert opinions. Chadwick begins his declaration by introducing himself not only as CEO of DCI, but also as a software developer "*specializing* in the development of Operating Systems and Application Development Platforms." See Chadwick SJ Decl. ¶ 1, DE #282 (emphasis added). Thereafter, Chadwick

23

sets forth certain opinions about UniBasic that arguably fall within Chadwick's knowledge and personal experience as CEO — such as the fact that UniBasic "is a programming language" that can be used "to write and modify computer programs"  See Chadwick SJ Decl. ¶ 2, DE #282.  While Chadwick, unlike Burden, does not explicitly opine as to the copyrightability of UniBasic, see generally id. ¶¶ 2-8, 11-12,[23] Chadwick does venture beyond his experience with UniBasic by expounding on the functions and contents of another program, not owned by DCI, called Dartmouth Basic.  See, e.g., Chadwick SJ Decl. ¶¶ 3-4, DE #282.  To the extent that he is comparing Dartmouth Basic with UniBasic, Chadwick is offering opinions based on his specialized, technical knowledge, and thus is acting as an expert under Rule 702.  See, e.g., DVL, Inc., 490 F.App'x at 381; Fournier, 242 F.Supp.2d at 338.

### b.    The SJ Passport Modification

Even more obviously technical is Chadwick's discussion of the SJ Passport Modification.  See Chadwick SJ Decl. ¶¶ 13-22, DE #282.  In this portion of his declaration, Chadwick goes into great detail about how Passport works and its relationship to UniBasic, which presumably is within his knowledge as CEO of DCI.  See, e.g., id. ¶ 13 ("This embedded security [i.e. Passport] protects not only UniBasic itself, but also any business applications such as Genesys that operate[] on the UniBasic platform.").  But Chadwick's declaration is also rife with opinions based on technical and (admittedly) specialized knowledge.  See, e.g., id. ¶ 19 ("For Tri-State, this command directed Unix to launch

---

[23]  Although the section of Chadwick's declaration titled "Copyrightability of UniBasic" consists of paragraphs 2 through 12, paragraphs 9 and 10 address the "access" element of a section 1201(a)(1)(A) claim under the DMCA, as opposed to copyrightability.  See Chadwick SJ Decl. ¶¶ 9-10, DE #282.

/etc/passport (The DCI Passport Software) to bi-directionally communicate with a dongle at a speed of 19200 that was connected to a serial device on a port named tty2a."); id. ¶ 20 ("A second 'ps' command now shows a root level program with an id of 1188 running the command: /etc/passport-b19200.").

That Chadwick's opinion with respect to the SJ Passport Modification is based on his technical and specialized knowledge is made even more apparent by the fact that he does not merely discuss Passport in general terms based on his experience working with Passport. Rather, he draws conclusions based on his review and examination of evidence produced by Tri-State during the course of this litigation.  See, e.g., id. ¶¶ 18-19 ("I personally reviewed the contents of a December, 2009 'backup tape' supplied by Tri-State and the court-ordered 'image drive' made of the Tri-State server on February 16, 2011. . . . On the backup tape, the *proper* Passport start-up script is installed . . . .") (emphasis added);  see also id. ¶ 14 ("Based upon my personal review of the relevant log files, there is no evidence that Tri-State ever attempted to . . . re-configure the passport.cmd Passport start-up script to run the dongle on another port to determine if its problem was port-related.").  While plaintiffs frame this testimony as one based on Chadwick's personal investigation, see Pl. Reply at 18, DE #285, this litigation-specific analysis is nevertheless not based on "reasoning processes familiar to the average person in everyday life[.]"  Garcia, 413 F.3d at 216; see also DVL, 811 F.Supp.2d at 590.

In short, contrary to plaintiffs' assumption, Chadwick's experience as CEO of DCI cannot convert Chadwick's highly technical and specialized evidence into lay opinion that is based on "reasoning processes familiar to the average person in everyday life."  Garcia, 413

F.3d at 216.  In fact, notwithstanding Medforms (which is rarely cited for the proposition

advocated by plaintiffs), many courts have found that testimony concerning computers or

software is based on "scientific, technical or other specialized" knowledge outside the scope of

Rule 701.  See, e.g., Atlantis Info. Tech., GmbH v. CA, Inc., No. 06-CV-3921 (JS)(ETB),

2011 WL 4543252, at *12 (E.D.N.Y. Sept. 28, 2011) (witness's testimony, based on his

examination of source code of plaintiff's software program, that he "saw no evidence" plaintiff

had updated it since 2002, was expert testimony as it was "patently technical") (internal

quotation and citation omitted); Idan Computer, Ltd. v. Intelepix, LLC, No. CV-09-4849

(SJF) (ARL), 2010 WL 3516167, at *3 (E.D.N.Y. Aug. 27, 2010) (comparison of software

source codes "is beyond the competency of a layperson or this Court"); Bazak Int'l Corp. v.

Tarrant Apparel Grp., 378 F.Supp.2d 377, 392 n.8 (S.D.N.Y. 2005) (finding that affidavit

contravened Rule 701(c), "since it pertains exclusively to specialized and technological

knowledge of computers"); cf. Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 713

(2d Cir. 1992) (in sustaining expert testimony in the copyright infringement context, the

Second Circuit noted the "highly complicated and technical subject matter" of computer

programs).

   Moreover, plaintiffs' attachment of the label "lay testimony" to Chadwick's highly

technical and specialized evidence concerning a modification made by DongleLabs to *Passport*

-- by virtue of Chadwick's personal knowledge of that software -- cannot be squared with

plaintiffs' retention of experts Cross and Moritsugu to expound on modifications made by

DongleLabs to *UniBasic* -- a program also within Chadwick's everyday experience.  As

plaintiffs apparently recognize, an analysis of the Modified UniBasic requires expert opinion

under Rule 702, which, in turn, governs "scientific, technical or other specialized knowledge";

yet plaintiffs would have the Court conclude that an analysis of the SJ Passport Modification is

admissible under Rule 701, which explicitly does *not* extend to testimony "based on scientific,

technical, or other specialized knowledge." Compare Fed. R. Evid. 701(c) with Fed. R. Evid.

702(a).  Plaintiffs' position is inconsistent, and contrary to the language and spirit of Rule

701(c).

      For the foregoing reasons, Chadwick's analysis of the SJ Passport Modification

constitutes expert opinion.[24]

## II.    Preclusion of Burden and Chadwick's Expert Opinions

      Having determined that portions of the Burden and Chadwick Declarations constitute

expert opinions, the Court will next consider whether that evidence should be precluded.

### A.    Legal Standard

      Rule 26(a)(2) mandates the pretrial disclosure of the identities of expert witnesses, as

well as other related information such as their opinions.  See Fed. R. Civ. P. 26(a)(2).  In

---

[24]  Plaintiffs claim that this Court's Report and Recommendation on Tri-State's Motion for
Partial Summary Judgment has already rejected Tri-State's contention that Chadwick's
testimony constituted untimely expert opinion.  See Pl. Reply at 18, DE #285.  Tri-State
indeed raised that argument in conclusory fashion in its reply on that motion.  See Tri-State
PSJ Reply at 19 & n.13, DE #133.  In finding that the Chadwick PSJ Declaration was
"admissible . . . for purposes of this motion," this Court did not analyze or consider Rule 26
of the FRCP or Rule 701 of the FRE, but instead concluded that Chadwick had sufficient
personal knowledge to assist the Court in determining a "narrow legal issue" based on facts
both parties "*assumed to be true for purposes of th[at] motion*."  See Point 4, 2012 WL
3306600, at *11 n.13 (emphasis added).  The Court did not reach the merits of the Rule
26/Rule 701 issue, and does not regard the cited portion of the R&R as the law of the case on
the instant dispute.  See, e.g., Truskoski v. ESPN, Inc., 60 F.3d 74, 77 (2d Cir. 1995) ("It is
peculiarly within the province of the district court . . . to determine the meaning of its own
order[.]") (internal quotation and citation omitted).

order to prevent the unfair "sandbagging" of adverse parties, Rule 37(c)(1) prohibits the use of expert opinions that were not timely disclosed under Rule 26(a)(2).  See DVL, 811 F.Supp.2d at 588-89 (collecting cases); United States v. City of N.Y., No. 07-CV-2067 (NGG) (RLM), 2010 WL 2838386, at *2 (E.D.N.Y. July 19, 2010) (precluding testimony of witness who was not timely identified as an expert witness).

Rule 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).  "Substantial justification may be demonstrated where there is justification to a degree that could satisfy a reasonable person that parties could differ as to whether the party was required to comply with the disclosure request or if there exists a genuine dispute concerning compliance." Ritchie Risk-Linked Strategies Trading (Ireland), Ltd. v. Coventry First LLC, 280 F.R.D. 147, 159 (S.D.N.Y. Feb. 15, 2012) (internal quotation and citations omitted).  An omission or delay in disclosure is harmless where there is "an absence of prejudice" to the aggrieved party. Id.; see Aboeid v. Saudi Arabian Airlines Corp., No. 10 CV 2518(SJ)(VVP), 2011 WL 5117733, at *2 (E.D.N.Y. Sept. 6, 2011).

Preclusion is a "harsh remedy" that "should be imposed only in rare situations." Izzo v. ING Life Ins. & Annuity Co., 235 F.R.D. 177, 186 (E.D.N.Y. 2005) (quoting Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d 67, 71 (2d Cir. 1988)).  While a finding of bad faith is not required to justify preclusion of evidence under Rule 37, a court may consider bad faith in its analysis. See Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006).  Courts

enjoy broad discretion in deciding whether and how to fashion sanctions pursuant to Rule 37.
See id. at 294.  In determining whether, in their discretion, to preclude evidence under Rule
37, courts examine (1) the party's explanation for the failure to comply with the discovery
rules; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing
party as a result of having to prepare to address the new evidence; and (4) the possibility of a
continuance (the "*Patterson* factors").  See Patterson v. Balsamico, 440 F.3d 104, 117 (2d
Cir. 2006) (citing Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc., 118 F.3d 955,
961 (2d Cir. 1997)); Gotlin v. Lederman, No. 04-CV-3736 (ILG) (RLM), 2009 WL 2843380,
at *3 (E.D.N.Y. Sept. 1, 2009).

### B.  Application of Legal Standard

It is undisputed that plaintiffs did not disclose Burden or Chadwick as non-retained
experts under Rule 26(a)(2)(C).  Plaintiffs offer no justification, let alone a substantial one, and
Tri-State is clearly prejudiced by plaintiffs' failure to do so, in that Tri-State did not have
proper notice and an opportunity to retain rebuttal experts.  See Fed. R. Civ. P. 37(c)(1).
Thus, because plaintiffs' violation was neither substantially justified nor harmless, the Court
must consider the *Patterson* factors in determining whether preclusion is appropriate.  See
Patterson, 440 F.3d at 117.

### 1.  Plaintiffs' Explanation for Their Failure to Comply.

This factor weighs heavily in favor of preclusion.  Tri-State inquired as to the expert
status of Burden and Chadwick as early as June 2011, more than five months before plaintiffs'
expert disclosure was due.  See 6/14/11 Tr. at 21.  Plaintiffs responded that they had not
decided either way.  See id.  Tri-State repeated this query eight months later, at Chadwick's
March 2012 deposition, but counsel still purported not to have made a determination, even

though plaintiffs' expert disclosure had been due in November 2011.  See Chadwick Dep. Tr. at 113, DE #310-2.[25]  Despite being placed on notice of Tri-State's concerns with respect to Chadwick and Burden, plaintiffs, without explanation, continued to stonewall on affirmatively designating either as an expert.  In response to Tri-State's motion to strike, plaintiffs offer no excuse for this failure to disclose, presumably because they now take the position that their declarations do not rest on expert opinion -- an argument soundly rejected by this Court.

### 2.    Importance of the Precluded Evidence

This factor weighs against preclusion.  Only works protected by the Copyright Act fall within the purview of section 1201(a) of the DMCA.  See Jagex Ltd. v. Impulse Software, 750 F.Supp.2d 228, 237 (D. Mass. 2010).  As plaintiffs do not have registered copyrights in the Software, see discussion supra p. 8, evidence as to copyrightability is essential to plaintiffs' DMCA claim.[26]  Moreover, Chadwick's discussion of the SJ Passport Modification is the basis

---

[25]  What makes counsel's reluctance to commit to Chadwick's designation even more egregious and indicative of bad faith is the fact that as early as June 30, 2011, plaintiffs clearly contemplated that they would be claiming more than 17,000 acts of circumvention under the DMCA.  See 6/30/11 DCI Amended Response at 10.  The basis for this calculation -- revealed months later in opposing Tri-State's motion for partial summary judgment -- was the modification to Passport.  See supra p. 11.  Although plaintiffs apparently were aware as early as June 30, 2011 that Passport had been modified by DongleLabs, plaintiffs, for reasons they have not disclosed, declined to have their retained experts opine on this modification.  Only in the scramble to oppose Tri-State's motion for partial summary judgment on the issue of damages did plaintiffs submit the Chadwick PSJ Declaration as evidence of the PSJ Passport Modification.

[26]  Prior to filing their opposition to Tri-State's motion for summary judgment, plaintiffs had adduced no proof of copyrightability, but instead mistakenly took the position that all software is inherently copyrightable.  See Plaintiffs' Memorandum of Law in Reply to Tri-State's Opposition to Plaintiffs' Motion to Amend the Complaint (May 23, 2012) at 20, DE #179 ("[T]here can be no dispute that the Software.

for plaintiffs' demand for millions of dollars in statutory damages under the DMCA.  See Pl.

SJ Opp. at 52-53, DE #279 (seeking statutory damages ranging from a minimum of

$2,121,400 to a maximum of $26,517,500 per plaintiff).

### 3.   The Prejudice Suffered by Tri-State in Addressing the New Evidence

This factor weighs heavily in favor of preclusion.  Discovery has long been closed,

including Tri-State's exchange of affirmative and rebuttal expert evidence.  Absent an order of

preclusion, Tri-State would presumably seek leave to retain new rebuttal experts -- including

one specializing in copyright issues, which are beyond the scope of its currently retained

technical expert, Jones.  The Court would then be constrained to reopen the discovery phase to

allow Tri-State to conduct supplemental expert discovery, thereby burdening Tri-State with

significant additional costs, including those entailed in deposing Burden and Chadwick on their

opinion testimony and in resubmitting the pending motion for summary judgment.  See, e.g.,

Atlantis Info. Tech., 2011 WL 4543252, at *13 (plaintiff "would be prejudiced by having to

meet [the disputed] evidence at this late stage"); Gotlin, 2009 WL 2843380, at *5 (defendants

would be prejudiced by significant additional litigation costs if court reopened expert

discovery) (collecting cases); Pal v. N.Y. Univ., No. 06 Civ. 5892 (PAC)(FM), 2008 WL

2627614, at *5 (S.D.N.Y. June 30, 2008) (plaintiff would be prejudiced where discovery

would have to be reopened in "almost-two-year-old case" and "would impose further litigation

costs" on plaintiff).

### 4.   The Possibility of a Continuance

This factor weighs in favor of preclusion.  Even though trial has not yet been

scheduled, this case has been ongoing for almost two-and-one-half years.  A continuance

would not only require reopening discovery, which closed in June 2012,[27] but would result in resubmitted summary judgment motions.  As such, while a continuance is always theoretically possible, it certainly is not desirable in the circumstances of this case.  See Curcio v. Roosevelt Union Free Sch. Dist., No. 10-CV-5612 (SJF)(AKT), 2012 WL 6641715, at *6 (E.D.N.Y. Dec. 19, 2012) (where case had been pending for two years and plaintiff did not offer acceptable justification for his conduct, the possibility-of-continuance factor weighed in favor of preclusion); Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alientari S.P.A., No. 08-CV-2540 (DLI)(JMA), 2011 WL 1239867, at *4 (E.D.N.Y. Mar. 30, 2011) (close of discovery weighed strongly against possible continuance).

### 5.    Balancing the Factors

In sum, three of the four *Patterson* factors favor preclusion.  As the challenged evidence provides the predicate for most of plaintiffs' claimed damages, the importance of the proof tilts in favor of allowing it.  But the fact that plaintiffs offer no explanation whatsoever for their failure to designate Chadwick and Burden as experts, in the face of Tri-State's specific and repeated inquiries, justifies preclusion in this case.  See Atlantis Info. Tech., 2011 WL 4543252, at *13 (precluding expert testimony where defendant "has not offered a convincing explanation for its failure to submit an expert report" and permitting such testimony "would require the Court to re-open expert discovery" and delay the case); Morritt v. Stryker Corp., No. 07-CV-2319 (RRM)(RER), 2011 WL 3876960, at *7 (E.D.N.Y. Sept.

---

[27]  This Court ordered that fact discovery end by June 8, 2012, and that expert depositions be completed by June 22, 2012.  See Endorsed Order (Apr. 9, 2012), DE #161.  Nevertheless, the parties continued to raise discovery disputes through August 2012.  See, e.g., Letter to Judge Mann re Discovery Issues (June 8, 2012), DE #191; Letter to Judge Mann re Motion to Compel Discovery & Evidentiary Hearing (July 9, 2012), DE #211; Joint Status Report (Aug. 8, 2012), DE #234 (requesting access to various Tri-State hard drives).

1, 2011) (precluding evidence that would otherwise allow plaintiff to make prima facie case in strict liability for design defects, because "the great importance of this testimony only serves to underscore the inexcusable quality of its delayed submission") (internal quotation and citation omitted); Spotnana, Inc. v. Am. Talent Agency, Inc., No. 09 Civ. 3698 (LAP), 2010 WL 3341837, at *2 (S.D.N.Y. Aug. 17, 2010) (even though preclusion of evidence on damages would deprive defendant of recovery on its counterclaims, such preclusion was warranted where defendant "ha[d] disregarded its discovery obligations without any explanation at all"); see also DVL, 490 F.App'x at 382 (where plaintiff failed to disclose engineer as an expert witness, district court did not abuse its discretion in striking portions of his declarations containing expert opinions; even though plaintiff had disclosed him as a fact witness, defendants "did not have the opportunity to anticipate, challenge, or counter [the engineer's] statements, assessments, methods, or conclusions") (quoting DVL, 811 F.Supp.2d at 591). Simply put, "[d]espite the recognized importance of [the challenged] testimony, the exclusion of that testimony results wholly from [plaintiffs'] own failures . . . ." DVL, 811 F.Supp.2d at 592.

Therefore, after weighing the *Patterson* factors, the Court grants Tri-State's motion in substantial part. The Court strikes paragraphs 4 through 15 from the Burden SJ Declaration and paragraphs 3 through 6 and 14 through 22 from the Chadwick SJ Declaration. The stricken portions will not be considered by the Court in analyzing the pending motions for summary judgment. See DVL, 811 F.Supp.2d at 591 (where plaintiff did not properly disclose expert witness, to admit such evidence for the "purpose of the Court's determination of the various summary judgment [m]otions would greatly prejudice the [d]efendants").[28]

─────────────────

[28] Tri-State also objects to the exhibits attached to the Burden and Chadwick SJ Declarations,

(continued…)

## TRI-STATE'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment may not be granted unless the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations and citation omitted). Once the movant does so, the non-moving party may not rest upon the allegations or denials of its pleading but must set forth specific facts that raise a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir. 1996). "In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities, and draw all inferences, against the moving party." Sista v. CDC Ixis N.A.,

---

[28](...continued)
claiming that plaintiffs failed to produce them. See Tri-State Reply & Opp. at 4, 10, DE #266. Plaintiffs counter that they were produced on a USB hard drive stamped P4D02283, prior to the close of discovery. See Pl. Reply at 10, 21 n.23, DE #285. Because the Court strikes the opinions of Burden and Chadwick with respect to copyrightability and the SJ Passport Modification, the exhibits related to those issues are similarly precluded (i.e., Exhibit 1 to Burden's, and Exhibits A and B to Chadwick's, SJ Declarations). As for Exhibit 2 to Burden's SJ Declaration, Tri-State, in its sur-reply, does not contest that this exhibit was previously produced, see generally Tri-State Sur-Reply at 1-2, DE #295-1 (denying that the 62 pages constituting Exhibit 1 to Burden SJ Declaration were produced in discovery, but remaining silent as to whether the two pages constituting Exhibit 2 were produced). Therefore, Tri-State's motion with respect to Exhibit 2 of the Burden SJ Declaration is deemed abandoned and is denied on that basis. See generally Blouin ex rel. Estate of Pouliot v. Spitzer, 356 F.3d 348, 363 n.9 (2d Cir. 2004) (state law claims that appellant mentioned in her brief but for which she failed to provide any argument were deemed abandoned) (citing Taylor v. Rodriguez, 238 F.3d 188, 196-97 (2d Cir. 2001)).

Inc., 445 F.3d 161, 169 (2d Cir. 2006) (citations omitted).  Summary judgment "is properly

granted only when no rational finder of fact could find in favor of the non-moving party."

Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  Where, as here, cross-

motions for summary judgment have been filed, the Court must consider each motion

independently, and must apply the same standards, drawing all reasonable inferences "against

the party whose motion is under consideration."  Town of Southold v. Town of East Hampton,

477 F.3d 38, 46 (2d Cir. 2007) (citation omitted).

## I.      Plaintiffs' DMCA Claim  --  Copyrightability

In 1998, Congress enacted the DMCA as part of its compliance with the World

Intellectual Property Organization Copyright Treaty, which required contracting parties to

sufficiently protect copyrighted works in the digital environment.  See Universal City Studios,

Inc. v. Corley, 273 F.3d 429, 440 (2d Cir. 2001); H.R. Rep. No. 105-551, pt. 1, at 9 (1998).

To this end, Congress added new sections to Title 17 of the United States Code  -- including,

but not limited to, sections 1201(a) and 1201(b) -- with the intention that these additional

provisions would act as "technological adjuncts" to the Copyright Act.  See H.R. Rep. No.

105-551, pt. 1, at 9.  One notable difference between the Copyright Act, however, and the

DMCA, is that the former requires a party to register a work with the U.S. Copyright Office

before filing an infringement claim, whereas the DMCA has no such prerequisite for a party

asserting a DMCA violation.  See I.M.S. Inquiry Mgmt. Sys., Ltd. v. Berkshire Info. Sys.,

Inc., 307 F.Supp.2d 521, 530 n.9 (S.D.N.Y. 2004) ("Unlike its effect on its infringement

claim, plaintiff's failure to register its copyrighted work is not a bar to a DMCA action.").

Of importance to this motion, section 1201(a)(1)(A) of the DMCA prohibits a person from "circumvent[ing] a technological measure that effectively controls access to a work *protected under this title*." 17 U.S.C. § 1201(a)(1)(A) (emphasis added). Thus, the work that is being accessed must be protected under the Copyright Act.[29] As noted above, in the infringement context, parties must register their works with the U.S. Copyright Office before filing suit. With that registration, an infringement-plaintiff enjoys a presumption of copyright validity that a defendant accused of infringement may then rebut with specific evidence. See Medforms, 290 F.3d at 114. In the DMCA context, where a party has not registered its work, the absence of registration "makes it difficult for [a] plaintiff to succeed on [its] DMCA claim, which is dependent on proof of a valid copyright." Jagex, 750 F.Supp.2d at 237.

Thus, because plaintiffs do not have a registered copyright in the Software, the Court must examine whether plaintiffs have adduced sufficient evidence to establish a genuine issue of fact with respect to the copyrightability of their Software.

---

[29] The DMCA language and statutory history are silent as to the meaning of the statutory phrase "work protected under this title." At least one academic article, without citing case law, has surmised that access to the broad category of works under 17 U.S.C. § 102(a), such as "literary works," is sufficient to fall within section 1201(a)(1)(A). See Mary Maureen Brown, et al., Database Protection in a Digital World, 6 Rich. J.L. & Tech. 2, 13 (1999). However, that interpretation fails to take into consideration subsection (b) of section 102, which specifically excludes types of expressions from copyright protection. See infra p. 37 (quoting 18 U.S.C. § 102(b)). Hence, that interpretation would have the undesirable effect of allowing for broader copyright protection under the DMCA than under the Copyright Act. See Priya Barnes, The Prospects for Protecting News Content Under the Digital Millenium Copyright Act, 3 Harv. J. Sports & Ent. L. 201, 215 & n.81 (2012) (interpreting "work protected under this title" as incorporating 17 U.S.C. § 102(a) and (b)); Jennifer Miller, The Battle Over "Bots": Anti-Circumvention, the DMCA and "Cheating" at World of Warcraft, 80 U. Cin. L. Rev. 653, 685 (2011) (arguing that the functionality rule of the Copyright Act should apply to the DMCA). In any event, neither party argues that plaintiffs need only show that their technological measures prevent access to *a type* of work protected by the Copyright Act.

36

A.      **Legal Standard**

The Copyright Act protects "*original* works of authorship fixed in any tangible medium of expression[,]" including "literary works," 17 U.S.C. § 102(a) (emphasis added), and the latter term has been interpreted to encompass computer programs.  See Altai, 982 F.2d at 702. To be original, the work "must be independently created by the author and possess 'at least some minimal degree of creativity.'"  See Scholz Design, Inc. v. Sard Custom Homes, LLC, 691 F.3d 182, 186 (2d Cir. 2012) (quoting Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991)).  However, section 102 expressly excludes from copyright protection the following:

> . . . any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.

17 U.S.C. § 102(b).

In the context of a computer program, both literal and nonliteral elements may be protected by copyright.  See Altai, 982 F.2d at 702.  The literal elements of a computer program are the source code (the computer language that can be read by humans) and the object code (machine-readable language).  The nonliteral elements of a program include its structure and sequence.  See Altai, 982 F.2d at 702; eScholar, LLC v. Otis Educ. Sys., No. 04 Civ. 4051 (SCR), 2005 WL 2977569, at *8 (S.D.N.Y. Nov. 3, 2005).

Nevertheless, not every element, whether literal or nonliteral, is automatically entitled to protection.  Rather, there are three doctrines that define (and limit) the scope of copyright

protection, in that they address what is *not* protectible — the exclusion of functional elements,[30]

the merger doctrine[31] and the *scenes a faire* doctrine.[32]   See Bus. Mgmt. Int'l, 2009 WL

790048, at *12; see also Oracle Am., Inc. v. Google Inc., 872 F.Supp.2d 974, 999 (N.D. Cal.

2012) (in rejecting copyright protection for structure and sequence of software applications,

court notes that simply because "a system or method of operation has thousands of commands

arranged in a creative taxonomy does not change its character as a method of operation");

PRG-Schultz Int'l, Inc. v. Kirix Corp., No. 03 C 1867, 2003 WL 22232771, at *4 (N.D. Ill.

Sept. 22, 2003) (holding that plaintiffs' software modules were "unprotected processes"); Ilog,

Inc. v. Bell Logic, LLC, 181 F.Supp.2d 3, 9-10 (D. Mass. 2002) (user interface of computer

program was unprotectible because the expressive choices made by Bell Logic were "wholly

---

[30]  The exclusion of "functional" elements of a computer program stems from 17 U.S.C.
§ 102(b).  See Bus. Mgmt. Int'l, Inc. v. Labyrinth Bus. Solutions, LLC, No. 05 Civ. 6738
(MHD), 2009 WL 790048, at *13 (S.D.N.Y. Mar. 24, 2009); see also Altai, 982 F.2d at 705
(holding that "those elements of a computer program that are necessarily incidental to its
function are similarly unprotectible").

[31]  The merger doctrine, in the computer context, "means that when specific [parts of the
code], even though previously copyrighted are the only and essential means of accomplishing a
given task, their later use by another will not amount to infringement." See Bus. Mgmt. Int'l,
2009 WL 790048, at *13 (quoting Altai, 982 F.2d at 708).  Plaintiffs argue that in the case of
copyright infringement, the Second Circuit applies the merger doctrine only as an affirmative
defense to an infringement claim.  See Pl. SJ Opp. at 17 n.79, DE #279 (citing, *inter alia*,
Kregos v. Associated Press, 937 F.2d 700, 705 (2d Cir. 1991)).  However, the two Second
Circuit cases cited by plaintiffs pre-date the DMCA, which expressly requires that the accessed
work be "protected" by copyright law.  See 17 U.S.C. § 1201(a)(1)(A).  Accordingly, the
merger doctrine, which limits what aspects of work can be protected by copyright law,
provides useful guidance with respect to the issues in this case, even if such guidance is not
dispositive.

[32]  The *scenes a faire* doctrine refers to unprotectible elements that flow from a work's theme
rather than from an author's creativity.  In the computer context, this exclusion applies when
programmers "employ standard techniques to write a program[,]" dictated by "practical and
extrinsic considerations . . . ." Bus. Mgmt. Int'l, 2009 WL 790048, at *14 (internal quotations
and citation omitted).  Plaintiffs do not challenge the applicability of either the *scenes a faire*
doctrine or the functional-elements exclusion to claims asserted under the DMCA.

embraced in the operation of the software program itself"; the subject of the alleged

infringement was a non-protectible "method of operation, not an expression"). Indeed, the

Second Circuit has stated that "[d]rawing the line between expression and idea is a tricky

business," and that "[t]he essentially utilitarian nature of a computer program further

complicates the task . . . ." See Altai, 982 F.2d at 704.

Thus, for computer software to merit copyright protection, it is not enough for the

party claiming protection to show that it independently created a certain number of lines of

code. On the contrary, the Court must undertake a highly complex analysis that typically

requires expert evidence. See Kohus v. Mariol, 328 F.3d 848, 857-58 (6th Cir. 2003) (noting

that the determination of which elements are protectible under copyright "will almost certainly

require expert testimony, because the [works] are technical in nature and a lay person is

unlikely to understand what constitutes creativity in this area, which elements are standard for

the industry, and which elements are dictated by efficiency or by external standards"); Altai,

982 F.2d at 713 ("[W]e recognize the reality that computer programs are likely to be

somewhat impenetrable by lay observers—whether they be judges or juries . . . ."), accord

Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 65 (2d Cir. 2010)

(citing Altai for the "settled principle" that some issues regarding protectible elements of

copyright require expert testimony).

**B.      Application of Legal Standard**

As a preliminary matter, plaintiffs unfairly chastise Tri-State for failing to take

evidence of copyrightability during discovery. See Pl. SJ Opp. at 11, DE #279. But it is a

DMCA plaintiff's burden to show that the work accessed was "protected" under the Copyright

Act.  See 17 U.S.C. § 1201(a)(1)(A); Jagex Ltd., 750 F.Supp.2d at 236-37.  To meet their

burden, plaintiffs argue that because Tri-State had access to 100 percent of the Software, it

therefore accessed some protectible element of the Software.  See Pl. SJ Opp. at 11-13, DE

#279.  Plaintiffs fail to appreciate that, on summary judgment, the Court must rely on evidence

in the record and not on sheer assumption.  See, e.g., Weinstock v. Columbia Univ., 224 F.3d

33, 41 (2d Cir. 2000) (a party opposing summary judgment must point to evidence in the

record, as "[t]he time has come . . .'to put up or shut up'") (citation omitted).

To be sure, plaintiffs rely on the Burden and Chadwick SJ Declarations in support of

their claim for copyrightability, but those portions of the declarations have been stricken, for

the reasons stated above.  See discussion *supra* pp. 27-33.  Thus, all that remains of plaintiffs'

showing is an assumption that there must be something original and protectible about the

Software.  While that assumption may well be correct, a finding that a genuine issue of fact

exists must be based on evidence, not assumptions.  This principle applies with particular force

in an area of law as complex and technical as the protectible elements of software.  See, e.g.,

Lexmark Int'l, Inc. v. Static Control Components, Inc., 387 F.3d 522, 539 (6th Cir. 2005)

("To discern whether 'originality' exists in the work, the court should ask whether the ideas,

methods of operation and facts of the program could have been expressed in any form other

than that chosen by the programmer, taking into consideration the functionality, compatibility

and efficiency demanded of the program."); cf. Bus. Mgmt. Int'l, 2009 WL 790048, at *18

(finding an issue of fact as to the protectibility of portions of software, based on "significant

disagreements between the experts").

40

Apart from their reliance on the Chadwick and Burden SJ Declarations, plaintiffs, in a brief footnote in their initial brief, argue, without citation to any case law, that Tri-State should be "estopped" from asserting that the Software is not protected by copyright because the licenses granted by Genesys and UniBasic[33] state the following: "Customer [i.e., Tri-State] acknowledges and agrees that the software is copyrighted and protected by copyright laws." See Pl. Opp. at 11 n.53, DE #279; Genesys License, DE #283-3; UniBasic License, DE #283-4.  Plaintiffs fail to specify whether they are advocating equitable estoppel,[34] as Tri-State assumes in its opposition, see Tri-State Reply & Opp. at 18 n.46, DE #266, or promissory estoppel.  However, since their reply brief refers to a "binding contractual acknowledgment," the Court assumes that plaintiffs are invoking the latter form of estoppel.  See Pl. Reply at 6 n.4, DE #285.  But plaintiffs' estoppel argument is devoid of any supporting authority or explanation as to how a court could be bound by a contractual definition of a legal concept like copyright protection, which is dictated not by the parties' agreement but by the Copyright Law

_____

[33]  Those licenses have been proffered to the Court but neither has been executed.

[34]  Any equitable estoppel claim would be governed by New York law, which the parties have consistently applied throughout this case.  See Schneider v. Canal Ins. Co., No. 98-CV-5368(JG), 1999 WL 689476, at *8, *13 (E.D.N.Y. Sept. 1, 1999) (where parties relied entirely on New York law and neither party challenged its applicability, New York law governed, inter alia, equitable estoppel claim).  Under New York law, equitable estoppel requires the party invoking the doctrine to establish: (1) an act constituting a concealment of facts or a false misrepresentation; (2) an intention or expectation that such acts will be relied upon; (3) actual or constructive knowledge of the true facts by the wrongdoer; and (4) reliance upon the misrepresentations, causing the innocent party to change its position to its substantial detriment.  See Gen. Elec. Capital Corp. v. Armada, 37 F.3d 41, 45 (2d Cir. 1994).  The Court agrees with Tri-State that equitable estoppel is inapplicable on these facts.  See Tri-State Reply & Opp. at 18 n.46, DE #266.

41

and case law construing it.[35]  See FTC v. Metro. Commc'ns Corp., No. 94 Civ. 1042 (JFK), 1995 WL 571461, at *3 (S.D.N.Y. Sept. 27, 1995) ("The decision of whether the Agreement at issue is a finders fee agreement or a brokerage agreement calls for a legal conclusion by the Court and the Court will not be bound by the parties' label attached to [their] stipluation."); cf. Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber, 407 F.3d 34, 45 (2d Cir. 2005) (parties are bound by their concessions of fact in their Rule 56.1 statements, but not by concessions in the form of legal conclusions); Mason v. Jamie Music Publ'g Co., 658 F.Supp.2d 571, 586-87 (S.D.N.Y. 2009) (rejecting equitable estoppel argument where adverse party's alleged acquiescence contravened Copyright Act's requirement that transfer of ownership rights be in writing).

For the foregoing reasons, the Court recommends that the District Court grant Tri-State's motion for summary judgment as to plaintiffs' DMCA claim, as the evidence remaining in the record is not sufficient to create an issue of fact with respect to the copyrightability of the Software.[36]  In addition, although only Tri-State has moved for summary judgment, this

---

[35]  As a final note, the record contains a fleeting reference to software that is owned by a non-party that apparently is embedded somehow in UniBasic, for which that non-party claims copyright.  See Excerpts of Douglas Chadwick Deposition (Mar. 6, 2012) at 60-61, DE # 309-27.  However, plaintiffs do not rely on this evidence, which they describe as "wholly irrelevant."  See Pl. Reply at 6 n.4, DE #285.  Moreover, there is no proof in the record identifying the work at issue and its registration status with the U.S. Copyright Office.

[36]  Because the Court recommends granting summary judgment in favor of Tri-State on plaintiffs' DMCA claim due to plaintiffs' failure to create a genuine issue of material fact that the Software is protected under Title 17, it need not address Tri-State's alternative arguments concerning whether the security measures prevented "access" under section 1201(a)(1)(A), whether plaintiffs have met their burden with respect to their claimed actual and statutory damages under the DMCA, or whether an unauthorized supplemental report by Cox concerning DMCA statutory damages should be precluded.  See Tri-State SJ Mem. at 17-40, DE #264.

Court's analyses of the Burden and Chadwick SJ Declarations and of plaintiffs' evidentiary showing on their DMCA claim are equally applicable to Judkovitz and SJ Computers; summary judgment should therefore be granted in favor of all three defendants dismissing the DMCA claim.  See, e.g., Zwillinger v. Garfield Slope Housing Corp., No. CV 94-4009 (SMG), 1998 WL 623589, at *23 & n.10 (E.D.N.Y. Aug. 17, 1998).

Tri-State also moves for summary judgment on plaintiffs' state law claims.  Each such claim is addressed in turn.

## II.      Plaintiffs' Breach of Contract Claims

### A.        Liability: Notice and Opportunity to Cure

Tri-State claims that it is entitled to summary judgment dismissing plaintiffs' breach of contract claims on the ground that plaintiffs were contractually obligated to notify Tri-State of any breach and give Tri-State thirty days to cure the same.  See Tri-State SJ Mem. at 7-8, DE #264.  In particular, Tri-State cites nearly identical provisions appearing in the Genesys and UniBasic Licenses, stating that plaintiffs:

> . . . may terminate this Software License for failure to comply with any of these terms, provided that [Point 4 or DCI] has requested [Tri-State] to cure the failure and [Tri-State] has failed to do so within thirty (30) days of such notice.

Genesys License, DE #283-3; see also UniBasic License, DE #283-4.

Preliminarily, the Court notes that, in advancing this argument, Tri-State relies on licenses from which it has otherwise sought to distance itself in other portions of its motion papers.  See Tri-State 56.1 ¶ 12 (noting that Tri-State received the Genesys License after the 1999 Agreement was fully executed); Tri-State Opp. 56.1 ¶ 186 (denying receipt of the UniBasic License); Tri-State Reply & Opp. at 59, DE #266 (arguing that the evidence shows that plaintiffs never sent Tri-State a copy of the UniBasic license).  Regardless, Tri-State's

argument fails for multiple reasons.  To begin with, the plain language of both licenses

unambiguously requires that plaintiffs provide a thirty-day opportunity to cure where plaintiffs,

at their option, seek to *terminate the license*.[37]  See Genesys License, DE #283-3; UniBasic

License, DE #283-4; see also Pl. SJ Opp. at 50, DE #279 (provision relates only to

termination).  Nothing in the language at issue limits plaintiffs' right to sue for breach of

contract.  See Genesys License; UniBasic License.  In contrast to the licensing language here,

contractual notice-and-opportunity-to-cure provisions that have been construed by courts to

create conditions precedent to claims for breach of contract have instead contained language

explicitly incorporating litigation-related terms such as "action" or "remedy" or "damages."

See Mahoney v. Sony Music Entm't, No. 12 Civ. 5045(RJS)(AJP), 2013 WL 491526, at *2

(S.D.N.Y.  Feb. 11, 2013) ("You [*i.e.*, Mahoney] shall not be entitled to recover damages . . .

unless [Sony] has failed to remedy such breach within a reasonable time following receipt of

your notice thereof.") (brackets in original); Rojas v. Don King Prods., Inc., No. 11 Civ.

8468(KBF), 2012 WL 760336, at *1 (S.D.N.Y. Mar. 6, 2012) ("In the event that Promoter

cures said breach . . . , Fighter shall be precluded from commencing any action against

Promoter . . . ."); Salzberg v. Brooks, 37 Misc.3d 1221(A), at *2 (Sup. Ct. N.Y. Co. Nov. 13,

2012) ("Before either party claims entitlement to any remedy to which he may be entitled

arising from a breach of [c]ontract . . . .").

    Furthermore, Tri-State appears to argue that plaintiffs' procurement of a TRO in this

matter constitutes the functional equivalent of termination of the Genesys and UniBasic

Licenses.  See Tri-State Reply & Opp. at 48, DE #266.  Even assuming *arguendo* that a judicial

---

[37]  Plaintiffs allude in passing to this issue, but cite no case law.  See Pl. SJ Opp. at 50, DE
#279.

order can constitute "termination" by a contracting party, Tri-State does not explain how plaintiffs' failure to provide an opportunity to cure before securing a TRO would somehow relieve Tri-State of any liability based on breaches *committed by Tri-State* -- as opposed to serving as the factual basis for a breach of contract claim by Tri-State. Cf. Point Prods. A.G. v. Sony Music Entm't, Inc., No. 93 Civ. 4001 NRB, 2000 WL 1006236, at *4 (S.D.N.Y. July 20, 2000) (because defendant failed to provide contractually required notice-and-cure prior to termination, plaintiff was entitled to summary judgment on plaintiff's breach of contract claim).

Therefore, the Court recommends denying Tri-State's motion for summary judgment dismissing plaintiffs' breach of contract claims.

### B.      Damages

Citing plaintiffs' expert report on damages, Tri-State additionally moves for summary judgment to preclude specified categories of damages that Tri-State believes plaintiffs are seeking for their breach of contract claims. See Tri-State SJ Mem. at 8 & n.33, DE #264 (citing Cox Report at 9). Specifically, Tri-State moves to dismiss plaintiffs' purported claim for $85,000 as a lost fee for making use of the Genesys source code (hereinafter, "Genesys Source Code Fee") and $407,075 and $95,502 in lost fees for "unrestricted or unlimited user" Genesys and UniBasic licenses, respectively (hereinafter "Unrestricted User Fees"). See Tri-State SJ Mem. at 8, DE #264. This aspect of Tri-State's motion is, however, grounded on a mistaken reading of the record.

The page in the Cox Report cited by Tri-State does not reference the breach of contract claims and appears to be part of Cox's analysis of plaintiffs' DMCA damages. See Cox Report at 9. Plaintiffs confirm this in their responsive papers, stating that, "as Professor Cox's report makes absolutely clear, Point 4's [Genesys Source Code Fee] arises under § 1203(c)(2) of the

DMCA . . . ."  Pl. SJ Opp. at 45 & n.163, DE #279 (citing Cox Report ¶ 13).  Plaintiffs

similarly limit their demand for Unrestricted User Fees to their DMCA claim.  See Pl. SJ Opp.

at 45 & n.165, DE #279 (arguing, in opposition to Tri-State's motion, that Cox properly

calculated the Unlimited User Fee "as part of [p]laintiffs['] actual damages under § 1203(c)(2)

of the DMCA").  Plaintiffs do not argue, in the alternative, that they would seek these damages

in connection with their breach of contract claims in the event that the Court dismissed their

DMCA claims.  See generally Pl. SJ Opp. at 45-46, DE #279.  Plaintiffs have thereby waived

their right to assert these damages under their breach of contract claims.  See, e.g., Gun Hill

Road Serv. Station, Inc. v. ExxonMobil Oil Corp., No. 08 Civ. 7956 (PKC), 2013 WL

1804493, at *11 n.5 (S.D.N.Y. Apr. 18, 2013) (party waived argument in failing to advance it

in opposing summary judgment); Martin v. Nat'l R.R. Passenger Corp., No. 10 Civ. 4199 CM,

2012 WL 1129360, at *9 n.3 (S.D.N.Y. Mar. 30, 2012) (same); see also Taylor, 238 F.3d at

197-98 (where appellate brief included no argument on certain theories of liability, they were

deemed abandoned).

     Therefore, the Court recommends denying as moot Tri-State's motion for summary

judgment with respect to what Tri-State erroneously characterizes as plaintiffs' demand for the

Genesys Source Code Fee and the Unrestricted User Fees in connection with plaintiffs' breach

of contract claims.

### III.    Plaintiffs' Claim for Breach of Duty of Good Faith and Fair Dealing

     Tri-State also challenges plaintiffs' claim for breach of the implied covenant of good

faith and fair dealing.  See Tri-State SJ Mem. at 12, DE #264.  Specifically, Tri-State argues

that this claim "is duplicative of [plaintiffs'] breach of contract claims and suffers from all of

the same defects."  Id.  Plaintiffs do not counter this particular argument with any specific facts

46

or case law; instead, at the conclusion of their arguments in support of their cross-motion for summary judgment on their breach of contract claims, plaintiffs assert, in conclusory fashion, that Tri-State's motion for summary judgment dismissing the contract claims and the implied covenant claims should be denied.  See Pl. SJ Opp. at 50-51, 52, DE #279.

Under New York law, "implicit in all contracts is a covenant of good faith and fair dealing in the course of the contract performance."  Nat'l Gear & Piston, 861 F.Supp.2d at 364 (citation and internal quotation omitted).  A "claim for breach of the implied covenant [of good faith] 'will be dismissed as redundant where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract.'"  See id. at 365 (quoting Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 80 (2d Cir. 2002)).

Here, plaintiffs have failed to identify any unfair conduct on Tri-State's part that falls outside the scope of the 1999 Agreement and licenses.  See Pl. SJ Opp. at 49-52, DE #279. Indeed, the duplicative nature of plaintiffs' claims is made clear by the fact that they base this alleged breach of the implied covenant on the same facts that underlie their claim that Tri-State breached the 1999 Agreement.  See id. at 50, 52; Sauer v. Xerox Corp., 95 F.Supp.2d 125, 132 (W.D.N.Y. 2000) (granting summary judgment dismissing counterclaim for breach of implied covenant, where its "factual underpinnings" were the same as those for breach of contract claims and where the section in defendant's memorandum of law addressing the implied-covenant claim "mostly simply repeat[ed] and paraphras[ed] its prior allegations regarding the contract claims").

Therefore, the Court recommends granting summary judgment dismissing as redundant plaintiffs' implied-covenant claim.

**IV.    Plaintiffs' Unjust Enrichment Claim**

Tri-State also seeks to dismiss plaintiffs' unjust enrichment claim because (1) a written agreement governs the disputes at issue here; and (2) plaintiffs have failed to establish that they have conferred a benefit on Tri-State.  See Tri-State SJ Mem. at 12-13, DE #264.  In a single perfunctory paragraph in their opposition, plaintiffs state, with no citation to the record,[38] that "Tri-State has at times asserted that [unspecified] aspects of its relationship with Point 4 and/or DCI are not governed by any written agreement[,]" and that, "*[t]o the extent that* the Court may find that this is so, Plaintiffs' cause of action for unjust enrichment necessarily survives."  Pl. SJ Opp. at 52, DE #279 (emphasis added).  Essentially, plaintiffs seem to be asserting a claim for unjust enrichment as a fallback position in the event Tri-State succeeds in procuring the dismissal of plaintiffs' breach of contract claims.  See id.  Plaintiffs further contend (again, without citations to the record or case law), "as set forth above, [DongleLab's modifications] conferred a legal benefit upon Tri-State for which Plaintiffs were not paid."  Id.  In response, noting plaintiffs' failure to identify any benefit that plaintiffs conferred upon Tri-State, Tri-State argues that its payment to consultants to fix the Recurring Problem is not a benefit recoverable by plaintiffs, "particularly since Plaintiffs admittedly played no role in fixing the problem Tri-

---

[38]  Frustratingly, in opposing Tri-State's motion with respect to the unjust enrichment claim, plaintiffs do not cite any evidence in the record, but instead require the Court to comb through voluminous documents and exhibits to substantiate plaintiffs' assertions.  See Pl. SJ Opp. at 52, DE #279.  As shown in subsequent sections of this opinion, plaintiffs' arguments in support of their own cross-motion for summary judgment suffer from the same defect.  See, e.g., pp. 65, 67-68.  Plaintiffs are in clear violation of Rule 56(c)(1)(A), which states that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record . . . ."  Fed R. Civ. P. 56(c)(1)(A).  If plaintiffs' counsel expects the Court to "scour the record" to document the facts posited in their legal arguments, "that is simply not our job, at least in a counseled case."  See Sioson v. Knights of Columbus, 303 F.3d 458, 460 (2d Cir. 2002).

State was experiencing." Tri-State Reply & Opp. at 47, DE #266.

"Unjust enrichment is a quasi-contract theory of recovery and is an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties concerned." Georgia Malone & Co. v. Rieder, 926 N.Y.S.2d 494, 497 (1st Dep't 2011) (internal quotation and citation omitted). To maintain a cause of action for unjust enrichment under New York law, a party must establish "that the other party was enriched, at plaintiff's expense, and that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." Id. (citation and internal quotation omitted; brackets in original).

The only enrichment identified by plaintiffs in opposing Tri-State's motion consisted of the modifications made by DongleLabs. See Pl. SJ Opp. at 52, DE #279. DongleLabs, however, has no direct or indirect connection with plaintiffs. Indeed, plaintiffs were completely unaware that DongleLabs modified the Software until after the filing of this lawsuit. See Pl. 56.1 ¶ 250. Therefore, plaintiffs have not established that they, as opposed to DongleLabs, conferred a benefit upon Tri-State. See R&R Recreation Prods., Inc. v. Joan Cook, Inc., No. 91 Civ 2589 (JSM), 1992 WL 88171, at *5 (S.D.N.Y. Apr. 14, 1992) (dismissing unjust enrichment claim on summary judgment; although defendant had benefitted financially from sales of third-party's watches that allegedly infringed plaintiff's copyright, those benefits were "not from any action by [plaintiff]"). For this reason, the Court recommends granting Tri-State's motion for summary judgment on plaintiffs' unjust enrichment claim, and dismissing that claim against all three defendants.

49

## V.     Plaintiffs' Unfair Competition Claims

Tri-State also seeks summary judgment dismissing plaintiffs' unfair competition claims under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and New York common law.  See Tri-State SJ Mem. at 13-14, DE #264.  In their complaint, plaintiffs alleged that Tri-State violated federal and state unfair competition laws by "remov[ing] the start-up screen of the [Software] containing Plaintiffs' respective name and/or trademark and license information[,]" thereby "causing confusion as to the true origin" of the Software.  See Compl. ¶¶ 43, 45.  Now, at the summary judgment stage, plaintiffs instead contend that Tri-State "recreated" the start-up screen containing their trademarks.  See Pl. SJ Opp. at 48, DE #279.  "In doing so," plaintiffs argue, "the Defendants aimed to, and did mislead and deceive users as to the origin, sponsorship, or approval of the hacked program [i.e., the Modified UniBasic]."  Id.

In moving for summary judgment dismissing plaintiffs' federal and state unfair competition claims, Tri-State argues, *inter alia*, that plaintiffs failed to present evidence of customer confusion or damages stemming from any customer confusion.  See Tri-State SJ Mem. at 14, DE #264.  According to Tri-State, the only customer potentially confused by the Modified UniBasic's trademarks was "Tri-State itself," rendering plaintiffs' claims "frivolous." See Tri-State Reply & Opp. at 46, DE #266; see also id. at 46-47 (Chadwick, DCI's Rule 30(b)(6) witness, was unaware of factual basis for unfair competition claim and corresponding damages).  Plaintiffs defend their Lanham Act claim by arguing, without citing any law or facts, that they are "only required to prove harm, and there is a legitimate issue of triable fact as to whether Tri-State's improper use of the plaintiffs['] trademarks to conceal their hacking of Plaintiffs['] software, harmed the Plaintiffs by preventing earlier discovery of the true nature of [Tri-State's] hack."  Pl. SJ Opp. at 48, DE #279.  As for their New York unfair competition

50

claim, plaintiffs challenge Tri-State's assumption that the state law claim mirrors the alleged

Lanham Act violation, arguing that the state law claim is broad enough to encompass Tri-State's

"unfair conduct in this case . . . ."  See id. at 48-49.

### A.    Section 43(a) of the Lanham Act

Section 43(a) of the Lanham Act provides, in relevant part:

> Any person who, on or in connection with any goods or services, . . . uses in
> commerce any word, term, name, symbol, or device, or any combination
> thereof, or any false designation of origin, false or misleading description of fact,
> or false or misleading representation of fact, which –
>
> > (A)   is **likely to cause confusion**, or to cause mistake, or to deceive as to
> > the affiliation, connection, or association of such person with
> > another person, or **as to the origin, sponsorship, or approval
> > of his or her goods**, services, or commercial activities by
> > another person . . .
>
> shall be liable in a civil action by any person who believes that he or she
> is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(A) (emphasis added).  Section 43(a) protects both registered and

unregistered marks.  See Lopez v. Gap, Inc., 883 F.Supp.2d 400, 412-13 (S.D.N.Y. 2012).

"To establish a claim under this provision, a plaintiff must show that he or she has a

valid mark that is entitled to protection and that the defendant's actions are likely to cause

confusion with the plaintiff's mark."  Id. at 413; J.T. Colby & Co. v. Apple, No. 11 Civ. 4060

(DLC), 2013 WL 1903883, at *5 (S.D.N.Y. May 8, 2013).  To qualify for protection under the

Lanham Act, the mark must be sufficiently distinctive and "*used* in a way sufficiently public to

identify or distinguish the marked goods in an appropriate segment of the public mind as those

of the adopter of the mark."  Lopez, 883 F.Supp.2d at 414-15 (quoting Gameologist Grp., LLC

v. Scientific Games Int'l, Inc., 838 F.Supp.2d 141, 154 (S.D.N.Y. 2011)) (emphasis added in

Lopez).  A likelihood of confusion arises "when an appreciable number of ordinarily prudent

51

purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." Lopez, 883 F.Supp.2d at 419 (citations and internal quotation omitted). To determine likelihood of confusion, courts weigh various factors, first identified in Polaroid Corp. v. Polarad Electric Corp., 287 F.2d 492, 495 (2d Cir. 1961) (hereinafter, the "Polaroid factors"). See Lopez, 883 F.Supp.2d at 419.[39]

Judged by these standards, plaintiffs' Lanham Act claim should not survive summary judgment.

First of all, plaintiffs do not sufficiently identify in their complaint what particular marks were misappropriated or whether the marks are registered or unregistered. See generally Compl. ¶¶ 42-47. In their memorandum of law opposing Tri-State's motion for summary judgment, plaintiffs reference the marks at issue as the names "UniBasic" and "Genesys," but they provide no information as to whether those marks are registered, nor do they cite any evidence in support of their claim. See Pl. SJ Opp. at 48, DE #279. Furthermore, in disputing Tri-State's Rule 56.1 Statement regarding lack of consumer confusion, plaintiffs cite only a *proposed* start-up screen, which was sent by Judkovitz to DongleLabs, that includes the names "Genesys" and "UniBasic." Compare Tri-State 56.1 ¶ 74 (asserting that plaintiffs were "not aware of any instance in which any consumers have confused any of Tri-State's products with any of Plaintiffs' products)," with Pl. 56.1 ¶ 74 (asserting that Tri-State's employees and consultants were confused as to the authenticity of the Modified UniBasic "because Tri-State

---

[39] The *Polaroid* factors include: (1) the strength of plaintiff's mark; (2) the similarity of the marks; (3) the proximity of the parties' products; (4) the likelihood that the plaintiff will bridge the gap; (5) actual consumer confusion; (6) bad faith of the defendant in adopting the similar mark; (7) the quality of the defendant's products; and (8) sophistication of the consumer. See Polaroid, 287 F.2d at 495.

took steps to tell hackers exactly what the screens had to look like").

Even if plaintiffs had established that the start-up screen did in fact misappropriate their marks, their federal unfair competition claim could not be sustained.  Plaintiffs cite no evidence in support of this claim, let alone proof of a likelihood of confusion among consumers. Plaintiffs simply surmise, without analyzing the relevant *Polaroid* factors, that if the start-up screen had been recreated, then Tri-State confused "users" as to the origin or sponsorship of the Software.[40]  See Pl. SJ Opp. at 48, DE #279.

The Court's own analysis of the *Polaroid* factors confirms the absence of any genuine issue of fact as to consumer confusion.  First, the strength of plaintiffs' marks and the similarity of the marks used by Tri-State are at best neutral, due to the lack of relevant evidence.[41] Plaintiffs do not indicate whether their marks are registered, such that the marks would be presumed to be strong, nor have they made any argument or provided any evidence with respect to the inherent distinctiveness of the marks, or any secondary meaning.  Furthermore, the lack of proximity of the parties' products and the unlikelihood that plaintiffs would bridge the gap tip strongly in Tri-State's favor: medical supplies and complex accounting software are distinctive products and plaintiffs have presented no evidence that they intend to enter the medical supply market in the future.  Moreover, the consumer who purchases costly accounting software is not likely to do so on impulse, and thus, the sophistication-of-the-consumer factor also weighs in

---

[40]  Plaintiffs' choice of the word "users" is telling — as likelihood of confusion in the unfair competition context does not concern itself with users of a product, but rather with consumers. See J.T. Colby, 2013 WL 1903883, at *5 (Lanham Act plaintiff must prove, *inter alia*, a "likelihood that an appreciable number of ordinary prudent purchasers will be confused").  Tri-State employees were not consumers, but were merely using a product already purchased by Tri-State.

[41]  As previously noted, plaintiffs point to no evidence that any of their marks were actually used in the Modified UniBasic, as opposed to what was simply proposed by Judkovitz.

Tri-State's favor.  See Schieffelin & Co. v. Jack Co. of Boca, Inc., No. 89 Civ. 2941 (PKL), 1992 WL 156560, at *12 (S.D.N.Y. June 28, 1992) (noting greater likelihood of confusion where products at issue "are relatively inexpensive items and tend to be purchased on impulse").  The record before the Court contains no proof of actual confusion or evidence suggesting that the quality of the Modified UniBasic would cause confusion.

The only factor that might arguably weigh in plaintiffs' favor is Tri-State's bad faith in allegedly adopting the marks.  But even assuming that Tri-State acted in bad faith, this factor is insufficient, in light of all the other factors, to create an issue of fact as to likelihood of consumer confusion under the Polaroid factors.  See J.T. Colby, 2013 WL 1903883, at *25 (finding as a matter of law no likelihood of confusion where, "[o]n balance," most of the Polaroid factors weighed heavily against a finding that an appreciable number of ordinary prudent consumers were likely to be confused); Lopez, 883 F.Supp.2d at 424 (granting summary judgment dismissing Lanham Act claim where no factors favored plaintiff, and, in dicta, surmising that even if one Polaroid factor favored plaintiff, it would be insufficient to raise a genuine issue of material fact with respect likelihood of confusion).

Therefore, the Court recommends granting Tri-State's motion for summary judgment dismissing plaintiffs' federal unfair competition claim against all three defendants.[42]

---

[42]  Because the Court concludes that plaintiffs have failed to raise a genuine issue of material fact with respect to consumer confusion, it need not address the merits of Tri-State's argument that the Lanham Act applies only to competitors.  The Court does briefly note, however, the factually unfounded nature of plaintiffs' assertion that Tri-State has sold accounting services or software and, therefore, is plaintiffs' competitor.  See Pl. 56.1 ¶ 3 (arguing that "Tri-State has provided access to Genesys to other companies, including Crystal Ware LLC"); id. ¶ 4 (citing two emails that mention Genesys in relation to Tri-State subsidiary Crystal Ware LLC).  The

(continued…)

### B.    New York Common Law

The elements of a claim for unfair competition under New York state common law

mirror those of its federal counterpart, except that New York additionally requires a showing of

bad faith.  See Lopez, 883 F.Supp.2d at 430-31; Miss Universe, L.P. v. Villegas, 672

F.Supp.2d 575, 596 (S.D.N.Y. 2009).  As noted above, plaintiffs failed to offer any evidence

to establish likelihood of confusion under the Lanham Act, and that failure is likewise fatal to

their state law claim.  See J.T. Colby, 2013 WL 1903883, at *26; Lopez, 883 F.Supp.2d at

431; Miss Universe, 672 F.Supp.2d at 596.  Therefore, the Court also recommends granting

Tri-State's motion for summary judgment dismissing plaintiffs' unfair competition claim under

New York law, as against all defendants.

In sum, the Court recommends granting summary judgment dismissing all of plaintiffs'

claims, with the exception of their respective breach of contract claims against Tri-State.

### VII.   Tri-State's Motion for Summary Judgment on Its Affirmative Defenses

Tri-State also contends that, in the event the Court concludes that plaintiffs have

identified genuine issues of material fact as to any of their claims, Tri-State is nevertheless

entitled to summary judgment dismissing those claims, based on several of Tri-State's

affirmative defenses; more specifically, Tri-State, in rather conclusory fashion, seeks summary

---

[42](...continued)
cited evidence shows only that Tri-State allowed one of its subsidiaries to *use* Tri-State's copy
of Genesys, not that Tri-State sold accounting software.  Moreover, *plaintiffs*' respective Rule
30(b)(6) witnesses testified that Tri-State was not a competitor.  See Chadwick Dep. Tr. at
361, DE #310-2; Deposition of Don Burden (Mar. 8, 2012) at 227, DE #310-7.  Therefore,
plaintiffs have failed to show with relevant, admissible evidence that these facts are
controverted.

judgment as to three of its affirmative defenses: laches, unclean hands and plaintiffs' failure to mitigate their damages.  See Tri-State SJ Mem. at 40-43, DE #264.  In view of this Court's recommendation that Tri-State's motion for summary judgment on plaintiffs' breach of contract claims be denied, as well as the fact that the District Court has yet to rule on the viability of any of plaintiffs' claims, Tri-State's affirmative defenses present a live issue.  Therefore, the foregoing affirmative defenses are addressed below.

### A.      Laches

#### 1.      Legal Standard

"The issue of laches is committed to the discretion of the district court . . . ."  King v. Innovation Books, 976 F.2d 824, 832 (2d Cir. 1992).  To prove the affirmative defense of laches, a party "must establish: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay."  Ikelionwu v. United States, 150 F.3d 233, 237 (2d Cir. 1998) (citation omitted).  Even before analyzing the individual elements of a laches defense, courts consider a myriad of threshold issues, including the following: whether the defense is being asserted against a claim that is based in law or in equity, see, e.g., Ogilvy Grp. Sweden, AB v. Tiger Telematics, Inc., No. 05 Civ. 8488 (DLC), 2006 WL 547785, at *2 (S.D.N.Y. Mar. 7, 2006) ("Laches is an equitable doctrine and cannot be invoked as a defense to a claim for damages."); whether the claim is predicated on federal or state law, see, e.g., Ivani Contracting Corp. v. City of N.Y., 103 F.3d 257, 260 (2d Cir. 1997) (laches is not a defense to a timely filed federal statutory claim); and whether the claim was brought within the applicable statute of limitations.  See, e.g., Maxim Grp. LLC v. Life Partners Holdings, Inc., 690 F.Supp.2d 293, 310 (S.D.N.Y. 2010) (granting summary judgment dismissing laches affirmative defense, where breach of

contract action was filed within six-year statute of limitations).

### 2. Application

Plaintiffs seek both legal and equitable relief in connection with their breach of contract claims. See Compl., *ad damnum* clause ¶ 13 (requesting $6 million in damages and injunctive relief pursuant to section 41 of the 1999 Agreement). Plaintiffs contend that laches, an equitable remedy, is no bar to a claim for damages at law, see Pl. SJ Opp. at 52-53, DE #279 -- an argument left unaddressed in Tri-State's reply. The clear weight of authority supports plaintiffs' position, at least where the applicable statute of limitations for a breach of contract claim had not expired when the claim was brought. See Maxim Grp., 690 F.Supp.2d at 310 ("Laches cannot be a defense to a legal action for damages if the action was commenced within the statute of limitations period."); RST (2005) Inc. v. Research in Motion, Ltd., No. 07-CV 3737 (VM), 2008 WL 5416379, at *7 (S.D.N.Y. Dec. 17, 2008) (same); Ogilvy Grp. Sweden, 2006 WL 547785, at *2; Garber v. Stevens, 941 N.Y.S.2d 127, 129-30 (1st Dep't 2012) (laches unavailable as a defense to breach of contract claim, which is not equitable in nature). Hence, Tri-State's laches theory is no defense to plaintiffs' demand for monetary relief in connection with their breach of contract claims, which were asserted well within the six-year statute of limitations under New York law. See N.Y. C.P.L.R. § 213.

Even assuming *arguendo* that laches may be asserted as a defense against a demand for equitable relief arising out of an alleged breach of contract, see Medinol Ltd. v. Boston Scientific Corp., 346 F.Supp.2d 575, 609-10 (S.D.N.Y. 2004) (laches could not bar plaintiff's claim for damages for breach of contract but could bar plaintiff's "claim for injunctive and other equitable relief"), Tri-State is not entitled to summary judgment on its laches defense.

It cannot be said, as a matter of law, that it was inexcusable for plaintiffs to wait seven months to bring their action, particularly in light of the six-year statute of limitations for breach of contract claims.  See Maxim Grp., 690 F.Supp.2d at 310 (granting summary judgment dismissing laches affirmative defense, where breach of contract action was brought within six-year statute of limitations); RST (2005), 2008 WL 5416379, at *7 (same); cf. Lego A/S v. Best-Lock Constr. Toys, Inc., 874 F.Supp.2d 75, 94 (D. Conn. 2012) (noting, in dicta, that "the sort of delay condemned by laches as unreasonable is usually made of sterner stuff than" a nine-month delay from discovery of infringement until filing suit).[43]  Moreover, although Tri-State challenges plaintiffs' claimed motive for, and their evidence concerning, why they waited seven months to initiate this lawsuit, see Tri-State Reply & Opp. at 52-53, DE #266,[44] it does not follow that a delay of seven months to investigate the alleged breach and to assess one's legal options and strategy is per se unreasonable.[45]

---

[43] In arguing that plaintiffs' delay was unreasonable, Tri-State relies on  Juicy ZCouture, Inc. v. L'Oreal USA, Inc., No. 04 Civ. 7203 (DLC), 2006 WL 1012939, at *33-34 (S.D.N.Y. Apr. 19, 2006), see Tri-State Reply & Opp. at 52, DE #266, which did not, however, involve a motion for summary judgment.  Rather, following a bench trial, the court, based on factual findings bearing no resemblance to the case at bar, found that the plaintiff acted unreasonably in waiting three years to bring a Lanham Act claim, and the court sustained the defendant's laches defense as to the plaintiff's demand for injunctive relief (but not as to damages).  See id. at *33-34.

[44] While Tri-State claims that plaintiffs have "no admissible evidence to explain why they waited [seven] months" to file this action, see Tri-State SJ Mem. at 42, DE #264, it is undisputed that plaintiffs' former counsel retained an investigator to conduct a background report on defendant Judkovitz during this time period.  See Threat Management and Protection, Inc. Background Investigation Report, DE #143-14 (Sept. 10, 2010) (submitted in connection with plaintiffs' opposition to Tri-State's Motion for Partial Summary Judgment).

[45] Indeed, in the context of assessing motions for preliminary injunctions, courts have found

(continued...)

58

The determination of whether a party acted diligently in asserting its rights must be "based on the circumstances peculiar to each case . . . [and t]he inquiry is a factual one." Tri-Star Pictures Inc. v. Leisure Time Prods., B.V., 17 F.3d 38, 44 (2d Cir. 1994).  The reasonableness of plaintiffs' delay in this instance is thus precisely the type of determination that is properly within the province of the fact-finder.  See Kamat v. Kurtha, No. 05 Civ. 10618(KMW)(THK), 2008 WL 5505880, at *6-7 (S.D.N.Y. Apr. 14, 2008) (whether party acted unreasonably in waiting sixteen months to assert his rights turned on "disputed questions of fact, and various inferences that can be drawn from the facts," and thus posed "questions [that] should be resolved by a jury"); Monsanto Co. v. Haskel Trading, Inc., 13 F.Supp.2d 349, 361 (E.D.N.Y. 1998) ("resolution of defendants' laches defense as a matter of law [wa]s inappropriate" where parties disputed what facts were known to plaintiffs prior to filing lawsuit and when plaintiffs acquired that knowledge); Baron Philippe de Rothschild v. Paramount Distillers, Inc., 923 F.Supp. 433, 438 (S.D.N.Y. 1996) (denying motion for summary judgment seeking dismissal of laches defense, as "[n]umerous material facts remain in dispute[,]" including "any inexcusability and unreasonableness of plaintiffs' delay in bringing

---

[45](…continued)
delays flowing from the investigation of claims and exploration of legal options to be "excusable."  See Juicy Couture, Inc. v. Bella Int'l Ltd., No. 12 Civ. 5801 (RA), 2013 WL 978773, at *9 (S.D.N.Y. Mar. 12, 2013) (although delay of several months between discovery of infringement and filing of motion for preliminary injunction might call into question plaintiff's sense of urgency, court found that time plaintiff spent investigating defendants' activities was reasonable); Kuklachev v. Gelfman, 629 F.Supp.2d 236, 250-51 (E.D.N.Y. 2008) (delay in bringing motion for preliminary injunction was "excusable," where, in part, five-month delay between discovery of infringement and cease-and-desist letter was "explained by the need to investigate the nature of the infringement and to explore what legal recourse was possible"), aff'd, 361 F.App'x 161 (2d Cir. Oct. 16, 2009).

this action").[46]  Consequently, Tri-State is not entitled to summary judgment on its laches defense.

### B.      Unclean Hands

#### 1.    Legal Standard

Unclean hands is an equitable defense, sustained by a court "only when a plaintiff otherwise entitled to relief has acted so improperly with respect to the controversy at bar that the public interest in punishing the plaintiff outweighs the need to prevent the defendant's tortious conduct."  Price v. Fox Entm't Grp., Inc., No. 05 Civ. 5259 (SAS), 2007 WL 241387, at *4 (S.D.N.Y. Jan. 26, 2007) (internal quotations and citations omitted).  In other words, the party against whom the doctrine is invoked must have committed "some unconscionable act." See Bild v. Wieder, 09-CV-5576 (ARR)(VVP), 2013 WL 2120654, at *31 (E.D.N.Y. May 15, 2013) (quoting PenneCom B.V. v. Merrill Lynch & Co., 372 F.3d 488, 493 (2d Cir. 2004)); cf. Price, 2007 WL 241387, at *4 (noting that, in the copyright context, the defense is "recognized only rarely, when the plaintiff's transgression is of serious proportions").  The equitable doctrine is applied at the discretion of the trial court.  See Gucci Am., Inc. v. Guess? Inc., 868 F.Supp.2d 207, 245 (S.D.N.Y. 2012).

---

[46]   In rejecting Tri-State's contention that, as a matter of law, plaintiffs acted unreasonably in delaying bringing their lawsuit against defendants, this Court by no means condones plaintiffs' former counsel's representations to Judge Dearie, in February 2011, that plaintiffs learned of defendants' identities "only recently," when, in fact, the record unambiguously indicates that plaintiffs were on notice of the activities of at least Tri-State and SJ Computers as of July 2010.  Compare Declaration of Jason Koral ¶ 6 (Feb. 14, 2011), DE #5, with Tri-State Reply at 53 & n.133, DE #266 (citing record evidence).

## 2.   Application

Tri-State does not clearly articulate the basis for its defense of unclean hands, except for referencing the same delay in bringing suit, cited in support of Tri-State's laches defense.  See Tri-State SJ Mem. at 40-43, DE #264; see also Tri-State Reply & Opp. at 50-54, DE #266. The Court recommends that the District Court, in its discretion, deny Tri-State's motion for summary judgment on its unclean hands defense.  Even accepting Tri-State's theory that plaintiffs caused the delay solely to increase their DMCA damages, Tri-State cites no cases to establish that this conduct was so unconscionable as to preclude any recovery whatsoever under the unclean hands doctrine.  Put simply, Tri-State has not shown that plaintiffs' conduct was so egregious that equity requires the Court, as a matter of law, to overlook any transgression on the part of Tri-State.  See Price, 2007 WL 241387, at *5 (granting summary judgment striking defense of unclean hands; "minor conduct" on the part of plaintiff, and his knowledge at the time that the work was infringed, did not rise to the level of an "unconscionable act" sufficient to sustain a defense of unclean hands).

Moreover, as plaintiffs point out, see Pl. SJ Opp. at 53, DE #279, courts in this Circuit routinely decline to apply unclean hands as a bar or limit to claims for monetary damages in an action at law.  See, e.g., Gala Jewelry, Inc. v. Harring, No. 05 Civ. 7713(GEL), 2006 WL 3734202, at *2 n.3 (S.D.N.Y. Dec. 18, 2006) (Lynch, J.) (citing Aetna Cas. & Sur. Co. v. Aniero Concrete Co., Inc., 404 F.3d 566, 607 (2d Cir. 2005)).  Tri-State ignores this point in its reply.  See Tri-State Reply & Opp. at 50-54, DE#266.  Thus, even assuming plaintiffs' delay was sufficiently egregious to justify the imposition of the unclean hands defense, it would not apply to any monetary relief plaintiffs are seeking here.  See, e.g., Cohen v. Elephant

61

Wireless, Inc., No. 03 Civ. 4058 (CBM), 2004 WL 1872421, at *3 (S.D.N.Y. 2004) (striking defendant's unclean hands defense as a matter of law in breach of contract action; "[u]nclean hands is an equitable defense and unavailable in an action seeking money damages").

Therefore, Tri-State's motion for summary judgment on this defense should be denied.[47]

## C.  Failure to Mitigate Damages

Finally, in a section of its brief addressing all three affirmative defenses, Tri-State asserts in two headings that "Tri-State is Entitled to Summary Judgment on Its Affirmative Defense[] of Failure to Mitigate," see Tri-State SJ Mem. at 40, DE #264, and that "Plaintiffs' Conduct Constitutes . . . Failure to Mitigate . . . ." See id. at 43.  Ignoring the principle that "[t]o make a legal argument is to advance one's contentions by connecting law to facts," see Sioson, 303 F.3d at 460, Tri-State makes no specific legal argument in support of this particular defense, nor does it cite any supporting case law on mitigation of damages.  See Tri-State SJ Mem. at 40-43.  It is "well-established that courts cannot make a party's arguments for it or fill in the blanks on that party's behalf."  Bey v. State of N.Y., No. 11-CV-3296(JS)(WDW), 2013 WL 3282277, at *6 (E.D.N.Y. June 25, 2013) (internal quotation and citation omitted).

Moreover, although plaintiffs' opposition remarked on the deficiency in Tri-State's motion, see Pl. SJ Opp. at 56 n.178, DE #279, Tri-State's reply essentially fails to cure these omissions.  See Tri-State Reply & Opp. at 50-54, DE #266.[48]  Thus, the Court deems Tri-State

---

[47]  Indeed, as demonstrated by the decision in Price, plaintiffs should be granted summary judgment striking this affirmative defense.  See infra p. 71.

[48]  Tri-State's discussion of its three affirmative defenses conflates all three and cites one case that addresses laches but not mitigation.  See Tri-State Reply & Opp. at 52, DE #266.  The

(continued…)

to have abandoned this aspect of its motion and, as such, the Court recommends denying Tri-State's motion for summary judgment on its mitigation-of-damages defense.  See Blouin, 356 F.3d at 363 n.9; Taylor, 238 F.3d at 196-97.


## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The Court now turns to plaintiffs' cross-motion for summary judgment on its DMCA, breach of contract, and implied covenant claims against Tri-State; on Tri-State's affirmative defenses of laches, unclean hands, and failure to mitigate; and on all of Tri-State's counterclaims.

**I.      Plaintiffs' DMCA Claim**

Plaintiffs move for summary judgment in their favor on their claim under section 1201(a)(1)(A) of the DMCA, which provides that no person shall

circumvent a technological measure that effectively controls access to *a work protected under this title*.

17 U.S.C. § 1201(a)(1)(A) (emphasis added).  For the reasons stated in addressing Tri-State's motion to strike undisclosed expert opinion and for summary judgment dismissing plaintiffs' DMCA claim, plaintiffs have failed to establish by timely disclosed, admissible evidence that the Software is protected under the Copyright Law.  See discussion *supra* pp. 15-43.

---

[48](…continued)
theory of Tri-State's failure-to-mitigate defense appears to be identical to its laches and unclean hands defenses: to wit, plaintiffs "purposely chose to wait [for seven months in order to] drive up their own purported damages[,]" id., because, had they immediately sent Tri-State the Notice Letter, "they would have no statutory damages to claim."  Id. at 54.  Since Tri-State's mitigation defense thus relates exclusively to plaintiffs' statutory damages, that defense will in any event be rendered moot in the event Judge Amon dismisses plaintiffs' DMCA claim.

Therefore, the Court recommends denying plaintiffs' motion for summary judgment on their DMCA claim.

## II.      Plaintiffs' Breach of Contract Claims

Plaintiffs seek summary judgment on the issue of liability with respect to each of their respective breach of contract claims.  See Pl. SJ Opp. at 49-52, DE #279.

### A.      Liability as to Point 4

Point 4 premises its breach of contract claim on two documents — the 1999 Agreement and the Genesys License.  See Pl. SJ Opp. at 49, DE #279.  Specifically, plaintiffs allege that Tri-State breached section 23 of the 1999 Agreement, when it provided third parties, including Spiegel, Judkovitz, and Goldstein, with access to the Software, without requiring each of them to execute a "Contractor Confidentiality Declaration."  See id.  Moreover, plaintiffs state (albeit without citation to the record in their initial moving papers[49]) that Tri-State breached several aspects of the Genesys License, including the 48-user limit and a provision prohibiting Tri-State from reversing, compiling or disassembling Genesys.  See id.

In opposition, Tri-State incorporates the arguments regarding notice and opportunity to cure that it advanced in its motion for summary judgment dismissing plaintiffs' breach of contract claims; this Court has concluded that those arguments are unavailing.  See discussion *supra* pp. 43-45.  Tri-State tellingly does not specifically address each breach cited by plaintiffs.  See Tri-State Reply & Opp. at 58-60, DE #266.  Instead, Tri-State argues in general terms, without supporting authority, that the evidence "[o]verwhelmingly [e]stablishes" that

---

[49]  With respect to most of the alleged breaches, plaintiffs fail to cite any evidence in the record.  See *supra* note 38.

Tri-State informed plaintiffs in February 2010 that its dongle was malfunctioning, and that therefore plaintiffs were required to help Tri-State fix the Recurring Problem.  See id. at 59. Tri-State also contends that plaintiffs never sent Tri-State a copy of the UniBasic License.  See id. at 59.

### 1.   The 1999 Agreement

In moving for summary judgment on the basis of an alleged breach of the 1999 Agreement, Point 4 asserts, again without any citation to the factual record, that Tri-State gave third parties access to Genesys without requiring them to execute a Contractor Confidentiality Declaration, as required under section 23 of the Agreement.  See Pl. SJ Opp. at 49, DE #279.[50] On reply, plaintiffs cite specific evidence that they claim shows that Spiegel, Goldstein, and Judkovitz were given unauthorized access to Genesys and UniBasic.  See Pl. Reply at 32 & n.39, DE #285.  However, the cited evidence with respect to Spiegel, Goldstein and Judkovitz relates only to UniBasic and is silent as to access to Genesys, Point 4's product.  See id.[51]

---

[50]  In opposition, Tri-State does not refute these facts, except to suggest that plaintiffs suffered no resulting damages from this particular breach.  See Tri-State Reply & Opp. at 49-50, DE #266.  Tri-State overlooks the fact that plaintiffs moved for summary judgment solely with respect to liability and not as to damages; and Tri-State's own motion for summary judgment targeted only specific categories of damages, see Tri-State SJ Mem. at 8 & n.33, DE #264. As it turns out, those categories of damages are not being sought in connection with the breach of contract claims.  See supra pp. 45-46.  Therefore, the apparently disputed issue of the nature and extent of plaintiffs' contractual damages is not now before the Court and ought to be deferred until trial.

[51]  Moreover, with respect to Spiegel, the record on which plaintiffs rely suggests, in part, that Spiegel did not have access to UniBasic.  See Deposition Testimony of Shimon Hoffman (Dec. 14, 2011) ("S. Hoffman Tr.") at 93, DE #286-9 (Hoffman did not give Spiegel access to UniBasic).  Nor does the referenced evidence make clear what access to UniBasic Goldstein was given or whether he signed the requisite Contractor Confidentiality Declaration. While the evidence cited by plaintiffs suggests that Hoffman did not allow Goldstein of DongleLabs

(continued…)

Thus, due to plaintiffs' failure to cite relevant, undisputed evidence, Point 4 has not established its entitlement to summary judgment on liability as it pertains to its breach of contract claim based on section 23 of the 1999 Agreement.

### 2.    The Genesys License

Point 4 alleges that Tri-State also breached several provisions of the Genesys License. The Court addresses each alleged breach in turn.

- Tri-State was authorized to use Genesys on "any one computer[.]"  See Pl. SJ Opp. at 49, DE #279.

Without citing the record, plaintiffs allege that "the undisputed evidence" establishes that Tri-State "operated multiple copies of Genesys simultaneously on at least two computers – the 'production' and 'demo' servers — in June and July 2010, in order to [create the Modified UniBasic], and again in Dec. 2010/Jan[.] 2011 on [yet another server]." Id. at 50.  Plaintiffs' own Rule 56.1 Statement does not mention either the production or demo server.  See generally Pl. 56.1 ¶¶ 164-265.  Tri-State's Rule 56.1 Statement does reference a test on the Demo Computer, but it does not state definitively that the Demo Computer operated simultaneously with the "production" server.  See Tri-State 56.1 ¶ 28.[52]  Neither party's Rule 56.1 statement

---

[51](...continued)
access to the UniBasic object code, see S. Hoffman Tr. at 93, the Court has located other evidence in the record indicating that Goldstein had access to some aspect of UniBasic.  See Declaration of Nima Goldstein ¶ 5, DE #309-17 (testifying that he resolved Tri-State's dongle problem "by modifying the UniBasic Binary file").  As for Judkovitz, plaintiffs point to testimony that Judkovitz had access to UniBasic and did not sign the required Contractor Confidentiality Declaration, but they cite no evidence that Judkovitz had access to Point 4's Genesys code.  See S. Hoffman Tr. at 94.

[52]  Although not cited by plaintiffs, there is testimony by Judkovitz from which an inference might be drawn that the Modified UniBasic ran on two computers for more than a week.  See

(continued…)

alludes to a December 2010/January 2011 server.  Therefore, the Court recommends denying

summary judgment as to this specific breach.

- Tri-State was authorized to use Genesys "solely for [Tri-State's] business purposes."  See Pl. SJ Opp. at 49, DE #279.

Plaintiffs also state, again without citing the record, that Tri-State "made unauthorized

copies of Genesys, other than for its own legitimate business purposes — i.e., to [create the

Modified UniBasic]."  See Pl. SJ Opp. at 50, DE #279.  However, there exists a genuine issue

of material fact as to whether, as Point 4 contends, the Modified UniBasic was created "other

than for [Tri-State's] legitimate business purposes," id., or whether, as Tri-State contends, it

had a malfunctioning dongle and simply sought in good faith to fix the Recurring Problem for

legitimate business purposes.  Hence, the Court recommends denying Point 4's motion for

summary judgment as to this specific breach.

- Tri-State agreed "not to reverse, compile or di[sa]ssemble [Genesys]."  See Pl. SJ Opp. at 49-50, DE #279.

Plaintiffs, again, make the claim that this fact is undisputed, yet include no citation to

the record or either party's Rule 56.1 statement.  See Pl. SJ Opp. at 50, DE #279.  Plaintiffs'

Rule 56.1 Statement affirmatively states that DongleLabs modified UniBasic, see Pl. 56.1 ¶

230, but does not address whether DongleLabs was required to "reverse, compile or

---

[52](…continued)

Declaration of Shmuel Judkovitz (Nov. 14, 2012) ¶¶ 8-11, DE #309-13 (testifying that he uploaded the Modified UniBasic onto the Demo Computer on July 11, 2010 and then transferred it to the 2007 Server on July 19, 2010).  But this evidence does not definitively state whether the *Genesys* program was also uploaded on the Demo Computer.  See id.  To be sure, there may be additional evidence in the record establishing that Genesys ran simultaneously on two computers, but it is plaintiffs' obligation under Rule 56 to specifically identify proof in the record to establish the absence of any genuine issue of material fact.  See Fed. R. Civ. P. 56(c); see also *supra* note 38.

disassemble" Genesys in order to do so.  Indeed, it appears that whether Genesys was encrypted is a disputed issue of fact.  See Tri-State ¶ 128; Pl. 56.1 ¶ 128 (citing Burden SJ Decl. ¶ 21).[53] For these reasons, the Court recommends denying Point 4's motion for summary judgment on this breach.

- Tri-State agreed to a 48-user maximum.  See Pl. SJ Opp. at 50, DE #279.

In yet another argument devoid of citation to the record, plaintiffs assert in their initial moving papers that "[i]t is also undisputed that [the] effect of the [Modified UniBasic] was to remove any effective limit upon the number of concurrent users of Point 4's software . . . ." See Pl. SJ Opp. at 50, DE #279.  Notably, plaintiffs do not deny that whether more than 48 Tri-State users actually used the Software is very much in dispute.  See generally id.; see also Pl. 56.1 ¶ 254; Tri-State Opp. 56.1 ¶ 254; Tri-State Reply & Opp. at 10-11, DE #266 (arguing that evidence showed only that Tri-State was "capable" of adding more than 48 users, and not that it actually did so).  Thus, the Court recommends denying Point 4's motion for summary judgment on this breach.

For the foregoing reasons, the Court recommends denying plaintiffs' motion for summary judgment with respect to liability on all of the breaches identified by Point 4.

### B.    Liability as to DCI

Advancing essentially the same arguments relied upon by Point 4 in connection with the

---

[53]  Because the Burden SJ Declaration contains no paragraph 21, plaintiffs apparently meant to cite to paragraph 20, which states that Genesys is encrypted as "created and/or modified," but then claims that Tri-State had "access to the source code."  Burden SJ Decl. ¶ 20. Presumably, if there was access to the source code, there would be no need to disassemble Genesys.  Again, if plaintiffs had complied with their obligations under Rule 56, the Court would not have had to search the record to determine whether or not plaintiffs' statements are indeed undisputed.

Genesys License, DCI moves for summary judgment as to liability for Tri-State's breach of the UniBasic License, but does not assert any breach of the 1999 Agreement, to which it was not a party.  See Pl. SJ Opp. at 51, DE #279.[54]  In opposition, Tri-State has raised a genuine issue of material fact as to whether it ever received a copy of the UniBasic License.  See Tri-State Reply & Opp. at 59, DE #266.[55]  Therefore, the Court recommends that the District Court deny DCI's motion for summary judgment on its breach of contract claim.

### III.    Plaintiffs' Claim for Breach of Duty of Good Faith and Fair Dealing

Plaintiffs also move for summary judgment on their respective claims for breach of the duty of good faith and fair dealing.  See Pl. SJ. Opp. at 49-52, DE #279.  As noted above, Tri-State correctly characterizes these claims as duplicative of plaintiffs' breach of contract claims.  See supra pp.46-47.  Having failed to identify any conduct on Tri-State's part that falls outside the scope of the 1999 Agreement and licenses, see Pl. SJ Opp. at 49-52, DE #279, plaintiffs implied-covenant claims necessarily fail.  See Nat'l Gear & Piston, 861 F.Supp.2d at 364.

### IV.    Tri-State's Affirmative Defenses: Laches, Unclean Hands and Failure to Mitigate

As explained above, Tri-State failed in its burden to establish its entitlement to judgment on its affirmative defenses of laches and unclean hands, and abandoned its motion with respect

---

[54]  One distinction between the two licenses is that the UniBasic License specifically required Tri-State to obtain authorization from DCI before transferring UniBasic to another platform, whereas the Genesys License had no comparable provision for Genesys.  Compare Genesys License, DE # 283-3, with UniBasic License, DE #283-4.

[55]  Moreover, even if plaintiffs had adduced uncontroverted proof of the existence of a contract between Tri-State and DCI, the Court would nevertheless recommend denying DCI's motion for summary judgment as to the covenants concerning the 48-user limit and Tri-State's "business purposes," for the reasons stated above with respect to the asserted breaches of the Genesys License.

to plaintiffs' failure to mitigate their damages.  See discussion supra pp. 56-63.  Plaintiffs

cross-move for summary judgment striking those three defenses.  Even when all factual

inferences are drawn in Tri-State's favor, those defenses are fatally flawed.

### A.     Laches

Although Tri-State's laches defense raises issues of fact concerning the reasonableness of

plaintiffs' delay in bringing their breach of contract claim, see supra pp. 58-60, that affirmative

defense nevertheless cannot survive plaintiffs' motion for summary judgment, as Tri-State has

not met its burden of proving prejudice on account of that delay.  The only prejudice identified

by Tri-State relates to the statutory damages plaintiffs seek for their DMCA claim — i.e.,

damages based on the number of employee logins that increased with each day during the

Waiting Period.  See Tri-State Reply & Opp. at 53-54, DE #266.   For the reasons explained

above, this Court recommends that the DMCA claim be dismissed.[56]  Tri-State identifies no

other prejudice resulting from plaintiffs' delay in bringing suit.  See Compania Sud Americana

de Vapores, S.A. v. Global Terminal & Container Servs., Inc., 509 F.App'x 97, 100-01 (2d

Cir. Jan. 30, 2013) (affirming dismissal of laches defense on summary judgment, where

plaintiff filed breach of contract action within statute of limitations and defendant proffered no

evidence of prejudice); see also Puccio v. L.M.G. Air Corp., No. 94 CV 4013 (SJ), 1998 WL

---

[56]  Even if the District Court disagrees with the Court's recommendation with respect to the
DMCA claim, the DMCA damages would likely not qualify as the type of economic prejudice
that justifies a finding of laches.  Cf. Mahmood v. Research in Motion Ltd., No. 11 Civ. 5345
(KBF), 2012 WL 1801693, at *6 (S.D.N.Y. May 16, 2012) (economic prejudice for laches
"addresses something more than the damages that may be awarded for a finding of
infringement; it is seeking evidence that there has been a change in the economic position of
the alleged infringer during the period of delay") (quotation and citation omitted).  Notably,
the DMCA claim was brought well within its three-year statute of limitations.  See 17 U.S.C.
§ 507(b).

887008, at *9 (E.D.N.Y. Dec. 8, 1998) (finding, after bench trial, that defendants did not meet their burden in establishing laches, where they "offered no evidence concerning any prejudice they suffered as a result of the delay").

### B.      Unclean Hands

Even assuming that plaintiffs deliberately delayed in asserting their rights in order to increase their statutory damages, their conduct nevertheless is not so egregious or unconscionable as to trigger the application of the unclean hands doctrine -- particularly if the claim pursuant to which those damages are sought (i.e., the DMCA claim) is dismissed from the case. Accordingly, this Court recommends granting plaintiffs' motion for summary judgment striking the defense of unclean hands. See Price, 2007 WL 241387, at *5 (granting summary judgment striking unclean hands defense).

### C.      Failure to Mitigate

As discussed in connection with Tri-State's motion for summary judgment on its affirmative defenses, Tri-State's argument concerning plaintiffs' failure to mitigate lacks the "requisite combination of authorities and putative facts." See Sioson, 303 F.3d at 460; *supra* pp. 62-63. Even generously construed, Tri-State's theory in support of its failure-to-mitigate defense pertains solely to plaintiffs' demand for statutory damages under the DMCA. See Tri-State SJ Mem. at 41-42, 43, DE #264; Tri-State Reply & Opp. at 52, DE #266. If, as recommended by this Court, Judge Amon dismisses plaintiffs' DMCA claim, Tri-State's mitigation defense will be rendered moot and should be stricken on that basis.[57]

---

[57] Furthermore, various courts have held that because statutory damages are penal in nature, the affirmative defense of mitigation of damages has no application to the imposition of such

(continued…)

**V.      Tri-State's Breach of Contract and Implied Covenant Counterclaims**

In their cross-motion for summary judgment, plaintiffs seek dismissal of Tri-State's

counterclaims against Point 4 for breach of contract and for breach of the implied covenant of

good faith and fair dealing.  See Pl. SJ Opp. at 56-59, DE #279.  Tri-State raises no argument,

either in fact or law, in response to these challenges.  See generally Tri-State Reply & Opp.,

DE #266.  As plaintiffs correctly observe in their reply, Tri-State "evidently abandoned" these

counterclaims.  See Pl. Reply at 36, DE #285.  Thus, this Court recommends granting

summary judgment in favor of Point 4 dismissing Tri-State's counterclaims for (1) breach of

contract; and (2) breach of the implied covenant of good faith and fair dealing.  See Taylor v.

City of N.Y., 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim

abandoned when a party moves for summary judgment on one ground and the party opposing

summary judgment fails to address the argument in any way.") (collecting cases).

**VI.     Tri-State's Fraudulent Inducement Counterclaim**

Plaintiffs additionally seek summary judgment dismissing Tri-State's counterclaim

against Point 4 for fraudulent inducement, and Tri-State opposes this aspect of the cross-motion.

See Pl. SJ Opp. at 59, DE #279; Tri-State Reply & Opp. at 61, DE #266.  In that counterclaim,

Tri-State alleges that Point 4 fraudulently concealed the fact that the UniBasic License

prohibited Tri-State from transferring UniBasic to another computer system without prior

---

[57](...continued)

damages (including those recoverable under the Copyright Act).  See, e.g, Malibu Media, LLC
v. Batz, Civil Action No. 12-CV-01953-WYD-MEH, 2013 WL 2120412, at *3 (D. Colo. Apr.
5, 2013), adopted, 2013 WL 2115236 (D. Colo. May 15, 2013); Arista Records, Inc. v. Flea
World, Inc., 356 F.Supp.2d 411, 422 (D.N.J. Jan. 27, 2005).

authorization from DCI, and that, had Tri-State been aware of that fact, it never would have entered into the 1999 Agreement.  See Am. Counterclaims ¶¶ 8, 11-13, DE #42.

Point 4 challenges this claim on two grounds: for failure to plead with particularity under Rule 9(b), and because Tri-State's Vice President, Jonah Geisler, who negotiated the 1999 Agreement, testified that Point 4 "never made any separate representations concerning the right of Tri-State to transfer Genesys or UniBasic to new systems or servers, and that Tri-State relied solely upon the negotiated terms of the 1999 Agreement."  Pl. SJ Opp. at 59, DE #279. Tri-State retorts that its pleadings are sufficiently particular and that Burden admitted that he "copied the UniBasic License nearly verbatim, but that he surreptitiously and purposefully omitted the UniBasic License's restriction on moving software from one computer to another." See Tri-State Reply & Opp. at 61, DE #266.[58]

Notably, neither Point 4 nor Tri-State bothers to cite case law or the elements of this cause of action, which must be established by clear and convincing evidence.  See Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank, 57 F.3d 146, 153 (2d Cir. 1995).  To sustain a claim for fraudulent inducement under New York law, Tri-State must prove the existence of a material "misrepresentation or omission on which [it] relied that induced [Tri-State] to enter into an agreement."  Barron Partners, LP v. LAB123, Inc., 593 F.Supp.2d 667, 670-71 (S.D.N.Y. 2009).  A material omission will not be actionable unless the

---

[58]  In support of this assertion, Tri-State cites an excerpt from Chadwick's deposition that has nothing to do with Burden's alleged admission.  See Tri-State's Reply & Opp. at 61 & n.169 (citing DE #309-27 at 63:9-13).  Regardless, even assuming that the record contains such an admission, Tri-State's counterclaim for fraudulent inducement should be dismissed, for the reasons discussed herein.

party withholding material information had a duty to disclose it.  See id. at 671; Gander

Mountain Co. v. Islip U-Slip LLC, — F.Supp.2d — , 2013 WL 528444, at *12-14 (N.D.N.Y.

Feb. 11, 2013) ("A claim for fraudulent inducement requires the plaintiff to allege that the

defendant first had a duty to disclose material information.") (citations omitted).  A duty to

disclose a material fact arises (1) where there is a fiduciary or confidential relationship between

the parties; (2) where the nondisclosing party made a partial or ambiguous statement; or (3)

"where one party possesses superior knowledge, not readily available to the other, and know[s]

that the other is acting on the basis of mistaken knowledge."  Woods v. Maytag Co., 807

F.Supp.2d 112, 124 (E.D.N.Y. 2011) (internal quotations and citations omitted); see also

Golub v. Tanenbaum-Harber Co., 88 A.D.3d 622 (1st Dep't 2011) ("[A]n omission does not

constitute fraud unless there is a fiduciary or special relationship between the parties.").

 Tri-State has not alleged, either in its counterclaim or in its opposition to summary

judgment, that a fiduciary relationship existed between Tri-State and Point 4, such that Point 4

had a duty to disclose the fact that any transfer of UniBasic had to be authorized by DCI.

Whether Point 4 had a duty to disclose based on a partial statement is a closer question.  Point

4's Genesys License allows Tri-State to use Genesys on "any one computer," Genesys License,

DE #283-3, from which Tri-State conceivably could have inferred that the UniBasic License

contained a similar term.  However, Tri-State claims that it did not receive a copy of the

Genesys License until more than a month after the 1999 Agreement was executed.  See Tri-

State 56.1 ¶ 12. Therefore, Tri-State's decision to enter into the 1999 Agreement could not

have been based on any such "partial" statement.  Tri-State's opposition to Point 4's motion

thus identifies no evidence -- testimonial or otherwise -- to establish that it reasonably relied on

74

this omission or that this omission was material.  Hence, Tri-State has not established the elements of its fraudulent inducement counterclaim.

In any event, no reason appears why Tri-State could not have requested copies of the licenses prior to executing the 1999 Agreement, as specifically contemplated in section 2.  See 1999 Agreement § 2 ("Point 4 agrees to sell, furnish and install . . . licenses or sublicenses required to use any of the software programs[.]"), DE #309-1; id. at 15 (referencing UniBasic License); see also Amusement Indus., Inc. v. Buchanan Ingersoll & Rooney, P.C., Civ. No. 11 4416(LAK), 2013 WL 628533, at *12 (S.D.N.Y. Feb. 15, 2013) ("Reasonable reliance does not require due diligence, but the plaintiff must show minimal diligence or care that negates its own recklessness.") (internal quotations and citations omitted).

Therefore, the Court recommends that summary judgment be granted in favor of Point 4 dismissing Tri-State's fraudulent inducement counterclaim.

## VII.   Tri-State's Counterclaim for Indemnification from Point 4

In its fourth counterclaim, Tri-State alleges that "[i]n the event that DCI recovers judgment in any amount, Tri-State is entitled to full indemnification from Point 4."  Am. Counterclaims ¶ 43, DE #42.  According to that counterclaim, the 1999 Agreement contains a provision pursuant to which Point 4 "agreed to indemnify and hold Tri-State harmless" from any liability arising out of any third-party claims relating to the Software.  Id. ¶ 42.  Point 4 moves for summary judgment dismissing that counterclaim, on the ground that the contractual provision, by its terms, does not provide for indemnification of Tri-State for any claims by DCI.  See Pl. SJ Opp. at 59-60, DE #279.  Point 4's reading of the 1999 Agreement is correct.

Section 26 of the 1999 Agreement, which contains the indemnity provision on which

Tri-State apparently relies, clearly defines and limits the circumstances under which Point 4's

duty to indemnify (and defend) arises; the preliminary portion of section 26 provides in relevant

part that:

> In the event Tri-State becomes aware of *any claims by any third parties* of an
> infringement of any copyright, patent, trademark, trade secret or other
> proprietary rights *by the Software licensed hereunder*, Tri-State agrees to notify
> Point 4 of such claims of infringement within five (5) days of its becoming aware
> of same.

1999 Agreement § 26, DE #309-1 (emphasis added).  Thus, in accordance with the

unambiguous contractual language, the duty to indemnify applies where Tri-State learns that a

*third party* has asserted a claim that the Software (i.e., Genesys or UniBasic) unlawfully

infringes that third party's rights.  See Pl. SJ Opp. at 59-60, DE #279.  Suffice it to say, DCI's

claims against Tri-State do not allege that the Software (including DCI's UniBasic) violates

DCI's or Point 4's rights.

Ignoring the plain meaning of the provision, Tri-State instead complains that plaintiffs

were contractually obligated to help Tri-State fix the Recurring Problem.  See Tri-State Reply &

Opp. at 60-61, DE #266.  Tri-State does not explain how these contractual obligations somehow

expand the 1999 Agreement's limited indemnification clause.  Accordingly, the Court

recommends granting summary judgment dismissing Tri-State's counterclaim for

indemnification against Point 4.

## VIII.   Tri-State's Contribution Counterclaim Against Point 4

In a separate counterclaim for contribution against Point 4, Tri-State blames Point 4 for

any injury sustained by DCI, and asserts a common law right of contribution from Point 4, see

Am. Counterclaims ¶ 47, DE #42, based on Point 4's failure to disclose that the UniBasic

76

License required Tri-State to obtain advance authorization from DCI to transfer the Software to a new server.  See id. ¶ 46 ("Point 4's failure to disclose this information and misleading Tri-State about the scope of the [UniBasic license] that Tri-State was acquiring under the 1999 Agreement caused DCI's injury.").

Point 4 moves to dismiss Tri-State's contribution claim on several grounds.  First, to the extent that DCI obtains a judgment against Tri-State for its wrongful acts, Tri-State's liability would be predicated on misconduct for which Point 4 plainly would not share any culpability.  See Pl. SJ Opp. at 61, DE #279; Pl. Reply at 38-39, DE #285.  While Point 4's first argument has logical appeal, the Court need not predicate dismissal of the counterclaim on that basis. Point 4's alternative legal challenge to the contribution counterclaim provides an independent ground on which to dismiss.  See Pl. SJ Opp. at 61, DE #279.  "Under New York law[,] there is no right of contribution between parties whose potential liability to a third party is for economic loss resulting only from breach of contract."  In re Crazy Eddie Secs. Litig., 802 F.Supp. 804, 815 (E.D.N.Y. 1992) (citing Bd. of Educ. v. Sargent Webster, Crenshaw & Folley, 71 N.Y.2d 21 (1987)).  Tri-State, in citing Point 4's various alleged breaches of the 1999 Agreement, ignores the fact that to support a claim for contribution, the duty that was breached must be independent of the contract.  See Tri-State Reply & Opp. at 60-61, DE #266.

Here, Tri-State has failed to identify any duty that was owed by Point 4 independent of the 1999 Agreement.  This is fatal to Tri-State's claim for contribution.  See, e.g., BNP Paribas Mortg. Corp. v. Bank of Am., N.A., 866 F.Supp.2d 257, 265 (S.D.N.Y. 2012); Lubell v. Stonegate at Ardsley Home Owners Ass'n, Inc., 915 N.Y.S.2d 103, 105 (2d Dep't 2010) (affirming summary judgment dismissing contribution claim where the party asserting that claim

77

failed to show that the party from whom contribution was sought "owed it a duty of reasonable care independent of [the latter party's] contractual obligations") (citation and internal quotations omitted).

Therefore, the Court recommends that the District Court grant summary judgment in favor of Point 4, dismissing Tri-State's contribution counterclaim, along with Tri-State's other counterclaims against Point 4.

## CONCLUSION

For the reasons detailed above, this Court grants, in substantial part, Tri-State's motion to preclude the Burden and Chadwick SJ Declarations.

In addition, the undersigned magistrate judge respectfully recommends that the District Court: (1) grant summary judgment in favor of Tri-State dismissing plaintiffs' DMCA  and Lanham Act claims, as well as their state law claims for unjust enrichment and unfair competition, and correspondingly deny plaintiffs' cross-motion for summary judgment with respect to their DMCA claim; (2) deny Tri-State's motion for summary judgment with respect to plaintiffs' breach of contract claims, and correspondingly deny plaintiffs' cross-motion for summary judgment as to liability on those claims; (3) deny as moot Tri-State's motion for summary judgment on damages with respect to the Genesys Source Code Fee and Unrestricted User Fees in connection with plaintiffs' breach of contract claims; (4) deny Tri-State's motion for summary judgment with respect to its affirmative defenses of laches, unclean hands and failure to mitigate, and grant plaintiffs' cross-motion for summary judgment striking these defenses; and (5) grant plaintiffs' cross-motion for summary judgment dismissing Tri-State's counterclaims for breach of contract, breach of the implied covenant of good faith and fair

dealing, fraudulent inducement, indemnification and contribution.  The only claims remaining in the case would be plaintiffs' respective breach of contract claims against Tri-State.

Any objections to the recommendations contained in this Report and Recommendation must be filed with the Honorable Carol B. Amon on or before August 19, 2013.  Failure to file objections in a timely manner may waive a right to appeal the District Court order.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72; Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED.**

**Dated:**   **Brooklyn, New York**
**August 2, 2013**

/s/ *Roanne L. Mann*
**ROANNE L. MANN**
**UNITED STATES MAGISTRATE JUDGE**